```
               UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MICHIGAN
                     SOUTHERN DIVISION


_____

ROBERT L. DYKES #201541,

          Plaintiff,

     v.                              File No. 1:14-cv-01167

N. MARSHALL, ET AL.,

          Defendants.
_____/
```

```
                     Trial - Volume 2
Before

               THE HONORABLE RAY KENT
            United States Magistrate Judge
                   August 23, 2018

                       APPEARANCES
```

| | |
|---|---|
| In Pro Per: | Robert L. Dykes-Bey #201541<br>Oaks (MSP)<br>Oaks Correctional Facility<br>1500 Caberfae Hwy.<br>Manistee, MI  49660 |
| For the Defendant: | Michael Richard Dean<br>Michigan Department of Attorney General<br>Public Employment, Elections & Tort Div.<br>525 W. Ottawa Street<br>P.O. Box 30736<br>Lansing, MI  48909<br>(517) 373-6434<br>deanm2@michigan.gov |
| Recorded By: | Digitally Recorded |
| Courtroom Deputy: | S. Carpenter |
| Transcribed By: | Bonnie L. Rozema, CER-5571<br>(616) 878-9091<br>rozemab1@comcast.net |

TABLE OF CONTENTS

<u>WITNESSES FOR THE PLAINTIFF</u>:                    <u>PAGE</u>

None



<u>WITNESSES FOR THE DEFENDANT</u>:

None



<u>OTHER THINGS IN TRANSCRIPT</u>:

Closing Arguments

        By Mr. Dykes-Bey
        By Mr. Dean

Rebuttal Argument by Mr. Dykes-Bey

Jury Instructions

Verdict



<u>EXHIBITS</u>:                                       <u>IDENTIFIED</u>

None

1    Grand Rapids, Michigan

2    Thursday, August 23, 2018 - 9:09 a.m.

3                   THE COURT:  Good morning.

4                   MR. DYKES-BEY:  Good morning.

5                   MR. DEAN:  Good morning.

6                   THE COURT:  Everybody manage to get some sleep

7         last night?  I didn't, but hopefully you guys did, so --

8         but I never do.

9                   All right, so Stef tells me we're all set to go.

10        I'll bring -- we'll bring the jury in, I'll tell them we're

11        going to have -- hear final argument from each side, and

12        then let you gentlemen go.

13                  Did I set anything about time limit on --

14                  MR. DYKES-BEY:  No.

15                  THE COURT:  -- final -- okay.  So Mr. Dykes-Bey,

16        give me -- give me just a ballpark estimate of how long you

17        think you may go.

18                  MR. DYKES-BEY:  I don't know, maybe 20 minutes,

19        maybe.

20                  THE COURT:  Oh, that's fine.  No worries.  I was

21        afraid you were going to say like two and a half hours or

22        something.

23                  MR. DYKES-BEY:  No.

24                  THE COURT:  Then we were going to have a

25        problem.

```
 1                    MR. DYKES-BEY:  No.

 2                    THE COURT:  Twenty minutes, 30 minutes, you

 3          know, anything, you know, under 40 minutes --

 4                    MR. DYKES-BEY:  Yeah, I won't, no.

 5                    THE COURT:  Please, God, under 40 minutes,

 6          but --

 7                    MR. DYKES-BEY:  I don't want to bore people,

 8          yeah.

 9                    THE COURT:  Okay, all right.  It's wise.  You

10          know, people have limited attention spans.  Okay, well,

11          anything else we should talk about?  Mr. Dykes-Bey?

12                    MR. DYKES-BEY:  No.  No, sir.

13                    THE COURT:  Okay.  Mr. Dean?

14                    MR. DEAN:  No, your Honor.

15                    THE COURT:  All right, we'll get the jury.

16                    (At 9:12 a.m., jurors enter courtroom.)

17                    THE COURT:  Good morning.

18                    THE JURORS:  Good morning.

19                    THE COURT:  I asked Mr. Dykes-Bey and Mr. Dean

20          and Mrs. Kerr whether they managed to get any sleep last

21          night.  How about you folks?  Everybody get some shuteye?

22                    THE JURORS:  Yes.

23                    THE COURT:  Ready to go?

24                    THE JURORS:  (No verbal response.)

25                    THE COURT:  Well, we're in the home stretch now,
```

1          so momentarily I'll have Mr. Dykes-Bey and Mr. Dean come up

2          and do their closing arguments.  As I said yesterday,

3          Mr. Dykes-Bey will go first, Mr. Dean will go second, and

4          then Mr. Dykes-Bey has a chance to make a rebuttal

5          argument, if he chooses to.  Then I'm going to read you the

6          instructions.  You know, I apologize in advance, they're,

7          you know, kind of long, and I'm sure they're not the most

8          exciting thing you've ever heard.  But they are important,

9          so please listen carefully as I give them to you, because

10         they'll structure what you do when you go back to the jury

11         room.  And then it's in your hands, and we'll be out here

12         waiting patiently and somewhat anxiously, I'm sure, for

13         your results.

14                    So Mr. Dykes-Bey, closing argument.

15                    MR. DYKES-BEY:  Oh, yes, sir.

16                    I'd like the jury to know that I understand that

17         this is a lengthy process and that the fate, you know, lies

18         with you.  I have the biggest burden, you know, between the

19         two, and I must admit, while it appear to be simple, it's

20         not.  But I'm confident that after you review the evidence

21         you'll find that there's enough evidence to establish each

22         element of my claim.

23                    As to the first claim, absent of any testimony

24         that you heard yesterday, just the evidence, I'm confident

25         that you will find that the evidence shows that I was

—5—

1     engaged in federally protected conduct when I filed the

2     legitimate grievances against food service staff, who were,

3     according to the evidence, retaliating against me in their

4     efforts to have me terminated from my job assignment.

5     Again, you will review independently that evidence.

6             As to the second prong, absent of any testimony

7     that you heard yesterday, the evidence shows that the

8     defendant took an adverse action against me when she

9     falsified the program classification report by asserting

10    that I had received a misconduct on the job.  No, I did

11    not.  While the evidence shows that the defendant changed

12    her reasons for termination a few times, none of that means

13    anything, because none of those reasons is what got me

14    terminated.  What got me terminated was the false claim

15    that I had received a misconduct on the job.  That's what

16    got me terminated.

17            I don't want the jury to be, you know,

18    misdirected, you know, and going down this rabbit hole

19    about these other claims that were created to make me look

20    bad.  What's on that classification report is what got me

21    terminated from my job.  So that is the adverse action.

22            I will go on to the third prong.  As to the

23    third prong, the adverse action was taken on behalf of her

24    coworkers as it is the classification director -- the

25    classification director is the really the head of all the

1    supervisors.  They all have to go to the classification

2    director to have somebody terminated from their job.

3              The food service staff were trying to terminate

4    me, which the evidence will show were false claims and

5    misconducts, but they failed in their attempts.  But it was

6    the fabrication of food service North that the defendant

7    now claims, yesterday, according to her testimony, was her

8    reason for termination, the only supervisor she testified

9    yesterday to knowing.  Coincidence, or an unintentional

10   fact discovery during trial yesterday?

11             So I would like to ask you just to, you know,

12   allow the evidence to speak to you.  You know, testimony is

13   fine, but I believe that the evidence is more solid than

14   anything that a person have to say.  And I rest with that.

15   Thank you.

16             THE COURT:  All right, Mr. Dykes-Bey.  Thank

17   you.  Mr. Dean?

18             MR. DEAN:  Good morning.  Once again I want to

19   thank you for your time, and I'm glad this trial ended up

20   being fairly short.  But there's a couple of key points

21   that need to be brought out here in terms of this

22   retaliation claim.  First, the only element that's really

23   at issue here is the third element.  Was the firing from

24   his work assignment causally connected to the grievances

25   that Mr. Dykes-Bey wrote against food service staff.

1    There's been absolutely no documentary evidence presented

2    by plaintiff that there's a connection, and the only

3    testimony that he gave was that she was working on behalf

4    of her long-time coworkers.

5         Now, I will admit, Mr. Dykes-Bey sounds very

6    convincing.  He's absolutely certain he's right, until he's

7    presented with facts that shows he wrong, and then he

8    blithely continues on.  He insisted that the connection

9    between Ms. Kerr and Stephen Jones was that they worked

10   together for a long time at Riverside Correctional

11   Facility.  You remember he testified to that.  I even asked

12   him on cross-examination, "Are you sure that these two knew

13   each other from Riverside?"  "Yup.  Absolutely sure."  And

14   when Nancy got up on the stand, you heard her testify, she

15   never worked at Riverside.  There is absolutely no

16   connection between her and Officer Jones.  They work in

17   different parts of the building, there's no ongoing

18   communication between the two.  Nancy even said he could

19   have passed by her on the street and she wouldn't even know

20   who he is.  There's no connection that she was assisting

21   these other officers in his claim that they were

22   retaliating against him.

23        In terms of director, food service director

24   North, she said she met him one time at a -- at a manager's

25   meeting, and that's the only connection she had with this

-8-

1    individual.  The people that he really wants to sue are

2    Officer Jones and Meadows and North, but they're not here,

3    so he has to connect this retaliation claim to somebody who

4    had nothing to do with anything, other than taking their

5    reports and saying, "We've got to get this guy out of the

6    cafeteria."

7            And I thought the most interesting exchange

8    yesterday was during cross-examination of Mr. Dykes-Bey,

9    and we went through this long back-and-forth about what

10   constitutes a legal agreement between two prisoners.  He

11   said he is very legally savvy, that he does a lot of legal

12   work for other prisoners, and yet he tried to characterize

13   this agreement with him and prisoner Johnson as Johnson was

14   just reaching out to him, and out of the goodness of his

15   heart and giving him coffee bags.  But if you look at the

16   exhibit, that note that Mr. Dykes-Bey does not deny that he

17   gave and tried to pass on to this prisoner, it's very

18   specific that there was an agreement for work he did for

19   the prosecutor for this other prisoner.  And if you look at

20   it, this wasn't an agreement out of the goodness of

21   Johnson's heart.  He was telling him emphatically, "I need

22   that coffee ASAP.  I looked out for you, now you've got to

23   look out for me."  And he gave explicit instructions of how

24   he wanted this hand-off to happen in the food service area.

25            And you saw the exhibit that talked about the

1        lay-in notice.  There was a real concern on the part of

2        prison officials that there was a legal agreement, against

3        the rules, which Mr. Dykes-Bey admitted, and that this

4        agreement could constitute extortion between one prisoner

5        and another.  You heard Nancy Kerr testify that, look, it's

6        a problem to have these people have these agreements

7        outside of the scope of the MDOC because of the potential

8        for harm that could result.  If somebody doesn't pay up, he

9        can get somebody to attack this prisoner, or they have a

10       disagreement and it ends up being a fight that draws in

11       either corrections officers or other prisoners.  There's a

12       very real reason to get him out of the cafeteria.

13              But the problem is is that Mr. Dykes-Bey doesn't

14       want to be held accountable for his own actions and

15       wrongdoing that started all this.  Instead, he wants to

16       shift the blame on everyone else and say, "You didn't

17       follow procedure.  Look at this policy directive.  You

18       didn't give me a 30 day conditional notice, and you can't

19       fire me."  But he's got it all wrong.  The safety and

20       security of the institution is paramount.  He could -- they

21       could break every policy directive that they set up all day

22       long and it's not a Constitutional violation because he

23       doesn't have a Constitutional right to a job in the prison.

24       What he has is the Constitutional right not to be

25       retaliated against.  And there's no connection.

1              There's this thing I like to call the Scooby-Doo

2        confession.  It's when a prisoner has no other connection

3        between the officer that he's accusing of retaliation and

4        the act that he claims was his grievances that he was

5        retaliated against, he magically has a conversation with

6        the defendant in which the defendant says, "I know all

7        about your grievances, and we're going to take care of you

8        by terminating you from the job."

9              In the Scooby-Doo cartoons every Saturday

10       morning they would investigate a crime, and at the end of

11       the episode, the bad guy would always say, "Yup, I did it,

12       and darn it, I would have gotten away with it if it weren't

13       for you meddling kids."  But I always wondered as a kid,

14       why would the villain just spill his guts and tell them

15       that, "Yes, I'm retaliating against you because of this."

16       Well, the truth is, and this is common sense, nobody talks

17       like that.  Nancy Kerr was working in a different part of

18       the prison and had no daily connection with the officers

19       that he really wants to sue.  Let's be honest here, he

20       wants to go after North and he wants to smear Officer Jones

21       and Meadows and blame them that they had a planned

22       retaliation, but the only person left here is Nancy Kerr.

23       So to get that connection, he had to say he heard her say

24       to him, "Well, I'm doing this because of all these

25       grievances you wrote."  But why?  These grievances never

—11—

1       impacted her job.  They weren't even grievances against

2       her.  They were against someone else.  Mr. Dykes-Bey

3       couldn't show that any of his grievances resulted in

4       terminations for any of these other officers, so why would

5       she need to protect them?  She has the entire prison and

6       every employee and prison employee that she's working on

7       making assignments.  Why would she care about stopping a

8       couple of grievances against officers that she doesn't even

9       really work with on a day-to-day basis?  And remember,

10      that's literally the only connection between these other

11      officers and Nancy Kerr, was he claims that she was

12      furthering their conspiracy to retaliate against him.

13              The bottom line is, after the first three

14      elements of this retaliation claim, if he could even

15      establish that there was some connection, then the onus

16      comes on the defendant the burden to prove that she would

17      have taken the same action anyway.  And if you'll recall in

18      Exhibit number 12, this was the e-mails, it's in the

19      exhibit book, the e-mails between Barb Slovisky and Nancy

20      Kerr.  Barb Slovisky was somebody working in the central

21      office.  She sent an e-mail to Nancy wanting to know the

22      circumstances of the termination.  And all she was worried

23      about was the 363s and the 175s, that they weren't there in

24      the paperwork.

25              Well, having worked in state government for the

1    last ten years, I can say that is spoken like a true

2    bureaucrat.  Barb Slovisky did not accuse Nancy Kerr of

3    lying.  All she was concerned about was this piece of

4    paperwork and that piece of paperwork wasn't in there, so

5    she didn't understand why he was terminated.  Read that

6    e-mail, and read the e-mail exchange and responses from

7    Nancy.  She explains exactly why she had to let

8    Mr. Dykes-Bey go, and there was no implication on the part

9    of Barb Slovisky that she didn't believe her.  In fact she

10   said, "Yeah, I'm sure he did do everything that was

11   contained in there.  I just need the 363s and the 175s."

12          Not following the bureaucratic procedure of

13   every piece of paperwork does not mean that the person had

14   a motivation to lie.  In fact, as she put everything, she

15   explained what she did with that report.  She stapled it

16   with the lay-in notice and the memorandum that he was being

17   on unemployable status, and it was stapled together.  That

18   little box on that form only contained so much room.

19          He keeps mentioning the misconduct that's

20   typewritten on there, but Nancy already explained to the

21   jury, and she explained in the e-mail to Barb Slovisky,

22   that that was from a previous facility.  That line that's

23   typewritten on Exhibit 12 is not the reason why he was let

24   go.  It was because of the fact that he had a legal

25   agreement with another prisoner and is trying to sneak

1    behind everyone's back to get this payment back and forth.

2    These legal agreements are dangerous, and if you look at

3    the note, of course the note isn't going to say "pay me or

4    else," but the implication is obviously there.  He said,

5    "Pay me as soon as possible.  I looked after you, now

6    you've got to look after me."  In the prison world, he's

7    not going to put his name to an actual explicit threat.

8    He's going to say something like that was in the note to

9    remind this prisoner that you have a debt to me, and I

10   expect you to pay it back.  And in prison where you have

11   people that are aggressively violent, that's the type of

12   thing that needs to be stopped by the MDOC to protect their

13   officers and other prisoners.

14          I told you yesterday at the end of the day

15   you're going to use your common sense, and the biggest

16   question, and I'm almost done here, and this is the last

17   time I have to speak to you, and in a moment when

18   Mr. Dykes-Bey gets up here he'll have a couple minutes to

19   rebut, but I would ask that he needs to answer that

20   question.  What was the motivation on Nancy Kerr's part to

21   falsify a report to get him fired when she had all the

22   reason in the world to let him go because of the note they

23   intercepted?  Why would she need to go through all the

24   subterfuge in order to protect him from filing or retaliate

25   for filing grievances against officers she doesn't even

—14—

1    work with.  That's the question that he needs to answer,

2    and I don't think that he can, other than his claim that

3    she told him, "I know about your grievances."  That's no

4    connection at all.

5            She did her job to get him out of the kitchen

6    because he was running an enterprise that could have gotten

7    people hurt.  Thank you.

8            THE COURT:  All right, Mr. Dean, thank you.

9            Mr. Dykes-Bey, rebuttal?

10           MR. DYKES-BEY:  Yeah.  Yes.  Yes, sir, thank

11   you.

12           Well, you know, that does sound, you know,

13   pretty decent.  The fact of the matter remains, a crafty

14   explanation as to what another person is doing.  If you

15   believe that, then surely you would assert that according

16   to the due process -- no, hey, I've got to say this to the

17   jury.  No matter what or how crafty the MDOC get, a

18   prisoner still has a due process.  Whether a person want to

19   believe it or not, and a lot of people don't.  They believe

20   you give up your rights once you come to prison, but that's

21   not true.  A person is still entitled to a due process.

22   And if you're doing something right, you don't make two or

23   three different versions of a story as you go along, you

24   make two, three different versions.  If what you believe is

25   true, then you assert that on the hearing report.  That's

—15—

1    what that is, an administrative hearing.  You assert that

2    on there as your reason.  You don't later on say, well, I

3    terminated this man because of this and then you come up

4    with this colorful explanation how somebody could get hurt

5    and all.  Hey, man, that's all backwash stuff.  That stuff

6    is not true.  It's all colored to make this individual such

7    as myself look bad as if, you know, this is something that

8    I'm actually doing.  If that was your reason for

9    termination, and you believed that, then you should have

10   put it on there.  But that was not on there.

11          And this hypothetical explanation that somehow

12   somebody else asserted the false claim about the

13   misconduct, the classification director is the sole

14   purpose -- is the sole person, excuse me, in that office.

15   No one else have access to an office, so no one else could

16   go in there and sneak in there just pull my file and just

17   type something on there.  It don't work like that.  That's

18   her office, she got the only key to it.  And so for the

19   defendant to make some claim that, you know, mysteriously

20   somehow somebody else put that on the hearing report,

21   that's -- that's false, and it's designed to, like I say,

22   pull you away from the actual facts.

23          The actual fact is, these are her coworkers.

24   Most officers stick together.  That's just the way it go.

25   And she did inform me that, "Because of the conflict that

1       you're having in food service," you'll read the grievances

2       yourself, I wrote a number of them, "I'm terminating you

3       from food service to alleviate the problem."  That's normal

4       behavior in prison.

5               If an officer believe that you having a conflict

6       in a particular area where other officers, they'll remove

7       you from that.  And if they can't do it legitimately,

8       they'll do it illegally, as she did by falsifying that

9       report, claiming that I caught a misconduct, knowing I

10      didn't.  Then when she was confronted about it, she said

11      oh, well, it's for various reasons.  Then when the people

12      in Lansing asked her about it, she came up with something

13      else.  Now we here today, now it's, "Well, you were doing

14      legal work for people.  You could have put somebody else

15      life in danger."

16              That's not -- don't none of that stuff mean

17      nothing, because that's not what you put on that

18      classification report.  That's not on there.  And the

19      defense would like for you to believe that somehow you can

20      bypass that, but that's how we got here in the first place,

21      people not following the policy and procedure, because they

22      don't believe prisoners have rights in the first place.

23      That's why I agree with the judicial system.

24              1983, they bless us and give us the opportunity

25      to bring our claims to this court, and it's a hard road to

1   get to.  You just don't get in here.  Everybody can't get

2   in here.  It's a hard road to get here.  A lot of people

3   get knocked out the box at the screening process.  This is

4   a hard road.  You won't see many prisoners sitting in that

5   seat there, trust me.  So I got to have some form of a

6   claim.  And I'm explaining to you people today that if you

7   just review the evidence, you ain't got to listen to what I

8   say, you don't have to listen to what nobody else's

9   testimony is, if you just review the evidence itself, you

10  will see that I have met each element of the claim.  Thank

11  you.

12          THE COURT:  All right, thank you, Mr. Dykes-Bey.

13          Ladies and gentlemen, you've now heard all the

14  evidence in the case, you've heard closing arguments from

15  the parties.  It's now my responsibility to give you the

16  law that you'll apply in deciding this case.

17          I'll start by explaining your duties and the

18  general rules that apply in every civil case, then I'll

19  explain the elements of the claim made by Mr. Dykes-Bey,

20  then I'll explain some rules that you must use in

21  evaluating the evidence.  Please listen very carefully to

22  everything I say.

23          Under the First Amendment to the United States

24  Constitution, individuals have a right to petition the

25  government for a redress of grievances.  Mr. Dykes-Bey was

—18—

1     an inmate at the Michigan Reformatory in Ionia, Michigan.

2     In this case, a prisoner, such as Mr. Dykes-Bey, retains

3     his First Amendment right to file grievances against prison

4     officials.

5          Mr. Dykes-Bey claims that defendant Marshall,

6     Mrs. Kerr, a prison official at the Michigan Reformatory,

7     denied his first amendment rights by retaliating against

8     him.  Defendant Marshall, Mrs. Kerr, denies that she

9     deprived him of his First Amendment rights for filing

10    grievances.

11         You have two main duties as jurors.  The

12    first -- the first one is to decide what the facts are from

13    the evidence that you've seen or heard here in court.

14    Deciding what the facts are is your job, not mine, and

15    nothing that I have said or done during this trial was

16    meant to influence your decision about the facts in any

17    way.

18         Your second duty is to take the law that I give

19    you, apply it to the facts, and decide what claims, if any,

20    plaintiff, Mr. Dykes-Bey, has proved by a preponderance of

21    the evidence.

22         It is my job to instruct you about the law, and

23    you are bound by the oath you took at the beginning of the

24    trial to follow the instructions that I give you, even if

25    you personally disagree with them.  This includes the

1    instructions that I gave you before and during the trial,

2    and these instructions. All the instructions are

3    important, and you should consider them together as a

4    whole.

5         Mr. Dykes-Bey and Mr. Dean have talked about the

6    law during their arguments, but if whey that said is

7    different from what I say, you must follow what I say.

8    What I say about the law controls. Perform these duties

9    fairly. Do not let any bias, sympathy, or prejudice you

10   may feel toward one side or the other influence your

11   decision in any way.

12        You must make your decision based only on the

13   evidence that you saw and heard here in court. Do not let

14   rumor, suspicions, or anything else that you may have seen

15   or heard outside of court influence your decision in any

16   way.

17        The evidence in this case includes only what the

18   two witnesses said while they were testifying under oath,

19   the exhibits that I allowed into evidence which are

20   contained in the evidence book, the exhibit book you'll

21   receive, and the stipulations the lawyers -- the parties

22   agreed to, nothing else is evidence. The statements and

23   arguments by Mr. Dykes-Bey and Mr. Dean are not evidence,

24   their questions and objections are not evidence. My legal

25   rulings are not evidence, and my comments and my questions

1      are not evidence.

2              During the trial I did not let you hear the

3      answer to some questions which were asked and sometimes --

4      oh, I don't think I ordered you to disregard anything, but

5      we do have a stipulation that some of the exhibits can be

6      considered only for a limited purpose, which I read to you.

7      Things that are not in evidence, however, must not

8      influence your decision in any way.  Make your decision

9      based only on the evidence as I have defined it here, and

10     nothing else.

11             You should use your commonsense in weighing the

12     evidence.  Consider it in light of your everyday experience

13     with people and events, and give it whatever weight you

14     believe it deserves.  If your experience tells you that

15     certain evidence reasonably leads to a conclusion, you're

16     free to reach that conclusion.  Unless and until outweighed

17     by evidence in the case to the contrary, you may find that

18     official duty has been regularly performed, that private

19     transactions have been fair and regular, and that the

20     ordinary course of business or employment has been

21     followed, that things have happened according to the

22     ordinary course of nature and the ordinary habits of life,

23     and that the law has been obeyed.

24             Now some of you have heard the terms "direct

25     evidence" and "circumstantial evidence."  Direct evidence

1      is simply evidence, like the testimony of an eyewitness,

2      which if you believe it, directly proves a fact.  If a

3      witness testified that it's raining outside, and you

4      believed the witness, that would be direct evidence that it

5      was raining.  Circumstantial evidence is simply a chain of

6      circumstances that indirectly proves a fact.  If someone

7      walked into the courtroom wearing a raincoat covered with

8      drops of water and carrying a wet umbrella, that would be

9      circumstantial evidence from which you could conclude that

10     it was raining.

11          It's your job to decide how much weight to give

12     the direct and circumstantial evidence.  The law makes no

13     distinction between the weight that you should give to

14     either one or the other, or nor does it say that one is any

15     better evidence than the other.  You should consider all

16     the evidence, both direct and circumstantial, and give it

17     whatever weight you believe it deserves.

18          Another part of your duties as jurors is to

19     decide how credible or believable each witness was.  This

20     is your duty, not mine.  It's up to you to decide if a

21     witness's testimony was believable, and how much weight you

22     think it deserves.  You are to -- you are free to believe

23     everything that a witness said, only part of it, or none of

24     it at all.  But you should act reasonably and carefully in

25     making these decisions.  Let me suggest some things for you

1        to consider in evaluating each witness's testimony.

2                Ask yourself if the witness was able to clearly

3        see or hear the events.  Sometimes even an honest witness

4        may not have been able to see or hear what was happening,

5        and may make a mistake.  Ask yourself how good the

6        witness's memory seemed to be.  Did the witness seem able

7        to accurately remember what happened?  Ask yourself if

8        there was anything else that may have interfered with the

9        witness's ability to perceive or remember the events.  Ask

10       yourself how the witness acted while testifying.  Did the

11       witness appear to be honest, or did the witness appear to

12       be lying.  Ask yourself if the witness had any relationship

13       to a party, which really doesn't apply here because the

14       only witnesses are the parties.  So ask yourself whether

15       the witness had anything to gain or lose that might

16       influence the witness's testimony.  Ask yourself if the

17       witness testified inconsistently while on the witness

18       stand, or if the witness said or did something or failed to

19       say or do something at any other time that is inconsistent

20       with what the witness said while testifying.

21               If you believe that a witness was inconsistent,

22       ask yourself if this makes the witness's testimony less

23       believable.  Sometimes it may, other times it may not.

24       Consider whether the inconsistency was about something

25       important or about some unimportant detail.  Ask yourself

—23—

1     if it seemed like an innocent mistake or if it seemed

2     deliberate.  And ask yourself how believable the witness's

3     testimony was in light of all the other evidence.  Was the

4     witness's testimony supported or contradicted by other

5     evidence that you found believable.

6          If you believe that a witness's testimony was

7     contradicted by other evidence, remember that people

8     sometimes forget things, and that even two honest people

9     who witnessed the same event may not describe it in exactly

10    the same way.

11          These are only some of the things you may

12    consider in deciding how believable each witness was.  You

13    may also consider other things you think shed some light on

14    a witness's believability.  Use your commonsense and your

15    everyday experience in dealing with people, and then decide

16    what testimony you believe and how much weight you think it

17    deserves.

18          Do not make any decision based only on the

19    number of witnesses who testified or the quantity of

20    evidence presented.  What is more important is how

21    believable the witnesses were, and how much weight you

22    think their testimony deserves, and which evidence appears

23    to your minds as being the most accurate and otherwise

24    trustworthy.

25          No party must call as witnesses all persons who

1   may have been present at any time or place involved in the

2   case, or who may appear to have some knowledge of the

3   matters at issue in this trial.  Nor does the law require

4   any party to produce as exhibits all papers and things

5   mentioned in the evidence in the case.

6      The testimony of a single witness which produces

7   in your minds belief in the likelihood of truth is

8   sufficient for the proof of any fact and would justify a

9   verdict in accordance with such testimony.

10      Mr. Dykes-Bey and Mr. Dean objected to some of

11   the things that were said or done during the trial.  Do not

12   hold that against either side.  Mr. Dykes-Bey and Mr. Dean

13   had a duty to object when they thought that something not

14   permitted by the rules of evidence was happening.  These

15   rules are designed to make sure that both sides receive a

16   fair trial.

17      Do not interpret my rulings on those objections

18   as any indication of how I think the case should be

19   decided.  My rulings were based on the rules of evidence,

20   not on any opinion I might have about the case.  Remember

21   that your decision must be based only on the evidence that

22   you saw and heard here in court.

23      I want to emphasize that this trial is only on

24   the particular claim alleged in Mr. Dykes-Bey's complaint,

25   the claim that you've heard about during the course of this

1    trial.  Your job is limited to deciding whether

2    Mr. Dykes-Bey has proven that claim or not.

3            The burden on Mr. Dykes-Bey to prove the claim,

4    is to prove every essential element by a preponderance of

5    the evidence.  If the proofs should fail to establish any

6    essential element of the claim by a preponderance, you

7    should find for the defendant as to the claim.

8            To establish by a preponderance means to prove

9    that something is more likely so than not so.  In other

10   words, a preponderance of the evidence means such evidence

11   as when considered and compared with that opposed to it has

12   more convincing force and produces in your minds belief

13   that what is sought to be proved is more likely true than

14   not true.

15           If on any issue in the case the evidence is

16   equally balanced, you cannot find that the issue has been

17   proven by a preponderance of the evidence.  This rule does

18   not, of course, require proof to an absolute certainty.

19   Since proof to an absolute certainty is seldom possible in

20   any case.  Furthermore, it does not require proof beyond a

21   reasonable doubt.  Proof beyond a reasonable doubt is a

22   stricter and higher standard that applies only in criminal

23   cases.  It does not apply in civil cases such as this.

24           The elements of a first amendment retaliation

25   claim require that Mr. Dykes-Bey prove each of the

1    following three elements.  First, that his conduct was

2    protected by the First Amendment.  Now, that element has

3    been conceded by Mr. Dean, so you may consider that having

4    been proven already.  Second, that Mr. -- that the

5    defendant, Ms. Marshall, Ms. Kerr, took an adverse action

6    against Mr. Dykes-Bey.  And third, that Mrs. Kerr's adverse

7    action was motivated at least in part by Mr. Dykes-Bey --

8    Mr. Dykes-Bey's protected conduct.  I'll explain each of

9    these elements in greater detail in a moment.  If you find

10   that Mr. Dykes-Bey has proven each of these elements by a

11   preponderance of the evidence, your verdict should be for

12   him.

13           I'm going to not discuss the first element since

14   it's been conceded, so we'll go to the second element,

15   adverse action.  And adverse action is one that is capable

16   of deterring a person of ordinary firmness from pursuing

17   his First Amendment rights.  If you believe that plaintiff

18   has proven by a preponderance of the evidence that

19   defendant took action against plaintiff, that would deter a

20   person of ordinary firmness from filing grievances against

21   defendant, then defendant has taken an adverse action

22   against the plaintiff.

23           Plaintiff also has the burden of establishing by

24   a preponderance that his protected conduct was a motivating

25   factor in the defendant's adverse action.  This does not

—27—

1    mean that plaintiff's protective conduct must be the only

2    factor that motivated the defendant's adverse action.

3           In this case plaintiff must establish that

4    defendant was motivated to take adverse action against

5    plaintiff at least in part because he filed grievances

6    against other prison officials.  In considering whether

7    plaintiff's protected conduct was a motivating factor in

8    defendant's adverse action, you may consider such factors

9    as defendant's statements, as well as the length of time

10   between plaintiff's protected conduct and defendant's

11   alleged adverse action.

12          If plaintiff shows that his protected conduct

13   was a motivating factor in the defendant's actions, the

14   defendant then bears the burden of establishing, also by a

15   preponderance of the evidence, that she would have taken

16   the same action, even if plaintiff had not engaged in the

17   protected activity or conduct.  If you find either that

18   plaintiff has failed to prove by a preponderance all of the

19   things required of him, or that defendant has shown by a

20   preponderance that she would have taken the same action

21   even without the protected activity, your verdict will be

22   for the defendant.

23          An injury or damage is proximately caused by an

24   act or a failure to act whenever it appears from the

25   evidence in the case that the act or omission played a

1    substantial part in bringing about or actually causing

2    injury or damage, and that the injury or damage was either

3    a direct result or a reasonably probable consequence of the

4    act or omission.  That means there must have been a

5    connection between the defendant's actions and the

6    plaintiff's injury.  And second, that the occurrence which

7    has claimed to have produced the injury was a natural and

8    probable result of defendant's conduct.

9          If the plaintiff has proven a claim against the

10    defendant by a preponderance of the evidence, you must

11    determine the damages to which the plaintiff is entitled.

12    You should not interpret the fact that I'm giving

13    instructions about the plaintiff's damages as an indication

14    that I believe the plaintiff should or should not win the

15    case.  It is your task first to decide whether the

16    defendant is liable.

17          I'm instructing you on damages only so that you

18    will have guidance in the event you decide that the

19    defendant is liable and that plaintiff is entitled to

20    recover money from defendant.

21          Damages must be reasonable.  If you should find

22    that the plaintiff is entitled to a verdict, you may award

23    the plaintiff only such damages as will reasonably

24    compensate the plaintiff for such injury and damage as you

25    find from a preponderance of the evidence was sustained as

1        a proximate result of defendant's acts or omissions.

2                Compensatory damages are not restricted to the

3        actual loss of time or money.  They cover both the mental

4        and physical aspects of injury, tangible and intangible.

5        They are an attempt to restore the plaintiff, that is make

6        the plaintiff whole, or as the plaintiff was immediately

7        prior to the injuries.  You are not permitted to award

8        speculative damages, so you are not to include in your

9        verdict compensation for any prospective loss, which,

10       although possible, is not reasonably certain to occur in

11       the future.

12               If you return a verdict in the plaintiff's favor

13       on his claims but find that he failed to meet his burden of

14       proving that he suffered actual damages, then you must

15       award the plaintiff nominal damages, not to exceed one

16       dollar.  Nominal damages are the law's way of recognizing

17       that Constitutional rights must be scrupulously observed,

18       even when Constitutional violations have not been shown to

19       have caused actual injury.

20               In addition to the damages mentioned in the

21       other instructions, the law permits you to award an injured

22       person punitive damages under certain circumstances.  In

23       order to punish the defendant for extraordinary misconduct

24       and to serve as an example or warning to others not to

25       engage in such conduct.  If you find in favor of the

1    plaintiff and against the defendant, then you may, but are

2    not required to, award the plaintiff an amount as punitive

3    damages, if you find it is appropriate to punish the

4    defendant or to deter the defendant and others from like

5    conduct in the future.  Whether to award the plaintiff

6    punitive damages and the amount of those damages is within

7    your sound discretion.

8         If you decide the plaintiff has suffered

9    damages, then you should award plaintiff the amount of

10   interest which you find will fairly compensate the

11   plaintiff for loss of use of the plaintiff's funds.  If you

12   decide to award interest, the interest should begin to run

13   on the date when plaintiff's total damages became

14   ascertainable, which would be November 12, 2014.  The

15   interest should run from that day through today's date, and

16   the interest rate shall be 2.622 percent.

17        That concludes the part of my instructions

18   containing the elements of the claim made by plaintiff and

19   how to calculate the damages if you find that damages

20   should be awarded.  Next I'll explain some rules you must

21   use in considering some of the testimony and the evidence.

22   The parties have agreed to certain stipulations of fact.  I

23   have read those to you.  You should treat those facts as

24   having been proved.

25        Some of the exhibits have been admitted for a

1    limited purpose.  I read the stipulation concerning those

2    exhibits and the limit purpose to you during the course of

3    the trial.

4         Impeachment by inconsistent statement.  A

5    witness may be discredited or impeached by contradictory

6    evidence by showing that he or she testified falsely

7    concerning a material matter, or by evidence that at some

8    other time the witness has said or done something or failed

9    to say or do something which is inconsistent with the

10   witness's present testimony.  If you believe any witness

11   has been so impeached, then it is your exclusive province

12   to give the testimony of that witness such credibility or

13   weight, if any, as you may think it deserves.

14        Now, let me conclude by explaining some things

15   about your deliberations in the jury room and your possible

16   verdicts.  The first thing you should do in the jury room

17   is choose someone to be your foreperson.  This person will

18   help guide your discussions and will speak for you here in

19   court.  Once you start deliberating, do not talk to the

20   jury officer or to me or to anyone else, except each other,

21   about the case.  If you have any question or message, you

22   must write it down on a piece of paper, sign it, and then

23   give it to the jury officer.  The officer will give the

24   message to me and I will respond as soon as I can.  I may

25   have to talk to Mr. Dykes-Bey and Mr. Dean about what you

1  have asked, so it may take me some time to get back to you.

2  Any question or message normally should be sent to me

3  through your foreperson.

4  You will be given the documents that were

5  admitted into evidence.  If you want to see any of the

6  exhibits that were admitted into evidence and which you do

7  not have, you may send me a message and those exhibits will

8  be provided to you.

9  One more thing about messages.  Do not ever

10  write down or tell anyone how you stand on your votes.  For

11  example, do not write down or tell anyone that you are

12  split or whatever your vote happens to be.  That should

13  stay secret until you are finished.

14  Remember you must make your decision based only

15  on the evidence you saw and heard here in court.  The

16  instructions I have given you throughout the trial also

17  apply to your deliberations.  Do not try to gather any

18  information about the case on your own.  Do not bring any

19  book, like a dictionary or anything else, to help you with

20  your deliberations.  Do not conduct any independent

21  research, reading, or investigation about the case.

22  In addition to not discussing the case with

23  anyone in person or on the telephone, you are not to use

24  electronic communications about this case with anyone until

25  you have reached your final conclusion in the case and you

1        are told that you can discuss the case under the conditions

2        that I will describe to you at that time.

3                It would violate your oath, for example, to try

4        to keep a family member, friend, or the media up-to-date

5        about what is happening during the trial or while you are

6        in the jury room.  For example, do not use e-mail or sites

7        such a Twitter to communicate about the case.  Such

8        communications, whether you intend so or not, would involve

9        people who are not jurors in possibly influencing you in

10       your decision at the conclusion of the trial.  These people

11       have not taken your oath to make a decision based solely on

12       the evidence that you hear in court.

13               Remember that both parties are entitled to a

14       fair trial by you, and you must follow the instructions as

15       to the law that I am giving you now, and that I gave you

16       throughout the trial.  Make your decisions based only on

17       the evidence that you saw and heard here in court.

18               Now that all the evidence is in and the

19       arguments are complete, you are free to talk about the case

20       in the jury room.  In fact it's your duty to talk with each

21       other about the evidence and to make every reasonable

22       effort you can to reach unanimous agreement.  You must

23       reach unanimous agreement.  The verdict must be unanimous.

24       Talk with each other, listen carefully and respectfully to

25       each other's views, and keep an open mind as you listen to

1      what your fellow jurors have to say.  Try your best to work

2      out differences.  Do not hesitate to change your mind if

3      you are convinced that other jurors are right and that your

4      original position was wrong.  Also be mindful that you each

5      may process information differently or have different

6      approaches to your deliberations.  For example, some of you

7      may need to think quietly, while others may want to openly

8      discuss their thoughts.  It may take more time for some of

9      you than for others to reach a decision.  Be patient and

10     considerate of each other's needs as you deliberate.

11             Try your best to work out your differences.  Do

12     not hesitate to change your mind if you are convinced that

13     other jurors are right and your original position was

14     wrong.  But do not ever change your mind just because other

15     jurors see things differently, or just to get the case over

16     with.  In the end your vote must be exactly that, your own

17     vote.  It is important for each of you to reach agreement,

18     but only if you can do so honestly and in good conscience.

19             No one will be allowed to hear your discussions

20     in the jury room, and no record will be made of what you

21     say.  You should all feel free to speak your minds.  Listen

22     carefully to what other jurors have to say, then decide for

23     yourself whether plaintiff's claims were proved by a

24     preponderance of the evidence.

25             I have prepared a verdict form for your use.  A

1    verdict form is simply the written notice of your decision.

2    Whatever decision you reach in this case must be the

3    unanimous decision of all of you.  When all of you agree

4    upon a verdict, it will be received as your verdict.  The

5    form is fairly short and simple and it says simply this:

6    "Regarding plaintiff's claim that defendant violated

7    plaintiff's rights under the First Amendment, we, the jury,

8    find in favor of" and then there's a line where you can

9    check "plaintiff" or a line where you can check

10   "defendant."

11           Go to damages only if you have found in favor of

12   plaintiff.  If your verdict was in favor of plaintiff,

13   state the amount of damages sustained by plaintiff.  And

14   then there are three lines, one each for compensatory, one

15   for nominal, and one for punitive damages.  Have the

16   verdict signed and dated by your foreperson, then ring the

17   doorbell.  Your foreperson should give a note to the

18   bailiff that you have reached a verdict.  Your foreperson

19   will deliver the verdict form to me in the courtroom.

20           When you answer one or all -- after the -- I'm

21   sorry.  After the verdict form is completed, we'll come

22   back into the courtroom and the parties will be informed of

23   your verdict.  Let me emphasize something I said earlier.

24   Nothing that I have said or done during this trial was

25   meant to influence your decision in any way.  You decide

1     for yourselves whether plaintiff's claims were proved by a

2     preponderance of the evidence.

3               That concludes the instructions.  I know in my

4     preliminary instructions I told you that I was going to

5     give you a written copy of these instructions to take with

6     you, however, as I have been reading the instructions, I

7     have been making changes which I thought were warranted

8     because of the evidence, the way the evidence came in in

9     the case, and other factors.  So I'm not going to give you

10    a written copy of the instructions and you should rely on

11    your collective memory of the instructions that I delivered

12    to you during the course of the trial and just now.

13              One other issue before I send you back to

14    deliberate.  We will be collecting all cellular devices.  I

15    think there's a basket, isn't there, Stef, right outside

16    the jury room?  So if you would be so kind as to deposit

17    your devices into that basket, I would greatly appreciate

18    it.  That concludes the instructions.  Stephanie, are we

19    good to go?

20              THE CLERK:  Have an oath.

21              THE COURT:  Okay.  Stephanie will now give you

22    an oath concerning your deliberations.

23              THE CLERK:  If you would stand and raise your

24    right hands, please.

25              Do you and each of you swear or affirm that you

—37—

1    will well and truly try and true deliverance make in the

2    case now on trial and render a true verdict according to

3    the law and the evidence, so help you God?

4                    THE JURORS:  We do.

5                    (At 10:03 a.m., jurors sworn.)

6                    THE CLERK:  Be seated.

7                    THE COURT:  I'm now going to have Mr. Dion and

8    Ms. Carpenter sworn as officers and put them in charge of

9    you during your deliberations, so if you would please both

10   raise your right hands.

11                   Do you swear or affirm to keep this jury

12   together and permit no one to communicate with them orally

13   or otherwise, nor to do so yourself unless ordered by me,

14   except to communicate questions and the arrival at

15   agreement on a verdict to the court until discharged by me

16   so help you God?

17                   THE BAILIFFS:  I do.

18                   (At 10:03 a.m., bailiffs sworn.)

19                   THE COURT:  All right, ladies and gentlemen.

20   We'll send you off to deliberate now.

21                   (At 10:03 a.m., jurors exit courtroom.)

22                   THE COURT:  All right, well, anything we need to

23   talk about?

24                   MR. DEAN:  Yeah, just a couple of things.

25                   THE COURT:  Sure.

```
 1                    MR. DEAN:  On instruction CV 9.01 --

 2                    THE COURT:  All right, hold on, what page is

 3          that?

 4                    MR. DEAN:  31.  I don't know how I missed it

 5          when I was looking through last night, but the instruction

 6          where the exhibits, if they want to they have to -- this

 7          was a pretty document-intensive case, I guess I would say,

 8          so I'm wondering if there's any reason why we can't just

 9          have the exhibit book delivered to them now.

10                    THE COURT:  Yeah.  No, I intended to do that,

11          I'm sorry.

12                    MR. DEAN:  Okay.  Okay.

13                    THE COURT:  No, I intended the --

14                    MR. DEAN:  That instruction always --

15                    THE COURT:  -- exhibits to go back, yeah.

16                    MR. DEAN:  I've seen it in another case, and we

17          always end up striking it, and I missed it this time.

18                    THE COURT:  Yeah.  Well, and clearly I missed

19          things when I was going through because there were

20          instructions which, as I'm preparing to read them I think,

21          those don't apply here.  So I just, you know, made

22          revisions on the fly.

23                    MR. DEAN:  Okay.  Yeah, I noticed that.  Page 28

24          the last paragraph where the witness was convicted of a

25          felony.  I just want to put a general objection on there in
```

1          case I need it later that I think it's an important

2          instruction that we normally read.

3                    THE COURT:  Well, no, but there was no evidence

4          that came in in this case that anybody was convicted.

5                    MR. DEAN:  Well, other than the fact that the

6          whole case was he is a prisoner, so --

7                    THE COURT:  But -- but, and here's my response

8          to your objection.  He's a prisoner, but the jurors don't

9          know what that means.

10                    MR. DEAN:  Okay.

11                    THE COURT:  They -- you know, there was no

12          testimony about what a felony is --

13                    MR. DEAN:  Okay.

14                    THE COURT:  -- as opposed to a misdemeanor.

15          There was no testimony in the case that anybody had been

16          convicted of a felony, and that it was reason I decided not

17          to read it.

18                    MR. DEAN:  Okay.

19                    THE COURT:  I mean I think you could have

20          offered that evidence if you chose to.

21                    MR. DEAN:  Sure.

22                    THE COURT:  Anything else?  Mr. Dean?

23                    MR. DEAN:  Nothing from me, your Honor.

24                    THE COURT:  Mr. Dykes-Bey, anything from you,

25          sir?

1          MR. DYKES-BEY:  No.

2          THE COURT:  Okay.  Well, you know, when the jury

3     comes back, Mr. Dykes-Bey, I'll have you taken back to the

4     lock-up while we wait.

5          MR. DYKES-BEY:  Yeah.

6          THE COURT:  When the jury comes back it can be

7     very emotional.

8          MR. DYKES-BEY:  Yes.

9          THE COURT:  And Mr. Dykes-Bey, you've been a

10    perfect gentleman here, and may I say I think you did an

11    excellent job of presenting your own case.  I was very

12    impressed by the job you did.  And I, you know, feel

13    confident that you will continue to comport yourself as a

14    gentleman regardless of what the jury decides in this case.

15         MR. DYKES-BEY:  Oh, yes.

16         THE COURT:  All right, we'll see you when the

17    jury comes back, unless they have a question or a note,

18    then we'll all come back and deal with that.

19              (At 10:06 a.m., court in recess.)

20              (At 11:11 a.m., court reconvened.)

21         THE COURT:  All right, we're back on the record.

22    It's 11:10 a.m., it's August 23.  The jury is deliberating.

23    We've received a question.  I'm going to read you the

24    question now.  "Can we know the date Dykes-Bey was

25    incarcerated?"  That is the question.  So I don't know what

1       that means, exactly, but thoughts about that?

2       Mr. Dykes-Bey?

3               MR. DYKES-BEY:  I don't understand the

4       relevance.

5               THE COURT:  Mr. Dean?

6               MR. DEAN:  I don't know the relevance either,

7       your Honor.  I mean --

8               THE COURT:  I don't either.  You know what I

9       can't -- what I won't do is give them any information that

10      is not in evidence in the case.  So if we were going to --

11      if I was going to give them an answer to this question, it

12      would have to be an answer that was introduced as evidence.

13      So I'll tell you we've looked, Mr. Dion looked through the

14      exhibits and I'm not, you know, obviously, it wasn't with a

15      magnifying glass, but in Exhibit 13 on the first page

16      there's, it's a program classification report, and there's

17      a date up in the upper left says, "Arrival date 7/1/2013."

18              MR. DYKES-BEY:  That's when I got to --

19              THE COURT:  Facility?

20              MR. DYKES-BEY:  -- Michigan Reformatory.

21              THE COURT:  Okay.  I mean I guess I wouldn't be

22      opposed to giving them that date.  I don't know.  It's --

23              MR. DEAN:  It's just I'm just trying to rack my

24      brain, what would be the possible --

25              THE COURT:  I mean one, you know one thing --

1     obviously there are a lot of reasons that they could be

2     asking for this information, reasons that I wouldn't even

3     be able to guess at.  They might be, I suppose, engaged in

4     some kind of damage calculation, and I think in the

5     instruction, though, right, I read in the interest

6     instruction I -- there was a date, I gave a date of in

7     2014 --

8             MR. DEAN:  Yeah, I --

9             THE COURT:  -- for the date the damages,

10    essentially, I mean we could give them that date.  It's

11    part of the damage instruction.

12            MR. DEAN:  That instruction is kind of

13    confusing.  The date you were picking was the date he was

14    terminated from his job?

15            MR. DYKES-BEY:  No.

16            MR. DEAN:  What is the --

17            MR. DYKES-BEY:  I was terminated May 14, 2014.

18            THE COURT:  Yeah, I can't remember how we picked

19    that.

20            MR. DYKES-BEY:  November was the day in which I

21    filed my compliant, it was filed with the Court.

22            THE COURT:  Okay.

23            MR. DYKES-BEY:  November, 2014.

24            MR. DEAN:  Yeah, I would steer away from any

25    mention of that instruction, because I don't know that --

1        yeah, I -- I guess the only way I would say that the

2        question, at least from my standpoint, could be answered is

3        that we don't know that it was ever introduced as evidence,

4        so it can't really be a fact used in determining your

5        decision one way or the other.

6                MR. DYKES-BEY:  Well, can you ask for

7        clarification?  Do they mean -- do they mean incarceration,

8        or do they mean the date in which I arrived at that

9        facility?

10               THE COURT:  Yeah.  We try not to get involved in

11       a dialogue with them.

12               MR. DYKES-BEY:  Okay.

13               THE COURT:  And, you know, I'm not sure what I'm

14       going to do.  You know, sometimes we just will answer "No,

15       we can't give you that information."

16               MR. DEAN:  That might be the simplest way.

17               THE COURT:  I guess if I said -- I mean but if I

18       say, "No," that's the, you know, that would be the end of

19       it, in all likelihood.  And they have the -- they have the

20       documents.  I mean they can look at, you know, and maybe

21       that has something to do with it.  Maybe they've been

22       looking through the exhibits and this question was

23       generated by something they saw in one of the exhibits.

24       But, of course, I'm just speculating.  I have no idea.  I

25       mean, I guess I think it was obvious from all of the

1    evidence that you were incarcerated during all relevant

2    time periods that have to do with this case.

3                    MR. DYKES-BEY:  Uh-huh.

4                    THE COURT:  I could say that, I suppose.

5    Mr. Dykes-Bey was incarcerated during all time periods

6    relevant to this case.  I think there was even a

7    stipulation in the pretrial order saying something like

8    that, but.

9                    MR. DEAN:  Yeah.  I mean I guess from my

10   standpoint it worries me, if they're using the date as a

11   damage calculation.  I don't think it has any relevance at

12   all to a damage calculation, so my preference would be the

13   shorter the better.  We don't think it was evidence that

14   was introduced at trial, so it's not something they can

15   consider, but.

16                   THE COURT:  Did the date of your termination --

17   did you testify to that?  Do you remember?

18                   MR. DYKES-BEY:  Yeah.  Yeah, I did.

19                   THE COURT:  That you were terminated on November

20   something?

21                   MR. DYKES-BEY:  May 14th, 2014.

22                   THE COURT:  May 14 you were terminated.

23                   MR. DYKES-BEY:  Uh-huh.  I say I started, you

24   know, I got to Michigan Reformatory and I started work

25   August 2013.

```
 1                    THE COURT:  '13.

 2                    MR. DYKES-BEY:  Until May 2014.

 3                    THE COURT:  I mean we could, you know, we could

 4          give the date he got there.

 5                    MR. DYKES-BEY:  Which was --

 6                    THE COURT:  July 1.

 7                    MR. DYKES-BEY:  Yup, July 1st.

 8                    THE COURT:  If the program classification, I

 9          could say something like that.

10                    MR. DYKES-BEY:  No, I do believe my out date is

11          on there already, though.  At the top.

12                    THE COURT:  Your out date?

13                    MR. DYKES-BEY:  Yeah.  All that information is

14          on there anyway, but it was never discussed.

15                    THE COURT:  Yeah.  Well, and so your point would

16          be they have it?

17                    MR. DYKES-BEY:  They already have it.

18                    THE COURT:  They already have it, so why give it

19          to them again.  So Mr. Dykes-Bey, are you telling me you

20          would vote for my answer being, "No, we can't give you that

21          information?"

22                    MR. DYKES-BEY:  I'm going to leave that up to

23          you, your Honor.

24                    THE COURT:  Do you have a strong feeling one way

25          or the other on that subject?
```

1            MR. DYKES-BEY:  No, I'm actually confused by it.

2            THE COURT:  Yeah.  As am I.  I mean I'm confused

3       about why they want that information and what they would do

4       with it.  Mr. Dean?

5            MR. DEAN:  Your Honor, I prefer, "No."

6            THE COURT:  You'd prefer a "No?"

7            MR. DEAN:  That we can't answer it.

8            THE COURT:  All right.  Well, I'm going to go

9       back, talk to Jim a bit, and we'll decide what we're going

10      to do, and I'll let you know what I've done after I've done

11      it.  Can you leave Mr. Dean here -- or Mr. Dean.  You can

12      leave Mr. Dean here.  Can you leave Mr. Dykes-Bey here for

13      a little while while Jim and I talk?

14            OFFICER:  Yes, your Honor.

15            THE COURT:  Okay.

16            (At 11:19 a.m., court in recess.)

17            (At 11:29 a.m., court reconvened.)

18            THE COURT:  All right, this is what I'm going to

19      do.  I'm going to send them a note in response which says,

20      "In response to your question, plaintiff was a prisoner

21      under the custody of the Michigan Department of Corrections

22      at all times relevant to the complaint."  That language is

23      taken verbatim out of the final pretrial order, ECF number

24      114, under Section Controverted -- Uncontroverted --

25      Uncontroverted Facts, B.

—47—

1                    Objection to that, Mr. Dykes-Bey?

2                    MR. DYKES-BEY:  No, your Honor.

3                    THE COURT:  Mr. Dean?

4                    MR. DEAN:  No, your Honor.

5                    THE COURT:  Okay.  All right, we'll be adjourned

6        again.

7                    (At 11:30 a.m., court in recess.)

8                    (At 11:48 a.m., court reconvened.)

9                    THE COURT:  All right, the jury has come up with

10       another question.  I'm going to read it to you now.  Quote,

11       "What are the three parts of complaint we are deciding on?

12       Number one, done.  Number two, question mark, question

13       mark, question mark.  Number three, Nancy retaliation."  So

14       what I'm contemplating doing is rereading the specific

15       element of claims instruction on page 16-CV 3.03.  Do you

16       have -- you don't have those with you?  Can -- you have

17       that clean copy, Jim, that you could put in front of

18       Mr. Dykes-Bey?

19                    MR. DEAN:  I think, if I may, the one part that

20       might be a little confusing is after page 16, the first

21       three elements are read.  "I will explain each of these

22       elements in greater detail in a moment.  If you find the

23       plaintiff has proven each of these elements by a

24       preponderance of the evidence, your verdict will be for the

25       plaintiff."  But then on the next page we talk about the

—48—

1          rebuttal burden.

2                    THE COURT:  Uh-huh.

3                    MR. DEAN:  So it might be confusing there

4          because then we go into if he shows those three things, the

5          defendants can show that they would have taken the same

6          action anyway.

7                    THE COURT:  Possibly.

8                    MR. DEAN:  So maybe --

9                    THE COURT:  I am disinclined -- I'm inclined to

10         simply try to recreate exactly what I said the first time.

11                   MR. DYKES-BEY:  Are they asking clarification

12         for what the other two are, or --

13                   THE COURT:  Well, I just read, I mean here, I'll

14         read it again.  This is exactly what the note -- I'm trying

15         to read the note exactly, so it's quote, "What are the

16         three parts of complaint we are deciding," it looks like

17         "or," but I'm guessing it's "on."  "Number one, done.

18         Number two, three question marks, number three Nancy

19         retaliation."  That's it.  So again, I don't know.

20                   MR. DYKES-BEY:  I think they want to know what

21         they supposed to decide on?

22                   THE COURT:  Yeah.  I mean, "What are three parts

23         of the complaint."  I think they mean "what are the

24         elements."

25                   MR. DYKES-BEY:  That's what I'm thinking, too.

```
 1                    THE COURT:  That's what I'm taking it, which is

 2          why I'm proposing to read the elements instruction again.

 3          Any objection to that, Mr. Dykes-Bey?

 4                    MR. DYKES-BEY:  No, your Honor.

 5                    THE COURT:  Mr. Dean?

 6                    MR. DEAN:  The only thing I'd bring up is in my

 7          notes I've got you kind of ad libbed on the protected

 8          conduct instruction saying that you weren't going to read

 9          it because defendants conceded that.

10                    THE COURT:  Yup.

11                    MR. DEAN:  So as long as we're pretty close to

12          that, then I'm fine.

13                    THE COURT:  Yup.  Okay, that's what we'll do

14          then.  We'll have the jury --

15                    MR. DEAN:  But can we also -- you're intending

16          to read through the rebuttal portion.

17                    THE COURT:  I'm going to read the whole

18          instruction.

19                    MR. DEAN:  Sixteen and seventeen?

20                    THE COURT:  Yup.  Not the footnote, obviously,

21          but --

22                    MR. DEAN:  Okay.

23                    THE COURT:  -- all of the text of 3.03, except

24          I'm going to omit first amendment retaliation claim number

25          one, plaintiff's conduct -- I'm not going to omit it, I'm
```

1    going to say it, but say that has been admitted.  That

2    element has been admitted by --

3              MR. DEAN:  So it sounds like what they're hung

4    up on is they didn't -- nobody can remember the exact

5    elements because they don't have the instructions?

6              THE COURT:  I'm guessing.

7              MR. DEAN:  Okay.  Would it be easier if we

8    printed this off and gave it to them?  Just that section,

9    so they can take it back and nobody is trying to -- because

10   they're not allowed to take notes, and I understand that,

11   so we're relying again that everybody remembers it exactly

12   the same way.  Most trials I've done it's never been an

13   issue to get the jury --

14             THE COURT:  Right.

15             MR. DEAN:  -- the instructions, and obviously,

16   the most important one typically is the elements.

17             THE COURT:  And I had intended to give them the

18   instructions, but then I, you know, changed the

19   instructions as I delivered them and so --

20             MR. DEAN:  Well, the only one I -- on that

21   section is the protected conduct, and I'm fine with that,

22   because we've already -- the conduct was protected.

23             THE COURT:  Yup.

24             MR. DEAN:  Nobody is disputing that.

25             THE COURT:  Well, how about this.  I'll send

1      them -- I send them the instruction 3.03 attached to a note

2      which says that element number one, you know, "Was

3      plaintiff's conduct protected by the First Amendment has

4      been conceded by the defendant, so it's -- you may consider

5      it proven," or something like that.

6                    MR. DEAN:  That's fine.

7                    THE COURT:  Mr. Dykes-Bey, any objection to that

8      procedure?

9                    MR. DYKES-BEY:  No, your Honor.

10                   THE COURT:  Okay, well, that's exactly what I'll

11     do then.  We won't bring the jury back in, I will do it by

12     note and --

13                   MR. DYKES-BEY:  Okay.

14                   THE COURT:  -- a copy of the instruction.  All

15     right, we'll be adjourned.

16                   (11:53 a.m., court in recess.)

17                   (At 1:13 p.m., court reconvened.)

18                   THE COURT:  All right, we have a third note.

19     I'm going to read it first.  Quote, "If we find in favor of

20     plaintiff, how do we determine amount of damages?  How much

21     do FS employees earn on an hourly" an then the word

22     "weekly" was written, but was crossed out, "basis,"

23     question mark, closed quote.  So what I'm proposing to do

24     is to simply send them back the damage instructions, so

25     that would be, again, could we get a copy of the

1          instructions for Mr. Dykes-Bey?

2                     (Off the record discussion between the Court and

3          employee.)

4                     The -- in three -- CV-304A, damages reasonable,

5          not speculative.  I amended, when I read it, to exclude

6          one, two, three, four.  Mr. Dykes-Bey, we'll get you a copy

7          of this.  "Damages are not allowed as punishment and cannot

8          be imposed or increased to penalize the defendant."  I took

9          that out because we have a separate punitive damage

10         instruction.  So I'm going to amend 304A by taking that

11         sentence out, and then give them all of the damage

12         instructions as a response.  (Long pause.)

13                    (Off the record discussion between the Court and

14         employee.)

15                    THE COURT:  Yeah, uh-huh, good.  You want to

16         hand them out?  So it would be from the instruction, pages

17         21 -- page 21 being amended as I just described on the

18         record.  Page 22, which contains the nominal damage

19         instruction, 23, which contains the punitive damage

20         instruction, and 24, which contains CV 3.05A, the

21         prejudgment interest instruction.  Objections to that,

22         Mr. Dykes-Bey?

23                    MR. DYKES-BEY:  No, your Honor.

24                    THE COURT:  Mr. Dean?

25                    MR. DEAN:  No, your Honor.

1           THE COURT:  Okay.  That's what we'll do then.

2      We'll be adjourned again.

3                (At 1:17 p.m., court in recess.)

4                (At 1:39 p.m., court reconvened.)

5           THE COURT:  Well, this is the note writing-est

6      jury I've ever had.

7           MR. DEAN:  Me, too.

8           THE COURT:  Here, quote, "Do we have to," and

9      then there's a mark, I don't know if it's supposed to be a

10     letter, I'm not sure, "dollar amount" -- did we get -- did

11     this get cut off?  I wonder if that's what happened.  Did

12     this, the copy, the photocopy get cut off?  I think it got

13     cut off.

14          MR. DEAN:  I might just raise this now, since

15     there have been a number of notes.  Are they being scanned

16     so they can be part of the record?

17          THE COURT:  Yup.  Absolutely, yeah.  They'll all

18     be part of the record.

19          MR. DEAN:  Thank you.

20          THE COURT:  Yeah, it got cut off.  Sorry.  So

21     here's, the note says, "Do we have to put a dollar amount

22     down, question mark, or a phrase, 1,460 days of lost

23     wages?"

24          MR. DEAN:  I'm sorry, 14,000 days?

25          THE COURT:  No, no.  It's one thousand -- it's

-54-

1     written in numbers, 1460 days of lost wages.  1460 days of

2     lost wages.  My inclination would be, I mean the verdict

3     sheet is set up with a dollar symbol in front of that line.

4     So my inclination would be to say "a dollar amount."

5             MR. DEAN:  So let me see if I understand this

6     question right.  They want to know whether they need to put

7     a dollar amount or like 1460 days of lost wages, and then

8     let us figure out what his wages were?

9             THE COURT:  I think that is certainly a fair

10    interpretation --

11            MR. DEAN:  I mean.

12            THE COURT:  -- or one interpretation of the

13    note.  Obviously, I don't know what's going on in their

14    minds.

15            MR. DEAN:  Obviously, from our standpoint, there

16    was no evidence presented at trial as to what he was making

17    or compensatory damages, and what the instruction in light

18    of it saying that they can't speculate, it was plaintiff's

19    burden to establish that.  I would think if they came back

20    with anything on that, that we would raise a posttrial

21    motion or judgment notwithstanding the verdict and say,

22    look, there's been no evidence presented of the dollar

23    amount, so they can't put any amount.  I know we can't

24    instruct the jury on that, but I'm just --

25            THE COURT:  No.

1           MR. DEAN:  -- letting the Court know that's

2      probably the direction I'm going at right now if they put

3      anything down, because there's been no testimony at all.

4           THE COURT:  All right, well, that's an issue for

5      another day or another proceeding, in any event, so I'm

6      going to answer it by saying, "The verdict form asks for a

7      dollar amount, so put down a dollar amount."  Any

8      objections to that Mr. Dykes-Bey?

9           MR. DYKES-BEY:  No, your Honor.

10           THE COURT:  Objections to that --

11           MR. DEAN:  Notwithstanding the objections I just

12      said, no.

13           THE COURT:  Okay.  That's what we'll do.

14           (At 1:42 p.m., court in recess.)

15           (At 1:52 p.m., court reconvened.)

16           THE COURT:  The jury sent us another note saying

17      they have reached a verdict, so we'll bring them in now and

18      take the verdict.

19           (At 1:53 p.m., jury enters courtroom.)

20           THE CLERK:  Please be seated.

21           THE COURT:  Ladies and gentlemen of the jury, I

22      understand that you've reached a verdict.  Would you please

23      have your foreperson pass the verdict form to

24      Ms. Carpenter.

25           Okay, the verdict form regarding plaintiff's

—56—

1      claim that defendant violated plaintiff's rights under the

2      First Amendment, we find in favor of plaintiff.  If your

3      verdict was in favor of plaintiff, state the amount of

4      damages sustained by plaintiff.  Compensatory, $5,500.

5      Dated today and signed by the foreperson.

6              Ms. Carpenter, will you please poll the jury?

7      The polling is a process by way we make sure that

8      everybody, that this is everybody's verdict.  So she'll be

9      asking each of you separately questions.

10              THE CLERK:  Juror in seat number one, Gary

11     Roberts, was that and is that your verdict?

12              JUROR ROBERTS:  It is.

13              THE CLERK:  Juror in seat number two, Charles

14     Moore, was that and is that your verdict?

15              JUROR MOORE:  Yes, it is.

16              THE CLERK:  Juror in seat number three,

17     Alicia --

18              JUROR TUMELE:  Tumele.

19              THE CLERK:  -- Tumele, was that and is that your

20     verdict?

21              JUROR TUMELE:  Yes.

22              THE CLERK:  Juror in seat number four, Debbie

23     Kaldenberg, was that and is that your verdict?

24              JUROR KALDENBERG:  Yes.

25              THE CLERK:  Juror in seat number five, Madeline

1          Newell, was that and is that your verdict?

2                    JUROR NEWELL:  Yes.

3                    THE CLERK:  Juror in seat number six, Eliza

4          Owens, was that and is that your verdict?

5                    JUROR OWENS:  Yes.

6                    THE CLERK:  Juror in seat number seven, Denise

7          Cripps, was that and is that your verdict?

8                    JUROR CRIPPS:  Yes.

9                    THE CLERK:  Juror in seat number eight, Destiny

10         Totten, was that and is that your verdict?

11                   JUROR TOTTEN:  Yes.

12                   THE COURT:  All right, ladies and gentlemen,

13         well, thank you so much for your service.  I know I speak

14         on behalf of the parties, certainly on behalf of the Court,

15         and really, on behalf of the citizens of West Michigan.  I

16         want to thank you for spending the time doing a civic duty

17         that has tremendous benefit, you know, to our community.  I

18         know it's a disruption and, you know, time away from work

19         and school and family and other things, but we really,

20         really appreciate it.  And it's folks like you that make

21         the whole legal system work.  So thank you so much.

22                   You're discharged now.  You can talk about the

23         case if you want to.  You don't have to, but you can, and

24         certainly go home and tell your family or whoever anything

25         you want to about the case at this point.

1           We're going to have you go back into the jury

2     room, collect your devices.  If you don't mind waiting, I'd

3     like to talk to you for a minute, just see what your

4     experience was like.  I'll have to talk to the parties for

5     a couple of minutes, but I'll be back there very -- very

6     quickly.  We'll be adjourned.

7           (At 1:56 p.m., jury exits courtroom.)

8           THE COURT:  All right, anything else we should

9     take up at this time?

10           MR. DEAN:  Well, in light of what just happened,

11     that the only order is compensatory, I think we probably

12     will file a posttrial motion outlining what I just said.

13     Would you rather us brief it out or --

14           THE COURT:  Uh-huh.  Yes, please.

15           MR. DEAN:  Okay.  Absolutely.

16           THE COURT:  To the extent you'll need a

17     transcript to do whatever it is you're intending to do,

18     you'll have to order it.  You know, it will have -- all I'm

19     saying is give it some time.

20           MR. DEAN:  Sure.  Sure.

21           THE COURT:  And if the, you know, getting the

22     transcript becomes a problem time-wise, you know, file a

23     motion --

24           MR. DEAN:  Okay.

25           THE COURT:  -- and, you know, I'll give you some

1          relief.  Because --

2                    MR. DEAN:  Okay.

3                    THE COURT:  -- you know, since we don't have a

4          court reporter here, it's harder for us to get the --

5                    MR. DEAN:  I totally understand.

6                    THE COURT:  -- transcripts prepared.

7                    MR. DEAN:  Sure.  Okay.

8                    THE COURT:  All right.

9                    MR. DEAN:  Thank you.

10                    THE COURT:  Mr. Dykes-Bey, anything from you,

11         sir?

12                    MR. DYKES-BEY:  No, sir.

13                    THE COURT:  All right.  Well, I just want to

14         say, I'm going to come down and shake the hands of both

15         sides.  I think you both did a fine job, you know.  I think

16         the jury took its responsibilities very seriously.  They

17         certainly were back there for a long time and they were

18         thinking about it, sending us notes about it, so --

19                    MR. DYKES-BEY:  Yeah.

20                    THE COURT:  -- I think the process worked.  And

21         I appreciate, Mr. Dykes-Bey, as I said from the beginning,

22         you're a perfect gentleman.

23                    MR. DYKES-BEY:  Thank you, sir.

24                    THE COURT:  I really appreciate that.  You did

25         yourself proud, and you did other inmates in your situation

1          proud as well, so.

2                         MR. DYKES-BEY:  Thank you, your Honor.

3                         (At 1:58 p.m., proceedings concluded.)

4                                   -oo0oo-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE OF REPORTER

2

3

4

5

6

7                       I, Bonnie L. Rozema, CER, do hereby certify

8       that the foregoing transcript consisting of 62 pages, is a

9       complete, true, and accurate transcript of the proceedings and

10      testimony, to the best of my ability from the audio recording,

11      held in this case on August 23, 2018.

12                             I do further certify that I prepared the

13      foregoing transcript.

14

15

16

17      /s/  Bonnie L. Rozema

18      Bonnie L. Rozema, CER-5571
        2700 92nd Street, S.W.
19      Byron Center, MI  49315
        (616) 878-9091
20

21      Notary Public in and for
        Kent County, Michigan
22      My commission expires:
        March 26, 2019
23      Acting in the County of Kent

24

25
```