UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ROBERT L. DYKES #201541,

       Plaintiff,

    v.                          File No. 1:14-cv-01167

N. MARSHALL, ET AL.,

       Defendants.
_____/


Trial - Volume 1

Before


THE HONORABLE RAY KENT
United States Magistrate Judge
August 22, 2018



APPEARANCES

In Pro Per:        Robert L. Dykes-Bey #201541
                   Oaks (MSP)
                   Oaks Correctional Facility
                   1500 Caberfae Hwy.
                   Manistee, MI  49660

For the Defendant:  Michael Richard Dean
                   Michigan Department of Attorney General
                   Public Employment, Elections & Tort Div.
                   525 W. Ottawa Street
                   P.O. Box 30736
                   Lansing, MI  48909
                   (517) 373-6434
                   deanm2@michigan.gov

```
Recorded By:            Digitally Recorded

Courtroom Deputy:       S. Carpenter

Interpreters
American Sign
Language:               Ashley Oakley-Stanaway
                        Renita Creasy

Transcribed By:         Bonnie L. Rozema, CER-5571
                        (616) 878-9091
                        rozemab1@comcast.net
```

TABLE OF CONTENTS

<u>WITNESSES FOR THE PLAINTIFF</u>:                    <u>PAGE</u>

ROBERT L. DYKES-BEY

        Testimony by Mr. Dykes-Bey              80
        Cross-examination by Mr. Dean          95



<u>WITNESSES FOR THE DEFENDANT</u>:

NANCY (MARSHALL) KERR

        Direct examination by Mr. Dean        120
        Cross-examination by Mr. Dykes-Bey    137



OTHER THINGS IN TRANSCRIPT:

Voir dire                                        3

Preliminary instructions                        56

Opening Statements

        By Mr. Dykes-Bey                        70
        By Mr. Dean                             71



<u>EXHIBITS</u>:                                  <u>IDENTIFIED</u>

Exhibit book received prior to trial.

```
1     Grand Rapids, Michigan
2     Wednesday, August 22, 2018 - 9:01 a.m.
3                    THE COURT:  All right, this is cv -- 14-cv-1167,
4         Dykes versus Marshall.  We're here for the first day of
5         trial.  Mr. Dykes, are you ready to go?
6                    MR. DYKES-BEY:  Yes.
7                    THE COURT:  Okay.  Mr. Dykes, how do -- what do
8         you -- what do you want me to call you?  I mean I'm calling
9         you Mr. Dykes.  Is that --
10                   MR. DYKES-BEY:  Yeah, my name -- my name is
11        Dykes-Bey.
12                   THE COURT:  Okay.
13                   MR. DYKES-BEY:  That's what I want to be called.
14                   THE COURT:  Okay.  Well, you get to be called
15        whatever you want to be called.  You might be surprised to
16        learn that it took me a long time to convince people to
17        call me Ray Kent rather than my full name is actually
18        Raymond Scott Kent.  So on everything, including when I
19        came here, the plate outside my courtroom was Raymond, and
20        I'm like, I'm only Raymond to my mother, okay?  Ray Kent is
21        what I want to be called.  So you get to be called whatever
22        you want.  So Dykes-Bey it is.
23                   Mr. Dean, are you ready to go?
24                   MR. DEAN:  I am, your Honor.
25                   THE COURT:  All right.  And this is
```

1          Ms. Marshall.  You have --

2                    MR. DEAN:  Yeah, and I just want to point out

3          her married name is Nancy Kerr now, so we may need to make

4          that clear to the jury that the documents show her name is

5          Marshall, but she's actually Mrs. Kerr.

6                    THE COURT:  Okay, well, maybe when you -- I'll

7          ask you to introduce her --

8                    MR. DEAN:  Yes.

9                    THE COURT:  -- at some point maybe you could

10         clear that up when --

11                   MR. DEAN:  I will do that.

12                   THE COURT:  -- you introduce her.

13                   THE CLERK:  How do you spell that?

14                   MS. KERR:  K-e-r-r.

15                   THE CLERK:  Thank you.

16                   THE COURT:  All right, Mr. Dykes-Bey, before we

17         get rolling with anything else, I received your proposed

18         voir dire.  I'm just going to tell you the ones that I'm

19         not going to let you ask.  That would be number 11.  I give

20         an instruction that will cover what to do about people who

21         have been convicted of a crime in terms of credibility.

22                   MR. DYKES-BEY:  Okay.

23                   THE COURT:  Sixteen, and 18 I think are too

24         close to arguing facts that are likely to be in issue in

25         the case, so they're out.  Seventeen is out because, again,

1       I give an instruction.

2                 MR. DYKES-BEY:  Seventeen?

3                 THE COURT:  Actually, here, it's the 16, 17, 18,

4       and 19 are all out.  Eighteen and 19 because they're,

5       again, close to argument, 17 because I give an instruction.

6       The rest of them are fine.

7                 So in a short while I'll call and have the

8       prospective jurors brought to the courtroom.  The computer

9       has generated random lists, so they'll be called to sit in

10      the seats according to that list.  And then I'm going to

11      ask them some questions, give them some preliminary

12      instructions, then I'll ask them some questions.  I'll

13      allow each of you to ask them some questions.  We'll have

14      challenges for cause up here at sidebar with white noise.

15      And once we've got a jury that everyone agrees is okay for

16      cause, then we'll exercise peremptories.  We only have 20

17      prospective jurors.  I don't suspect we're going to have

18      any problem with, you know, not having enough, but bear in

19      mind we only have 20, and we need eight of them in the box

20      before we start the trial.

21                What else?  We have a prospective juror who is

22      deaf, so we're going to have interpreters sitting in those

23      two chairs, sign language interpreters --

24                MR. DYKES-BEY:  Uh-huh.

25                THE COURT:  -- who will be interpreting for this

```
 1              juror.  And there's two of them because evidently they take

 2              turns because their hands get tired.  Let's see what else.

 3                        Stephanie, anything else you can think of --

 4              THE CLERK:  Not right now.

 5              THE COURT:  -- that I should cover before we get

 6       rolling?

 7                        All right, well, gentlemen, anything we should

 8       talk about before we get started?  Mr. Dykes-Bey, anything

 9       from you?

10              MR. DYKES-BEY:  No, I'm good.  I'm good.

11              THE COURT:  Okay.

12              MR. DYKES-BEY:  Yeah.

13              THE COURT:  You know, let me -- if you're

14       nervous, it's completely normal.

15              MR. DYKES-BEY:  Yeah.

16              THE COURT:  If you're not nervous, it's

17       abnormal, okay?  Mr. Dean's nervous, I think I said this

18       last time.  He's nervous, I'm actually nervous.

19              MR. DYKES-BEY:  Right.

20              THE COURT:  You know, I don't know why.  I have

21       no idea why, you know.

22              MR. DYKES-BEY:  Yeah.

23              THE COURT:  But I am, so it's just natural.  You

24       know, just try to stay focused, you know, on whatever's

25       happening in the moment.  As I said last time, simple,
```

1    clear, well-organized is the best way to persuade people,

2    you know.

3              When you're talking to -- well, when you're on

4    the witness stand, I guess we only have you as a witness,

5    or when you're talking to the jury in opening statement or

6    closing argument, I would encourage you to think of it like

7    you're in your living room and your new neighbors just came

8    over to visit.  So you're just having a conversation with

9    these new neighbors.  Now, you know, because they're new,

10   you're trying to make a good impression, right?  So you

11   kind of maybe don't talk to them the same way you would

12   talk to your family members.

13             MR. DYKES-BEY:  Uh-huh.

14             THE COURT:  But, you know, comfortable.  Just a

15   conversation in your living room over the coffee table.  If

16   you try to imagine, keep that image in your mind, I think

17   you'll be more effective in communicating to them.

18             I guess that's it.  So we'll have the jury

19   called and --

20             MR. DYKES-BEY:  Well, he had some stipulations.

21             THE COURT:  Oh, okay.

22             MR. DEAN:  I do, yeah.

23             THE COURT:  Fire away.

24             MR. DEAN:  Actually, and I added an Exhibit 17

25   per our discussion at the final pretrial conference, to

```
1                your exhibit binder.

2                         THE COURT:  Okay.

3                         MR. DEAN:  I'll mention that now.

4                         THE COURT:  Sure.  Thank you.

5                         MR. DEAN:  I'll hand it to you.  Unfortunately,

6        I ran out of number 17 tabs --

7                         THE COURT:  That's all right.

8                         MR. DEAN:  -- so I've got a post-it note.

9                         THE COURT:  No worries.

10                        MR. DEAN:  And the second thing is we reached an

11       agreement on the stipulation for Exhibits 1, 2, 3, 4, 14,

12       and 16, which were grievances about them not being admitted

13       for the truth of the matter, but for the limited purpose of

14       establishing that he filed grievances.

15                        THE COURT:  Okay.

16                        MR. DEAN:  I actually hand-wrote it out.  I'll

17       give it to you.

18                        THE COURT:  So when do you think -- when would

19       you propose that I read this to the jury?

20                        MR. DEAN:  I would suggest the first time he

21       covers a grievance as an exhibit, and then just mention

22       that this is one of several exhibits, and I numbered them

23       in the stipulation that are --

24                        THE COURT:  All right.

25                        MR. DEAN:  That you'll see our grievances, and
```

1          that we have a special instruction for them.

2                    THE COURT:  All right, somebody remind me, okay?

3                    MR. DEAN:  Okay.

4                    THE COURT:  Because I undoubtedly will forget

5          when the moment comes.

6                    MR. DEAN:  Yeah, no problem.

7                    THE COURT:  So gentlemen, remind me that I'm

8          going to do that.

9                    (Off the record discussion between the Court and

10         the clerk.)

11                   THE COURT:  All right, well, I'm going to step

12         out, gentlemen.  I'm going to have the jurors brought down.

13         When they're here I'll come back in.  Stephanie will reopen

14         court, and we'll begin jury selection.

15                   (At 9:10 a.m., court in recess.)

16                   (At 9:17 a.m., back on the record.)

17                   THE COURT:  Good morning.  Welcome to the United

18         States District Court for the Western District of Michigan,

19         and thank you for coming.  We're here this morning to

20         select a jury in the case of Robert L. Dykes-Bey versus

21         Nancy Marshall.  This is a civil trial.  Mr. Dykes claims

22         that defendant Marshall, a prison official at the Michigan

23         Reformatory, denied him his fist amendment rights by

24         retaliating against him.  Defendant Marshall denies that

25         she deprived Mr. Dykes-Bey of his first amendment rights by

1      retaliating against him for filing one or more grievances.

2      Mr. Dykes-Bey is representing himself.  The defendant is

3      represented by Attorney Michael Dean.

4              We're going to pick eight people for the jury.

5      Trial will begin after the jury is selected.  We expect the

6      trial will be completed by the end of the day tomorrow.  If

7      not, we'll need to come back on Monday to finish, because

8      on Friday I am not available.

9              I'm going to tell you now who we have in the

10     courtroom, and the cast of characters will change.  But we

11     have deputy marshals, we have my courtroom deputy,

12     Stephanie Carpenter, we have seated to my left you'll

13     notice, I'm sure, two American Sign Language interpreters,

14     Ms. Ashley Oakley-Stanaway and Ms. Renita Creasy.  That's

15     because one of your number has a hearing disability.  And

16     so if he -- they'll be here during jury selection, and if

17     he's selected for the jury, they'll be here throughout the

18     trial.

19             Right now I'm going to have these ladies sworn

20     in to faithfully discharge their duties as American Sign

21     Language interpreters.

22             Stephanie?

23             THE CLERK:  Do you solemnly swear or affirm that

24     you will justly, truly, fairly, and impartially act as

25     interpreters in the case before the Court, so help you God?

—11—

```
 1                    MS. OAKLEY-STANAWAY:  I do.

 2                    MS. CREASY:  I do.

 3                    (At 9:20 a.m., interpreters sworn.)

 4                    THE CLERK:  You may be seated.

 5                    THE COURT:  All right, before we get started,

 6          let me touch on one other issue, and that is Mr. Dykes-Bey

 7          is seated right here in the white shirt.  Turn around and

 8          say hi or wave to the crowd.  There you go.  Peace sign,

 9          perfect.

10                    The defendant, whose name -- whose last name was

11          Marshall at the time of the events giving rise to this

12          suit, to this lawsuit, is sitting at the defense table with

13          Mr. Dean.  She has since been married, however, and her

14          married name is Kerr.  So we -- you may hear her referred

15          to as Marshall or Kerr.  Same woman.  Same person.

16                    All right, at this time I'm going to ask

17          Ms. Carpenter to swear all of you in as prospective jurors.

18                    THE CLERK:  If you'd all rise and raise your

19          right hands.

20                    Do you swear or affirm that you will truthfully

21          answer all questions that shall be asked of you touching

22          upon your qualifications as a juror in the case now called

23          for trial, so help you God?

24                    THE JURORS:  I do.

25                    (At 9:21 a.m., jurors sworn.)
```

1              THE CLERK:  You may be seated.

2              THE COURT:  I just started asking this question,

3      but did anybody not say "I do?"  Okay, good.  Ms. Carpenter

4      is now going to call the names of some of you to come

5      forward and take a seat in the jury box.  Your names were

6      all put in the computer down in the jury selection by the

7      jury selection clerk.  The computer randomly, you know,

8      orders you and then draws names at random.  So the names

9      that we'll be drawing are the first eight names that were

10     randomly selected by the computer.  If your name's called,

11     please come forward.  First person called please come into

12     the box, go all the way to the left and sit in seat number

13     one.

14             THE CLERK:  In seat number one, juror number

15     one, Gary John Roberts.  In seat number two, juror number

16     30, Charles Lawrence Moore.  In seat number three, juror

17     number 27, Jason Joseph Johnson.  In seat number four,

18     juror number 29, Melia Lynn Carter.  In seat number five,

19     juror number 34, Frances Lucille Tice.  In seat number six,

20     juror number eight, Eliza Grace Owens.  In seat number

21     seven, juror number three, Christopher James Keeler.  In

22     seat number eight, juror number 28, Mary Chase Mobley.

23             THE COURT:  All right, all of you are qualified

24     to be jurors, and that applies to all of you in the back as

25     well.  There may be some reason, however, that it would not

—13—

1    be appropriate for you to be a juror in this particular

2    case.  To determine that, we employ a proceeding known as

3    voir dire.  Voir dire is simply Latin for "speak truth."

4    We ask you questions touching on your qualifications to

5    serve in order to gain more background information about

6    you.  Furthermore, to a limited extent, Mr. Dykes-Bey and

7    Mr. Dean may excuse some of you from service for any reason

8    at all.  So if you're excused, please don't consider it any

9    reflection on you personally.

10            At this time I've already introduced Mr. Dykes

11   and Mr. Dean to you, so we'll skip that.  As far as I know,

12   Mr. Dean -- or Mr. Dykes-Bey, the only witness you'll be

13   calling is yourself, am I right?

14            MR. DYKES-BEY:  Absolute -- correct.

15            THE COURT:  And Mr. Dean, you'll only be calling

16   Ms. Kerr?

17            MR. DEAN:  That's correct.

18            THE COURT:  Okay.  So we're only going to have

19   two witnesses in the case, and they are, in fact, the

20   plaintiff and the defendant.  I'm going to ask you some

21   questions now, and then I'll give Mr. Dykes-Bey and

22   Mr. Dean an opportunity to ask you some questions of their

23   own.  Does anyone -- any one of you in the box right now,

24   we call the jury box "the box," so you're in the box.  Do

25   any of you have a health, hearing, vision, or other problem

—14—

1      that would make serving on this jury difficult or

2      impossible?

3              Yes, ma'am.  Ms. --

4              PROSPECTIVE JUROR CARTER:  Carter.

5              THE COURT:  -- Carter.

6              PROSPECTIVE JUROR CARTER:  Yes.  I mean it

7      doesn't make it impossible, but I had a family death last

8      week, and I have family in from California right now at my

9      home, and they're leaving on Saturday.  So I don't know if

10     that's an excuse for it.

11             THE COURT:  Okay.  All right, well, it's not a

12     health, hearing, or disability problem, but I appreciate

13     you speaking up and we'll take that into account.

14             Now, as I said, the trial is expected to take

15     two days.  I think we'll be done tomorrow.  I'm pretty

16     confident we'll be done tomorrow.  I really think it's

17     unlikely we'll have to come back on Monday, but just the

18     fact that we're going to be here at least today and

19     tomorrow pose a problem for anyone, other than Ms. Carter?

20             THE JURORS:  (No verbal response.)

21             THE COURT:  All right, has anyone heard or read

22     any -- okay, all right, Mr. Keeler.

23             MR. KEELER:  (Through interpreter.)  Yes, your

24     Honor, my son, I'm supposed to drop my son off at day care

25     tomorrow, but the day care won't accept him because he has

—15—

1          the Hand-and-Foot disease right now, that rash.

2                    THE COURT:  Oh, sorry to hear that.  Is there

3          any other arrangement that you could make for him, for his

4          care for the two days that we're likely to be in trial?

5                    MR. KEELER:  I don't have.  My wife and I, we

6          live together and my wife has to go to work tomorrow.  They

7          have a strict policy, so I was hoping that the day care

8          would accept my son, but I think that if you provide a

9          letter, that they could watch my son.  Maybe that would

10         work (unintelligible.)

11                   THE COURT:  Okay.  All right, we'll think about

12         that.  Have any of you read or heard anything about this

13         case?

14                   THE JURORS:  (No verbal response.)

15                   THE COURT:  All right, is there anything about

16         the case itself, and I understand you don't know much about

17         it now, but based upon my very brief explanation as an

18         introduction, is there anything about the case that you

19         think would make it difficult for you to be fair and

20         impartial?

21                   THE JURORS:  (No verbal response.)

22                   THE COURT:  Do any of you know Mr. Dykes-Bey?

23                   THE JURORS:  (No verbal response.)

24                   THE COURT:  And just in case I stumble,

25         Mr. Dykes-Bey's last name is hyphenated Dykes-Bey.  I've

—16—

1          been calling him Mr. Dykes throughout the case.  My bad.

2          This morning I asked him what he, "How would you like me to

3          refer to you?"  And he said, "Well, my name is really

4          Dykes-Bey," and I said, "I'm sorry.  I will call you

5          Dykes-Bey."  But if I stumble, understand that I'm

6          intending to call him Mr. Dykes-Bey.  So nobody knows

7          Mr. Dykes-Bey?

8                    THE JURORS:  (No verbal response.)

9                    THE COURT:  Anybody know Mr. Dean, a lawyer for

10         the Michigan Attorney General's Office?

11                    THE JURORS:  (No verbal response.)

12                    THE COURT:  Anybody know Mrs. Kerr, formerly

13         Ms. Marshall?

14                    THE JURORS:  (No verbal response.)

15                    THE COURT:  All right, has any -- have any of

16         you -- oh, Stef, let's go to the microphone.  Have any of

17         you served on a jury before?

18                    UNIDENTIFIED PROSPECTIVE JUROR:  Yes.

19                    THE COURT:  Okay, I'm going to -- almost

20         everybody.  I'll start at this end with Ms. Mobley.

21         Ms. Mobley, what kind of jury did you serve on?

22                    PROSPECTIVE JUROR MOBLEY:  It was probably

23         district -- it was about 30 years ago, so I'm not really

24         sure, but it was not a federal case.  It was here in Grand

25         Rapids.

—17—

```
 1                    THE COURT:  Okay.  Do you remember if it was
 2          civil or criminal?
 3                    PROSPECTIVE JUROR MOBLEY:  (No audible
 4          response.)
 5                    THE COURT:  Anything about that experience stick
 6          with you?
 7                    PROSPECTIVE JUROR MOBLEY:  Yes, but it has
 8          nothing to do with -- has nothing to do with my ability to
 9          do this.
10                    THE COURT:  Okay.
11                    PROSPECTIVE JUROR MOBLEY:  One of the jurors, it
12          was back in the day when people could smoke in buildings.
13                    THE COURT:  Oh.
14                    PROSPECTIVE JUROR MOBLEY:  One of the fellow
15          jurors, when we were deliberating, went -- pulled out a
16          cigarette and went around the room and asked every single
17          person if it was okay if he smoked, and I happened to be
18          sitting here, so I was the last person he asked.  It was
19          like a psychology experiment.  Everybody said, "No, that's
20          fine," and when he got to me I said, "Well, actually, I
21          prefer you not," and he said, "Okay, I'll blow it over
22          there."  So that's what I remember about the case.
23                    THE COURT:  Times have changed, hey?
24                    PROSPECTIVE JUROR MOBLEY:  Fortunately, yeah.
25                    THE COURT:  All right.  Who is next?  Who raised
```

—18—

1    their hand?  Ms. Carter?

2       PROSPECTIVE JUROR CARTER:  I was on a criminal

3    case.

4       THE COURT:  Okay.

5       PROSPECTIVE JUROR CARTER:  It was a murder trial

6    in Saginaw County.  And I can't tell you how many years

7    ago.  It wasn't that long ago (unintelligible.)

8       THE COURT:  Okay.

9       PROSPECTIVE JUROR CARTER:  And then I had a

10   civil case prior to that in the same county.

11      THE COURT:  Okay.  How long did each of those

12   trials last?

13      PROSPECTIVE JUROR CARTER:  Well, it was a

14   different system there.  We sat around and waited for a

15   trial.

16      THE COURT:  Yeah.

17      PROSPECTIVE JUROR CARTER:  So it wasn't like you

18   were, you know, asked in and then because you had a trial,

19   it's just you were asked in to wait to see if something

20   opened, so.

21      THE COURT:  You met in a big common room?

22      PROSPECTIVE JUROR CARTER:  Correct, yes.  And we

23   waited for a trial.  And then trial lasted about three or

24   four days (unintelligible.)

25      THE COURT:  Okay.

—19—

1          PROSPECTIVE JUROR CARTER:  It was a long

2     process.

3          THE COURT:  In the criminal trial, did you

4     deliberate to a verdict?

5          PROSPECTIVE JUROR CARTER:  Yes.

6          THE COURT:  And what was the verdict?

7          PROSPECTIVE JUROR CARTER:  Guilty.

8          THE COURT:  Okay.  How about the civil case?

9          PROSPECTIVE JUROR CARTER:  Not guilty.

10          THE COURT:  Okay.  So when you say "not guilty,"

11     and we'll talk about this more later, but in a criminal

12     case, the options for a jury typically are guilty and not

13     guilty.  In a civil case it's different, because in a civil

14     case what the parties in this case, Mr. Bey -- Dykes-Bey is

15     seeking essentially is money damages.  So it's either, you

16     know, you find that he has proven his claim or that he has

17     not proven his claim.

18          PROSPECTIVE JUROR CARTER:  Well, we --

19          THE COURT:  So in the civil case you found that

20     the plaintiff had not proven the claim?

21          PROSPECTIVE JUROR CARTER:  Correct.

22          THE COURT:  Okay.

23          PROSPECTIVE JUROR CARTER:  Exactly,

24     (unintelligible.)

25          THE COURT:  What -- what was that case about?

1          PROSPECTIVE JUROR CARTER:  It was a money issue.

2     I couldn't tell you exactly the details, it's been so long

3     ago, but --

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR CARTER:  -- we decided that

6     the plaintiff didn't have a case to acquire the damages

7     that they claimed that they were entitled to.

8          THE COURT:  Okay.

9          PROSPECTIVE JUROR CARTER:  That was a function

10    of the facts, obviously.  So --

11         THE COURT:  Right.

12         PROSPECTIVE JUROR CARTER:  -- it's been a long

13    time since I did that one.

14         THE COURT:  Okay, who was next?  I saw some

15    other hands.  Mr. Moore.

16         PROSPECTIVE JUROR MOORE:  It was back in the

17    late Eighties and it was a -- was a district court.

18         THE COURT:  Yup.

19         PROSPECTIVE JUROR MOORE:  It was the Washington

20    State in Tacoma, Washington.

21         THE COURT:  So a state district court?  Or

22    federal district court?

23         PROSPECTIVE JUROR MOORE:  I think it was state.

24    It was a Pierce County court.

25         THE COURT:  Okay.  That would be state court

1          then, yup.

2                    PROSPECTIVE JUROR MOORE:  Thank you.  And it was

3          I guess a criminal case.  It was a DWI-type case.

4                    THE COURT:  All right.

5                    PROSPECTIVE JUROR MOORE:  The defendant was

6          found not guilty.

7                    THE COURT:  Okay.  All right, anything stick

8          with you about your service on that jury?

9                    PROSPECTIVE JUROR MOORE:  A lot different then

10         than it is now.  It's like Ms. Carter, it was a room of

11         about three to five hundred people.

12                   THE COURT:  Yeah.

13                   PROSPECTIVE JUROR MOORE:  They pulled you out to

14         go to do what we're doing right here now.

15                   THE COURT:  I've been called twice in Kent

16         County Circuit Court across the street, once since I've

17         been a judge, and for some reason they never want me.  I

18         would love to sit on a jury.  I've just go to be honest, I

19         think every lawyer, every trial lawyer dreams about sitting

20         on a jury.  Because when you're a trial lawyer, you know,

21         you do your best, you present your case, you make your

22         arguments, and then the jury goes back in that jury room

23         and of course you don't ever find out what goes on back

24         there.  So it's like you don't know how -- when you win you

25         don't know why, when you lose you don't know why.  You'd

                                    —22—

1          just love, as a lawyer, to get back there and see firsthand

2          behind the curtain, but.  Mr. Roberts.

3                    PROSPECTIVE JUROR ROBERTS:  Yes, once in 63rd

4          District.  I believe it was a civil case.

5                    THE COURT:  Okay.  Judge Smolenski?

6                    PROSPECTIVE JUROR ROBERTS:  Pardon?

7                    THE COURT:  What judge?

8                    PROSPECTIVE JUROR ROBERTS:  I don't remember.

9          It was quite a few years ago.

10                    THE COURT:  Okay.

11                    PROSPECTIVE JUROR ROBERTS:  And I served once in

12          Grandville.  That was a DWI.

13                    THE COURT:  Okay.  And did both of those juries

14          deliberate to a verdict?

15                    PROSPECTIVE JUROR ROBERTS:  Yes.

16                    THE COURT:  Okay, and what the -- what was the

17          63rd case about?

18                    PROSPECTIVE JUROR ROBERTS:  That was a medical

19          issue where the plaintiff was suing for some money, and he

20          was -- it didn't go good for him.

21                    THE COURT:  Okay.

22                    PROSPECTIVE JUROR ROBERTS:  Except in the fact

23          that there was a side note that the defendant said he'd pay

24          for a certain test, and we held him to it.

25                    THE COURT:  Okay.  So it was kind of a split

1          decision, or --

2                    PROSPECTIVE JUROR ROBERTS:  Yeah.  It was

3          different.

4                    THE COURT:  All right.

5                    PROSPECTIVE JUROR ROBERTS:  And the drunk

6          driving case was, he was found guilty.

7                    THE COURT:  Okay.  Have you, yourselves, any

8          member of your family, or a close friend, ever been

9          involved in a civil lawsuit?  Ms. Carter?

10                   PROSPECTIVE JUROR CARTER:  It was quite a long

11         time ago.

12                   THE COURT:  Okay.

13                   PROSPECTIVE JUROR CARTER:  Back in like '83,

14         '84.  I had a couple of businesses at the time and it was a

15         telephone book kind of thing, advertisement.

16                   THE COURT:  Okay.

17                   PROSPECTIVE JUROR CARTER:  I hadn't signed for,

18         they put it in anyway.

19                   THE COURT:  Tried to charge you for it?

20                   PROSPECTIVE JUROR CARTER:  Correct.  And I was

21         found -- the judgment was in my favor.

22                   THE COURT:  Okay.

23                   PROSPECTIVE JUROR CARTER:  That was it.  Really

24         it was a small thing, but a big thing for me back then.

25                   THE COURT:  Right.  So you were the defendant in

—24—

1           that case?

2                    PROSPECTIVE JUROR CARTER:  Correct, yeah.

3                    THE COURT:  And it actually went to trial?

4                    PROSPECTIVE JUROR CARTER:  Yes, but the --

5                    THE COURT:  And the jury found in your favor?

6                    PROSPECTIVE JUROR CARTER:  Correct.

7                    THE COURT:  Okay.

8                    PROSPECTIVE JUROR CARTER:  Actually, the judge

9           did.

10                   THE COURT:  The judge did.

11                   PROSPECTIVE JUROR CARTER:  We didn't have a

12          jury.

13                   THE COURT:  All right.  Was it a small claim

14          court, do you remember?

15                   PROSPECTIVE JUROR CARTER:  (Unintelligible) see,

16          it was well over a thousand dollars, I don't know --

17                   THE COURT:  Uh-huh.

18                   PROSPECTIVE JUROR CARTER:  -- if that would be

19          small claims.

20                   THE COURT:  Yeah, I don't either, to be honest.

21                   PROSPECTIVE JUROR CARTER:  Yeah.

22                   THE COURT:  Sometimes in small claim court, I

23          think always in small claim court there's not a jury.

24                   PROSPECTIVE JUROR CARTER:  Right, yeah.

25                   THE COURT:  It's a judge deciding.

1          PROSPECTIVE JUROR CARTER:  It probably was.  I

2     couldn't tell you, but --

3          THE COURT:  Okay.  All right.  Well, you are a

4     sophisticated user of the judicial system.

5          PROSPECTIVE JUROR CARTER:  I am.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR CARTER:  Yes.

8          THE COURT:  I would consider that makes you

9     highly qualified.

10          PROSPECTIVE JUROR CARTER:  Oh, boy.  I was

11     hoping you wouldn't say that.

12          THE COURT:  I know you were.  All right, does

13     anybody have -- oop, okay, Mr. Johnson.

14          PROSPECTIVE JUROR JOHNSON:  Yes, my -- my sister

15     was just involved in a civil case this year.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR JOHNSON:  So her husband was

18     working construction and he fell and broke his heel and had

19     a bunch of medical expenses.  And the people he was working

20     for didn't want to pay for it, because they didn't want to

21     claim him on his insurance.  So they ended up winning and

22     getting the money paid for.

23          THE COURT:  Okay, so your sister and her husband

24     were the plaintiffs?

25          PROSPECTIVE JUROR JOHNSON:  Correct.

—26—

```
1                    THE COURT:  And her -- the defendant was his

2          employer?

3                    PROSPECTIVE JUROR JOHNSON:  Correct.

4                    THE COURT:  And there was a -- was there a jury?

5                    PROSPECTIVE JUROR JOHNSON:  I -- I honestly

6          don't know.

7                    THE COURT:  Okay.

8                    PROSPECTIVE JUROR JOHNSON:  I just got a message

9          from her saying they had -- when they went to trial and

10         that they ended up getting money.

11                   THE COURT:  Oh.

12                   PROSPECTIVE JUROR JOHNSON:  I don't know all the

13         specifics.

14                   THE COURT:  Okay.  All right.  Does anyone have

15         any training, or has anyone worked in the legal field?

16         Okay, Mr. Moore.

17                   PROSPECTIVE JUROR MOORE:  I'm not sure if it's

18         legal field.  Back in the early 2000, after 911 I worked

19         with TSA, Homeland Security, for a couple years.

20                   THE COURT:  Okay.

21                   PROSPECTIVE JUROR MOORE:  So I don't know if

22         that's a legal field or.

23                   THE COURT:  Yeah.  It's, and you know, I'll

24         probably get to that question anyway, but what -- what --

25         in what capacity did you work for TSA?
```

—27—

```
1                    PROSPECTIVE JUROR MOORE:  I was in Tampa,

2          Florida, and was a screener where I hassled the passengers

3          that came through.

4                    THE COURT:  Right.  Yeah, I remember you.  I was

5          on vacation and I missed my connector because of you.

6                    PROSPECTIVE JUROR MOORE:  I've probably got your

7          fingernail clippers or something.

8                    THE COURT:  Yeah, right.

9                    PROSPECTIVE JUROR MOORE:  Yeah, so I don't know

10         if that would count.

11                   THE COURT:  Okay.  Well, no, I appreciate you --

12         you know, we all appreciate you telling us about that.  I

13         don't know that that qualifies as a legal field, but my

14         next question would be, is, do you -- have you ever, any

15         family member or close friend, worked in the law

16         enforcement field?  Okay, Ms. Owens.

17                   PROSPECTIVE JUROR OWENS:  My friend is a

18         policeman.

19                   THE COURT:  Okay.  Where does he work?

20                   PROSPECTIVE JUROR OWENS:  Kent County.

21                   THE COURT:  Okay.  Do you talk to him about his

22         job?

23                   PROSPECTIVE JUROR OWENS:  Mostly his wife.  His

24         wife and I are very close friends.

25                   THE COURT:  Okay.  All right, anything about
```

```
1              your relationship with your friend or her husband who is
2              the police officer that you think would make it difficult
3              for you to be fair and impartial in this case?  You know,
4              understanding that Ms. Kerr, at the time of the events
5              here, was an employee of the Michigan Department of
6              Corrections, which is going to be my next question.  And
7              so, you know, she was, in fact, a law enforcement officer
8              at the time.  Any problems for you posed by that fact?
9                        PROSPECTIVE JUROR OWENS:  I don't think so.
10                       THE COURT:  Okay.  So that's my next -- oh, yes,
11             sir?  Mr. Johnson.
12                       PROSPECTIVE JUROR JOHNSON:  My -- my friend
13             works as a cop.
14                       THE COURT:  Okay.
15                       PROSPECTIVE JUROR JOHNSON:  In Clinton Township.
16                       THE COURT:  I grew up in Clinton Township.
17                       PROSPECTIVE JUROR JOHNSON:  Oh, yeah?
18                       THE COURT:  Uh-huh.  My back fence was the
19             borderline with Mount Clemens.
20                       PROSPECTIVE JUROR JOHNSON:  Okay.  I don't
21             actively --
22                       THE COURT:  Name's not Bill Yeagley, is it?
23                       PROSPECTIVE JUROR JOHNSON:  No.  I don't -- I
24             don't talk to him about his job.  If he brings it up, but
25             it's very rarely that he'll talk to me about what he does.
```

```
1                    THE COURT:  Okay.  Anything about having --

2          simply having a friend who is a police officer you think

3          would make it hard for you to be impartial in this case?

4                    PROSPECTIVE JUROR JOHNSON:  I don't think so.

5                    THE COURT:  So my next question is, any -- same

6          question.  Have you, family member, close friend, ever

7          worked for the Michigan Department of Corrections?

8                    THE JURORS:  (No audible response.)

9                    THE COURT:  Does anybody, in a civil case such

10         as this, your job is to decide whether or not Mr. Dykes-Bey

11         has proven his case against Mrs. Kerr.  Is there anyone who

12         for religious, moral, ethical, or other reasons believes

13         that you couldn't perform that duty?  I mean we don't get a

14         "yes" to that very often, but occasionally we do.  There

15         are folks who, for religious reasons, think they can't sit

16         in judgment, even on a dispute between, you know, two

17         citizens like this.  Does everyone understand that merely

18         being sued, so simply the fact that Mr. Dykes-Bey filed the

19         lawsuit, does not necessarily mean that Mrs. Kerr did

20         anything wrong?  Anybody -- everybody understand that?

21                   THE JURORS:  (No audible response.)

22                   THE COURT:  Anybody not understand that?

23                   THE JURORS:  (No audible response.)

24                   THE COURT:  Okay.  At the end of the trial I'll

25         be giving you instructions on the law that you have to
```

—30—

1          apply in deciding the case.  If any of my instructions are

2          in conflict with your own beliefs, or if you personally

3          disagree with my instructions or with the law, will you set

4          aside your personal feelings and decide the case only based

5          on the law as I give it to you?  Anybody not able to do

6          that?  Commit to that?

7                    THE JURORS:  (No audible response.)

8                    THE COURT:  Because you have to.  I mean I'm

9          going to give you the law.  You might not disagree -- you

10         might not agree with the law.  I don't agree with all the

11         laws, but, you know, it's my job to enforce the laws.  It's

12         your job as jurors to follow the law in deciding the issues

13         in this case.  Everybody good with that?

14                   THE JURORS:  (No audible response.)

15                   THE COURT:  Kind of the other flip side of the

16         coin about simply filing a lawsuit doesn't mean the

17         defendant necessarily did anything.  Is there anybody who

18         has a problem with the idea that an injured party can file

19         a lawsuit and get damages?  Because that, of course, is

20         exactly what Mr. Dykes-Bey is attempting to do in this

21         case.  Anybody, for whatever reason, think no, you

22         shouldn't allow that in our society?

23                   THE JURORS:  (No audible response.)

24                   THE COURT:  All right, I don't see anybody

25         saying yes.  If you're selected to serve on the jury, you

1    will hear the testimony of Mr. Dykes-Bey and Mrs. Kerr, and

2    part of your job will be to decide how credible or

3    believable they are.  Now I'll give you some jury

4    instructions, some law that you'll have to follow in making

5    that decision about how credible each of them are.  But is

6    there anyone of you that believes you can't or will be

7    unable to decide on that issue of credibility?

8              THE JURORS:  (No audible response.)

9              THE COURT:  All right, any other reason that any

10   of you believe you can't serve on this jury, or shouldn't

11   serve on this jury?

12             THE JURORS:  (No audible response.)

13             THE COURT:  All right, Mr. Dykes-Bey, I'm going

14   to give you your chance now.  Before we do that, I'd like

15   to have a sidebar with Mr. Dean and Mr. Dykes-Bey.  So

16   Stephanie, from time to time I'll talk to Mr. Dykes-Bey and

17   Mr. Dean up here.  That's called a sidebar, because it's on

18   the side.  You can cut across.  That's fine.  And when we

19   do that, Stephanie's going to turn on some white noise so

20   that you all can't hear what we're talking about.

21             (From 9:44 am to 9:45 a.m., off the record bench

22   conference with white noise.)

23             THE COURT:  Before you start, Mr. Dykes-Bey, I

24   just wanted to say one other thing to the jurors about the

25   trial.  I don't -- I guess I didn't say this, but our

—32—

1          schedule each day, today and tomorrow, will be -- we're

2          going to start at 9 o'clock -- all right, Stef, I'm going

3          to forget the times.  We're going to start at 9 o'clock.

4          We're going to go until 10:15?

5                    THE CLERK:  10:30.

6                    THE COURT:  10:30.  We'll take a 15 minute

7          break, we'll come back at 10:45, we'll go to 12:15.  12:15?

8          We'll take a 15 minute break, and then we'll come back and

9          we'll go to 2, and we're going to adjourn for the day at 2

10         each day of the trial.  So that will be our schedule.  Now

11         we do that for a couple reasons.  One is, you know,

12         Stephanie and I have a lot of other cases, you know, that

13         we're -- other plates we're juggling at the same time, so

14         we need court time to take care of those matters.

15                    One of the benefits, however, for you we have

16         found from past jurors is you miss the traffic.  So if you

17         have to be here at 9, you don't get in that big snarl that

18         occurs every morning here, and you miss the snarl on the

19         way home.  In the past, I'm not saying you have to like it,

20         but in the past our feedback from jurors has been pretty

21         positive about that schedule.  So that will be our

22         schedule.

23                    All right, Mr. Dykes-Bey, voir dire.  The floor

24         is yours.  You want to come to the podium and ask away.

25                    MR. DYKES-BEY:  (Unintelligible) you covered

—33—

1          everything, but I just got one question.  Have any of you

2          or any member of your family or a close friend been

3          convicted of a crime or victim of a crime?  Okay.

4                    THE COURT:  Mr. Moore.  I'll help you with some

5          names, since I've got the seating chart.

6                    MR. DYKES-BEY:  Thank you.

7                    THE COURT:  Sure.

8                    PROSPECTIVE JUROR MOORE:  My brother, when he

9          was a child, was convicted of (unintelligible).  I guess he

10         was put like in a kids --

11                   MR. DYKES-BEY:  Youth home type.

12                   PROSPECTIVE JUROR MOORE:  Or no, not a home.  It

13         was more fenced in.

14                   MR. DYKES-BEY:  Oh.

15                   PROSPECTIVE JUROR MOORE:  Him and some friends

16         beat up somebody and he was put away for a couple years.  I

17         don't really -- I was in the military at the time, so I

18         don't really know much about it.

19                   MR. DYKES-BEY:  Okay.

20                   THE COURT:  Ms. Mobley.

21                   PROSPECTIVE JUROR MOBLEY:  Yeah, my daughter was

22         convicted of a repeat DUI, and was in jail for three weeks.

23                   THE COURT:  All right.  Ms. Tice.  We haven't

24         from you yet, have we?

25                   PROSPECTIVE JUROR TICE:  Yeah.

—34—

1              THE COURT:  Oh, good.

2              PROSPECTIVE JUROR TICE:  My son was incarcerated

3       for a year for beating up someone.  And our son-in-law just

4       went to -- to jail for raping a (unintelligible).

5              MR. DYKES-BEY:  Is that it?

6              THE COURT:  Mr. Roberts.

7              PROSPECTIVE JUROR ROBERTS:  My son was convicted

8       of breaking and entering.

9              MR. DYKES-BEY:  Okay.  And as I said, the judge

10      basically covered everything.  Thank you.

11             THE COURT:  All right.  And may I say, "Kids,

12      huh?"  Mr. Dean.

13             MR. DEAN:  Thank you, your Honor.  Good morning.

14      I work for the Michigan Attorney General, which, as you

15      know, the attorney general itself is an elected office, and

16      you may or may not agree with his politics.  Is that

17      standing in the way of you being able to judge this case?

18      I'm not on the political end of it.  I'm a career, so you

19      don't have to worry about me one way or the other.  How

20      about corrections?  Has anyone here visited a Michigan

21      Department of Corrections prison or jail?  Okay.

22             UNIDENTIFIED PROSPECTIVE JUROR:  My daughter was

23      in jail, Kent County.  We visited her, yes.

24             UNIDENTIFIED PROSPECTIVE JUROR:  My son

25      (unintelligible.)

1           MR. DEAN:  And which, was he in prison or jail?

2           UNIDENTIFIED PROSPECTIVE JUROR:  Muskegon

3       Correction Center.

4           MR. DEAN:  Okay.  And you visited?

5           UNIDENTIFIED PROSPECTIVE JUROR:  Yes.

6           MR. DEAN:  Okay.  Yes, sir?

7           UNIDENTIFIED PROSPECTIVE JUROR:  Kent County

8       Jail.

9           MR. DEAN:  Okay.  Anything about your visits

10      that gave you kind of a one-sided view of, and would affect

11      your ability to be a juror here today?

12          PROSPECTIVE JURORS:  (No audible response.)

13          MR. DEAN:  You're going to hear from

14      Mr. Dykes-Bey first, and I know that there's a human kind

15      of a prejudice that the first thing you hear has undue

16      importance sometimes, and then after he testifies, you're

17      going to hear from Nancy.  So I want to just make sure that

18      each of you will have the ability to withhold judgment in

19      what you think of this case until you've heard both sides.

20      That's all I have.  Thank you.

21          THE COURT:  Okay.  Now I'm going to have the

22      lawyers come up.  Mr. Dykes-Bey, did that, any other

23      question you wanted to ask that Mr. Dean --

24          MR. DYKES-BEY:  No, that's --

25          THE COURT:  Okay.  I'm going to have them come

1       up, we're going to have a conversation, again the white

2       noise will be on.  So we'll be back with you momentarily.

3       Gentlemen?

4                     (From 9:51 a.m. to 9:5 a.m., off the record

5       bench conference with white noise.)

6                     THE COURT:  We're going to take a short pause

7       here.  One of the jurors in the back had to take a short

8       break.  All right, back in business.  All right,

9       Mr. Keeler, I've discussed with the lawyers your son's

10      situation and have reason to believe that it's very

11      unlikely the day care will take him because that disease is

12      so infectious that if he's there and he poses a risk of

13      infecting all the other kids, and so we've agreed that

14      under those circumstances, you know, your best place is

15      home taking care of your son.  So we're going to excuse you

16      from the jury.  Thank you for coming down, and we

17      appreciate your time, and you may go.

18                    MR. KEELER:  (Through interpreter.)  Okay, thank

19      you.  You're welcome.

20                    THE COURT:  Ladies, thank you for your service.

21      We appreciate you coming down.

22                    INTERPRETER OAKLEY-STANAWAY:  Thank you.

23                    THE COURT:  Yup.

24                    INTERPRETER CREASY:  Thank you.

25                    THE COURT:  You're welcome.  I'm happy to know

—37—

1          there is such a service.  I'm sure it will come up again,

2          so --

3                    MR. KEELER:  Thank you, sir.

4                    THE COURT:  All right, what we're going to do

5          next is call a name.  This will be the ninth name which was

6          randomly selected by the computer, so if your name is

7          called, please come forward and take seat seven.

8                    THE CLERK:  Juror number 50, Denise

9          Elizabeth-Dil Cripps.

10                   THE COURT:  Thank you.  And that seat now, of

11         course, is known as the hot seat, so.  All right, Ms., and

12         is Dil -- I see Eliz -- in my crazy piece of paper here the

13         hyphen appears between Elizabeth and Dil.  Is your last --

14         how do you wish to be referred to?

15                   PROSPECTIVE JUROR CRIPPS:  My last name is

16         Cripps.

17                   THE COURT:  Cripps?  Okay.  Ms. Cripps, you

18         heard the questions that I asked to the folks up here.  Are

19         there any -- would you have answered any of those questions

20         in a way that you think we'd be interested in, that we need

21         to know about?

22                   PROSPECTIVE JUROR CRIPPS:  No, I think -- I

23         don't have anything to add.

24                   THE COURT:  All right.  I'm going to just ask

25         you a couple.

1              PROSPECTIVE JUROR CRIPPS:  Sure.

2              THE COURT:  All right, can you think of any

3    reason, you've heard some now, you've heard both from

4    Mr. Dykes-Bey, you've heard from Mr. Dean, you've heard me

5    blabber on.  Anything about this situation that you think

6    would make it hard for you to be fair and impartial?

7              PROSPECTIVE JUROR CRIPPS:  (No audible

8    response.)

9              THE COURT:  Any connections to Michigan

10   Department of Corrections, Michigan Attorney General, law

11   enforcement, that you think would make it difficult for you

12   to serve?

13             PROSPECTIVE JUROR CRIPPS:  No.

14             THE COURT:  Or might slant your view of the

15   evidence in any way?

16             PROSPECTIVE JUROR CRIPPS:  No.  No problem.

17             THE COURT:  All right.  Have you heard anything

18   about the case?

19             PROSPECTIVE JUROR CRIPPS:  No.

20             THE COURT:  Do you know Mr. Dykes-Bey, Mr. Dean,

21   or Ms. Kerr?

22             PROSPECTIVE JUROR CRIPPS:  No.

23             THE COURT:  All right.  Gentlemen, questions?

24   Mr. Dykes-Bey, any questions --

25             MR. DYKES-BEY:  No.

1              THE COURT:  -- for Ms. Cripps?

2              MR. DYKES-BEY:  No, sir.

3              THE COURT:  All right, Mr. Dean?

4              MR. DEAN:  No, your Honor.

5              THE COURT:  All right.  What we're going to do

6       next is I'm going to have Mr. Dykes-Bey and Mr. Dean come

7       up again and we'll put the white noise on again, and we'll

8       talk about you folks who are in the box.  And we may or may

9       not excuse some of you.  We'll see.  But it will take us a

10      minute.  And this is the way the process will work until

11      we've got the eight lucky finalists.

12              (From 9:59 a.m. to 10:00 a.m., off the record

13      bench conference.)

14              THE COURT:  Thanks, Stef.  We're going to do

15      this one at a time, so more than one of you are likely to

16      be excused, but we're going to do it one at a time and

17      refill your seats one at a time, for reasons that I guess

18      don't really probably matter to you, but it's a more

19      deliberate process that way.  So the first person that

20      we're going to excuse, and I'm sure she won't be

21      disappointed to learn this, is Ms. Carter.

22              MS. CARTER:  Okay.

23              THE COURT:  So thank you for coming down.

24      Appreciate you taking the time.  Sorry to hear about the

25      death in your family.

```
 1                    MS. CARTER:  Thank you very much.

 2                    THE COURT:  You're welcome.

 3                    MS. CARTER:  Appreciate it.

 4                    THE COURT:  You're welcome.  Be safe, and I mean

 5          that.  Especially when you're in the captain's chair and

 6          I'm in the cabin, right?

 7                    MS. CARTER:  We try.

 8                    THE COURT:  I know you do.  My dad was a pilot,

 9          so.

10                    MS. CARTER:  Oh, great.  Thank you.

11                    THE COURT:  Yup.  Uh-huh.

12                    THE CLERK:  Juror number 11, Debbie Lynn

13          Kaldenberg.

14                    THE COURT:  Thank you.  All right, hi,

15          Ms. Kaldenberg.

16                    PROSPECTIVE JUROR KALDENBERG:  Hello.

17                    THE COURT:  How are you this morning?

18                    PROSPECTIVE JUROR KALDENBERG:  Well, thank you.

19                    THE COURT:  Good.  Anything that you think we

20          should know about you, based upon the questions and answers

21          you've heard?

22                    PROSPECTIVE JUROR KALDENBERG:  No.  I don't have

23          anything -- anything that would be meaningful to

24          (unintelligible.)

25                    THE COURT:  All right.  Ever been on a jury?
```

1       PROSPECTIVE JUROR KALDENBERG:  No.

2       THE COURT:  Okay.  Any connections to Michigan

3   Attorney General, Michigan Department of Corrections, or

4   law enforcement in general?

5       PROSPECTIVE JUROR KALDENBERG:  (Unintelligible.)

6       THE COURT:  Any member of your family, close

7   friend, ever been a party to either a civil or a criminal

8   matter?

9       PROSPECTIVE JUROR KALDENBERG:  Well, my son last

10   year was involved in a drunk driving case.

11       THE COURT:  Okay.  Where -- was that here in

12   Kent --

13       PROSPECTIVE JUROR KALDENBERG:  That was here in

14   district court.

15       THE COURT:  Okay.

16       PROSPECTIVE JUROR KALDENBERG:  Judge Smolenski.

17   And -- and with her advising me and guidance,

18   (unintelligible.)

19       THE COURT:  Okay.  So did he end up -- how did

20   his case, was it -- did it go to trial, or was it resolved

21   some other way?

22       PROSPECTIVE JUROR KALDENBERG:  (Unintelligible.)

23       THE COURT:  Okay.

24       PROSPECTIVE JUROR KALDENBERG:  (Unintelligible.)

25   It was just her courtroom.

—42—

1          THE COURT:  All right, anything else you can

2     think of, I know you've said no, but anything you can think

3     of in your life experience that would make it hard for you

4     to be fair and impartial, based upon what you know about

5     this case?

6          PROSPECTIVE JUROR KALDENBERG:  (Unintelligible.)

7          THE COURT:  All right.  Mr. Dykes-Bey,

8     questions?

9          MR. DYKES-BEY:  No, your Honor.

10          THE COURT:  Mr. Dean?

11          MR. DEAN:  No, your Honor.

12          THE COURT:  Okay, gentlemen, come forward.

13          (From 10:03 a.m. to 10:03 a.m., off the record

14     bench conference with white noise.)

15          THE COURT:  All right, Ms. Mobley, thank you so

16     much for your time.  We appreciate it.  Have a wonderful

17     day.

18          PROSPECTIVE JUROR MOBLEY:  Thank you.

19          THE COURT:  It looks beautiful out there, so.  I

20     wish someone would excuse me and I could go to the golf

21     course, but I guess that's not to be.

22          THE CLERK:  In seat number eight, juror number

23     23, Amiya Gabrielle Ezell-Taylor.

24          THE COURT:  Hi, Ms. Ezell-Taylor, how are you?

25          PROSPECTIVE JUROR EZELL-TAYLOR:  Good.

```
 1                    THE COURT:  So, you know the question that's

 2       coming, right?

 3                    PROSPECTIVE JUROR EZELL-TAYLOR:  (No audible

 4       response.)

 5                    THE COURT:  All right.  So what's the answer?

 6                    PROSPECTIVE JUROR EZELL-TAYLOR:  Nothing that

 7       would stop me from being truthful and honest and fair.

 8       However, I do have ties to the Department of Corrections.

 9                    THE COURT:  Okay.  Tell us about those.

10                    PROSPECTIVE JUROR EZELL-TAYLOR:  My dad is

11       incarcerated.

12                    THE COURT:  Okay.  And where -- where is he

13       housed?

14                    PROSPECTIVE JUROR EZELL-TAYLOR:  He lived in

15       Ionia, but he's now in a place, it's by the Mackinac

16       Bridge.

17                    THE COURT:  Okay.  I don't know the name.

18       Mr. Dean, can you help me out?

19                    MR. DEAN:  There would --

20                    PROSPECTIVE JUROR EZELL-TAYLOR:  I want to say

21       it starts with a --

22                    MR. DEAN:  Chippewa or --

23                    PROSPECTIVE JUROR EZELL-TAYLOR:

24       (Unintelligible.)  I think it is in the Chippewa.

25                    THE COURT:  Chippewa County?  Yeah.  Okay.
```

1          MR. DEAN:  Oh, I'm sorry.  Ken Ross Correctional

2     Facility or Chippewa.

3          PROSPECTIVE JUROR EZELL-TAYLOR:  I think he's

4     actually (unintelligible.)

5          THE COURT:  Do you have -- do you go to visit

6     him?  Have you been to visit him?

7          PROSPECTIVE JUROR EZELL-TAYLOR:

8     (Unintelligible.)

9          THE COURT:  Okay.  Anything about that

10    experience which you think would make it difficult for you

11    to be fair and impartial?  In other words, you've been in a

12    Michigan prison and had a view of that system, so anything

13    about that experience, visiting him, that you think would

14    affect your ability to decide this case, just on the facts?

15         PROSPECTIVE JUROR EZELL-TAYLOR:  No.

16         THE COURT:  Okay.  How about on the other side

17    of the coin, any connections to the Michigan Attorney

18    General or anybody who works for Department of Corrections

19    or law enforcement?

20         PROSPECTIVE JUROR EZELL-TAYLOR:  My friend works

21    for the Muskegon Prison.  She works in the kitchen.

22         THE COURT:  Oh, okay.  I wouldn't think that

23    would have an effect, but would that have any effect on

24    your ability to be fair and impartial?

25         PROSPECTIVE JUROR EZELL-TAYLOR:  (No verbal

1           response.)

2                     THE COURT:  All right, questions, Mr. Dykes-Bey?

3                     MR. DYKES-BEY:  No, your Honor.

4                     THE COURT:  All right, Mr. Dean?

5                     MR. DEAN:  No, your Honor.

6                     THE COURT:  Okay.  Gentlemen, come forward.

7                     (From 10:06 a.m. to 10:07 a.m., off the record

8           bench conference with white noise.)

9                     THE COURT:  Did I say, I meant to say if I

10          didn't say, maybe I did say, that each side gets to excuse

11          three of you.  So if I didn't say that, I meant to.  If so,

12          you kind of know how long this is likely to go on.

13          Mr. Tice -- Ms. Tice, Mr. Tice, I'm sorry.  Ms. Tice,

14          clearly you're not Mr. Tice.  Thank you so much for your

15          time.

16                     THE CLERK:  Seat number five, juror number 48,

17          Madeline Marie Newell -- New-well.

18                     THE COURT:  Ms. Newell.

19                     PROSPECTIVE JUROR NEWELL:  Hi.

20                     THE COURT:  Hi.  Can you be fair and impartial

21          in this case?

22                     PROSPECTIVE JUROR NEWELL:  I believe so.

23                     THE COURT:  All right.  Any -- any questions

24          that we've asked that you think we'd be interested in the

25          answer to?

```
 1                    PROSPECTIVE JUROR NEWELL:  (No verbal response.)

 2                    THE COURT:  Any connections to Department of

 3       Corrections, the Attorney General, or law enforcement?

 4                    PROSPECTIVE JUROR NEWELL:  Well, yeah.

 5                    THE COURT:  Okay, tell us about those.

 6                    PROSPECTIVE JUROR NEWELL:  My uncle is a police

 7       officer in (unintelligible), and my grandpa used to be a

 8       state trooper and he worked up, he was a State

 9       Representative for a while.

10                    THE COURT:  Okay.  Your uncle and your grandpa.

11       Where does your uncle work?

12                    PROSPECTIVE JUROR NEWELL:  Dewitt.

13                    THE COURT:  All right.  So he's -- is he a

14       member of the Dewitt Police Department?

15                    PROSPECTIVE JUROR NEWELL:  Uh-huh.

16                    THE COURT:  Okay.  And your grandpa was a

17       Michigan State Police trooper.

18                    PROSPECTIVE JUROR NEWELL:  (No verbal response.)

19                    THE COURT:  And then you said he served as a

20       State Rep?

21                    PROSPECTIVE JUROR NEWELL:  (No verbal response.)

22                    THE COURT:  Do you talk to your uncle or your

23       grandpa about their experiences as police officers?

24                    PROSPECTIVE JUROR NEWELL:  (No verbal response.)

25                    THE COURT:  Is it -- I'm going to have to ask
```

1          you to answer "yes" or "no."

2                    PROSPECTIVE JUROR NEWELL:  Oh, yeah.

3                    THE COURT:  Because we're recording everything,

4          and sometimes I understand what you're saying, but later

5          it's hard -- it could be hard for people to know whether

6          you're saying "uh-huh," or "uh-uh."

7                    PROSPECTIVE JUROR NEWELL:  Yeah.  Sorry.

8                    THE COURT:  Anything about those conversations

9          that you think would slant you one way or another?

10                   PROSPECTIVE JUROR NEWELL:  No.

11                   THE COURT:  I mean understand that this case is

12         in some ways going to come down to the, you know, who you

13         believe, Mr. Dykes-Bey, who was in the Michigan prison

14         system at the time, or Mrs. Kerr, who was a law enforcement

15         officer.

16                   PROSPECTIVE JUROR NEWELL:  No, I would like to

17         think that I'm a pretty fair and just person, so I know

18         that those things (unintelligible) affect my views.

19                   THE COURT:  Okay.  I think this is very

20         unlikely, but have you ever sat on a jury before?

21                   PROSPECTIVE JUROR NEWELL: (No verbal response.)

22                   THE COURT:  Mr. Dykes-Bey, questions?

23                   MR. DYKES-BEY:  No, your Honor.

24                   THE COURT:  All right, Mr. Dean?

25                   MR. DEAN:  No, your Honor.

```
 1                    THE COURT:  Gentlemen?
 2                    (From 10:10 a.m. to 10:11 a.m., off the record
 3          bench conference with white noise.)
 4                    THE COURT:  All right, Mr. Johnson, thanks for
 5          your time.
 6                    THE CLERK:  In seat number three, juror number
 7          seven, Alicia Bernice Tumele.
 8                    THE COURT:  All right, is it Tu-mell or Tu-meal?
 9                    PROSPECTIVE JUROR TUMELE:  It's Tum-e-lee.
10                    THE COURT:  Not even close.
11                    PROSPECTIVE JUROR TUMELE:  I know.
12                    THE COURT:  I'm sorry.
13                    PROSPECTIVE JUROR TUMELE:  I spell it
14          differently.  I'm a teacher, so I spell it differently on
15          my board, just so my students can get it right.
16                    THE COURT:  Ah.
17                    PROSPECTIVE JUROR TUMELE:  Yeah.
18                    THE COURT:  Wise.  Although not, yeah, that
19          would have been good.
20                    PROSPECTIVE JUROR TUMELE:  Yeah.
21                    THE COURT:  Ms. Tumele, you think you can be
22          fair and impartial?
23                    PROSPECTIVE JUROR TUMELE:  (No verbal response.)
24                    THE COURT:  Heard anything that would -- any
25          answer that you would give to any of those questions that
```

—49—

```
1            would cause us concern?

2                     PROSPECTIVE JUROR TUMELE:  No.

3                     THE COURT:  Ever been on a jury?

4                     PROSPECTIVE JUROR TUMELE:  No.

5                     THE COURT:  Any connections to law enforcement,

6            Department of Corrections, or the Attorney General's

7            Office.

8                     PROSPECTIVE JUROR TUMELE:  My dad was a parole

9            officer.

10                    THE COURT:  Okay.  Where?

11                    PROSPECTIVE JUROR TUMELE:  Muskegon County.

12                    THE COURT:  Is he still?

13                    PROSPECTIVE JUROR TUMELE:  No.  Retired.

14                    THE COURT:  How long has he been retired?

15           Ballpark?

16                    PROSPECTIVE JUROR TUMELE:  Five years-ish.

17                    THE COURT:  All right.  How long was he a parole

18           officer in Muskegon?

19                    PROSPECTIVE JUROR TUMELE:  Probably twenty

20           years, maybe.

21                    THE COURT:  Okay.

22                    PROSPECTIVE JUROR TUMELE:  Maybe, no, you know,

23           it's probably not that long.  Maybe ten or fifteen years.

24                    THE COURT:  So as a parole officer, did he work

25           with folks who were out of prison, back in the community?
```

—50—

1           Is that what --

2                    PROSPECTIVE JUROR TUMELE:  Right.

3                    THE COURT:  -- his job was?

4                    PROSPECTIVE JUROR TUMELE:  Correct, yes.

5                    THE COURT:  So just so folks understand the way

6           it works in Michigan, somebody who is incarcerated in the

7           Michigan Department of Corrections in a prison, many or

8           most of those folks will come up for parole eventually.

9           And if they -- they go before a parole board.  If they're

10          paroled, then they're returned to the community, but they

11          remain under court supervision.  So under the supervision

12          of somebody like Ms. Tumele's dad.  So I'm guessing your

13          dad probably came home from work from time to time and

14          talked about the job.

15                   PROSPECTIVE JUROR TUMELE:  Yeah.

16                   THE COURT:  Okay.  So anything about those

17          conversations that you think would make it difficult for

18          you to be fair and impartial towards Mr. Dean, who, you

19          know, was in prison at the time of these events?

20                   PROSPECTIVE JUROR TUMELE:  No.

21                   THE COURT:  Okay.  Mr. Dean -- or Mr. Dykes-Bey,

22          questions?

23                   MR. DYKES-BEY:  No, your Honor.

24                   THE COURT:  Okay, Mr. Dean?

25                   MR. DEAN:  No, your Honor.

1           THE COURT:  All right, gentlemen?

2           (From 10:14 a.m. to 10:15 a.m., off the record

3     bench conference with white noise.)

4           THE COURT:  All right, Ms. Ezell-Taylor, thank

5     you.  Appreciate your time.

6           PROSPECTIVE JUROR EZELL-TAYLOR:  I enjoyed it.

7           THE COURT:  We appreciate you coming.  Thank

8     you.

9           THE CLERK:  In seat number eight, juror number

10    46, Destiny Lynn Totten.

11          THE COURT:  All right, so first question for you

12    is, was your great grandfather a principal at Seminole

13    Elementary School in Mount Clemens, Michigan?

14          PROSPECTIVE JUROR TOTTEN:  That I wouldn't know

15    because I married into the name.

16          THE COURT:  Ah.  Okay.  All right, fair enough.

17    Because if so, he had a paddle, and I'm going to tell you

18    something, he was not afraid to use it.  Back in those

19    days.  All right, any -- do you think you can be fair and

20    impartial to both parties in this case?

21          PROSPECTIVE JUROR TOTTEN:  Yes.

22          THE COURT:  Any connections to law enforcement,

23    Michigan Attorney General, or the Department of

24    Corrections.

25          PROSPECTIVE JUROR TOTTEN:  No.

—52—

1          THE COURT:  Ever been on a jury?

2          PROSPECTIVE JUROR TOTTEN:  No.

3          THE COURT:  Have family member, close friend,

4     you, yourself, ever been involved in a criminal or civil

5     case?

6          PROSPECTIVE JUROR TOTTEN:  No.

7          THE COURT:  Just too easy answers.  Got to be

8     something.  I just need to dig deeper, huh.

9          PROSPECTIVE JUROR TOTTEN:  Yeah.

10          THE COURT:  What's your favorite TV show?

11          PROSPECTIVE JUROR TOTTEN:  I don't watch TV.

12          THE COURT:  All right.  How do you spend your

13     free time?

14          PROSPECTIVE JUROR TOTTEN:  I'm a farmer.

15          THE COURT:  Okay, you don't have free time is

16     what you're saying.

17          PROSPECTIVE JUROR TOTTEN:  No.

18          THE COURT:  Okay.  What -- what do you farm?

19          PROSPECTIVE JUROR TOTTEN:  Cows.

20          THE COURT:  Okay.  Dairy or beef?

21          PROSPECTIVE JUROR TOTTEN:  Beef.

22          THE COURT:  Whereabouts?

23          PROSPECTIVE JUROR TOTTEN:  Rodney.

24          THE COURT:  Okay.  Rodney.  I have a place up

25     there not far from Rodney.  I actually drive through Rodney

1          all the time.

2                   PROSPECTIVE JUROR TOTTEN:  Let me guess,

3          Canadian Lakes.

4                   THE COURT:  Well, it's near there.  It's close

5          to there.  I stop at that whatever, what is that, a Mobile

6          station?

7                   PROSPECTIVE JUROR TOTTEN:  The Rodney General.

8                   THE COURT:  Yeah, exactly.

9                   PROSPECTIVE JUROR TOTTEN:  Yeah, the only thing

10         in Rodney.

11                  THE COURT:  The only thing.  Well, no.  There's

12         the bar or restaurant across the street.

13                  PROSPECTIVE JUROR TOTTEN:  Oh, yeah.  Don't

14         forget that.

15                  THE COURT:  Gentlemen, I have exhausted, you

16         know, my questions here.  I've got nothing for Ms. Totten.

17         Other than resentment towards her great grandfather for the

18         spankings he laid on me when I was an elementary school

19         student.  All right, come forward.

20                  (From 10:18 a.m. to 10:18 a.m., off the record

21         bench conference with white noise.)

22                  THE COURT:  All right, I'm happy to say that you

23         eight are the jury.  So I'm equally happy to say that you

24         folks in the back of the courtroom are free to go.  You're

25         excused.  Go forth, create no chaos.  Do good works.  Enjoy

—54—

1           the day.

2                    My only question for you is how can you get

3           along with a purse that small?

4                    UNIDENTIFIED JUROR:  It's a diaper bag,

5           actually.

6                    THE COURT:  Okay.  Ms. Carpenter, let me know

7           when you're ready.

8                    THE CLERK:  I'm ready.

9                    THE COURT:  All right.  The parties being

10          satisfied with the composition of the jury, I now ask

11          Ms. Carpenter, the courtroom deputy, to administer the oath

12          to the jury.  After the oath is taken, we're going to take

13          a break.  We'll -- Ms. Carpenter will take you back, show

14          you where the jury room is, and then we'll get started with

15          the evidence.

16                   THE CLERK:  If you would all rise and raise your

17          right hands.

18                   Do you and each of you swear or affirm that you

19          will well and truly try the matters in issue now on trial

20          and render a true verdict according to the law and the

21          evidence, so help you God?  If so, say "I do."

22                   THE JURORS:  I do.

23                   (At 10:20 a.m., jurors sworn.)

24                   THE CLERK:  You may be seated.

25                   THE COURT:  All right, we'll take a break for

1          about 15 minutes, and then we'll come back.  I'm going to

2          give you some preliminary instructions to help you

3          understand the process that's about to unfold before your

4          eyes, so we'll be -- come back and we'll come and get you,

5          but it will be 15 minutes, might be a little bit longer.

6                       (At 10:21 a.m., court in recess.)

7                       (At 10:44 a.m., court back in session, all

8          parties and jury present.)

9                       THE CLERK:  Please be seated.

10                      THE COURT:  All right, before we get rolling, I

11         want to introduce you to Jim Dion.  Jim is my law clerk.

12         He's the real judge here, so he does all the work.  I'm

13         just the pretty face.  And Faith Webb is my judicial

14         assistant, so she is the boss and runs the whole operation.

15         So you may be interacting with them.  If you push the

16         button and need something back in the jury room, it could

17         be one of them or Stephanie who comes to answer, so I just

18         wanted you to know who they were.  So thanks, guys.

19                      All right, we're going to start.  I'm going to

20         read the preliminary instructions, then we'll hear opening

21         statements from the lawyers.  I'll have something to say

22         about that before they give them.  And then it will be time

23         for Mr. Dykes-Bey to begin presenting his evidence.  So

24         preliminary instructions.

25                      Members of the jury, we're about to begin the

1       trial of the case about which you've heard some detail

2       during the process of jury selection.  Before the trial

3       begins, however, there are certain instructions you should

4       have in order to better understand what will be presented

5       before you, and how you should conduct yourselves during

6       the trial.  To the extent that some of these instructions

7       may be repetitive, it's because they're very important to

8       the proper performance of your duties as jurors.

9              The party who brings a lawsuit is called the

10      plaintiff.  In this action the plaintiff is Robert L.

11      Dykes-Bey.  The party against whom the suit is brought is

12      called the defendant.  In this action the defendant is

13      Nancy Marshall, now Nancy --

14              MS. KERR:  Kerr.

15              THE COURT:  Kerr.  Sorry.  Your verdict will

16      decide disputed issues of fact.  You, and you alone, are

17      the judges of the facts.  You will then have to apply those

18      facts to the law as I will instruct you from time to time.

19      You must follow the law as I explain it to you, whether or

20      not you agree with the law.

21              As I said before, I don't necessarily agree with

22      all the laws, but just like you, I have to follow them.

23              I will decide all questions of law that arise

24      during the trial.  And before you retire to deliberate at

25      the close of the case, I will instruct you on the law that

—57—

1        you must follow and apply in deciding your verdict.

2                Nothing that I may say or do during the course

3        of the trial is intended to indicate, nor should be taken

4        by you as indicating what your verdict should be.  During

5        the course of the trial I may occasionally ask questions of

6        a witness in order to bring out facts not then fully

7        covered in the testimony.  Please do not assume that I hold

8        any opinion on the matters to which my questions may have

9        related.  Remember that you, as jurors, are at liberty to

10       disregard all comments of the Court in arriving at your own

11       findings as to the facts.

12               From time to time during the trial I may be

13       called upon to make rulings of law on objections or motions

14       made by Mr. Dykes-Bey and Mr. Dean.  It is the duty of

15       Mr. Dykes-Bey and Mr. Dean to object when the other side

16       offers testimony or other evidence which they believe is

17       not properly admissible.  You should not show prejudice

18       against Mr. Dykes-Bey or Mr. Dean or his client because he

19       has made objections.  You will notice that we do not have

20       an official court reporter making a record of the trial, so

21       we will not have any typewritten transcripts of the record

22       available for your use in reaching the decision of this

23       case.

24               Your deliberations will be secret.  You will

25       never have to explain your verdict to anybody.  You will,

—58—

1    hopefully, collaborate on your memory of what was said and

2    what you heard in the courtroom, what you saw in the

3    courtroom, then once you determine what the facts are,

4    apply them to the law as I give you the law in the

5    instructions.

6            I cannot emphasize enough that your decision in

7    this case at the end of the day -- the end of the trial

8    must be based only on what you hear in the courtroom and

9    what you see in the courtroom.  I will ask the courtroom

10    deputy to collect your cellular devices prior to your

11    entering the jury room to deliberate.  Now, we're not going

12    to do that before deliberations, so you can have them back

13    there as the trial goes on, but when you're deliberating,

14    no cell phones, no laptops, iPads, anything like that.

15            I hope that when you spend time together in the

16    jury room you'll understand that you cannot discuss the

17    outcome of the case until such time as it has been handed

18    over to you to decide.  Nothing is final until all the

19    evidence is in and all the arguments have been made.  And

20    that is when you reach a decision based upon your

21    deliberations in the jury room.

22            The parties are both very well prepared, they're

23    knowledgeable, and they will present to you the things that

24    they think you need to know to make your decision in this

25    case.

1              Since you will be called upon to decide the

2       facts of the case, you should give careful attention to the

3       testimony and evidence presented for your consideration,

4       bearing in mind that I'll instruct you further at the end

5       of the trial.  When observing the testimony and making your

6       decision, you must do so without bias or prejudice towards

7       any person.  The parties are equal in the eyes of the law.

8              During the trial in deciding what facts are, you

9       must consider all the evidence.  The evidence from which

10      you will find the facts will consist of the testimony of

11      witnesses, documents, and other things received into the

12      record as evidence, and in facts which the parties have

13      agreed or stipulated to.

14             Certain things are not evidence and must not be

15      considered by you in reaching your decision.  Those include

16      the final arguments and questions by the parties.

17      Objections to questions are not evidence.  You should not

18      be influenced by an objection or by my ruling on an

19      objection.  If the objection is overruled, treat the answer

20      like any other.  If the objection is sustained, ignore the

21      question.  If you're instructed that some item of evidence

22      is received only for a limited purpose, you must follow the

23      instruction that I give you about what that limited purpose

24      is.

25             Testimony that I exclude or tell you to

1    disregard is not evidence and must not be considered.

2    Anything you see or hear outside the courtroom is not

3    evidence and must be disregarded.  You are here to decide

4    the case solely on the evidence presented here in the

5    courtroom.

6              There are two kinds of evidence, direct, and

7    indirect.  Direct evidence means a fact was proved by a

8    document or some other item, or by the testimony of a

9    witness who heard or saw the fact directly.  Indirect

10   evidence, sometimes called circumstantial evidence, is

11   proof of facts from which you may infer or conclude that

12   another fact exists.  A wet raincoat is one example.  The

13   water on a raincoat is not direct evidence that it's

14   raining outside.  Direct evidence would come from someone

15   who was out in the rain, or someone who looked out the

16   window and saw the rain.  The water on a raincoat worn by

17   someone who just came in from outside, however, is indirect

18   or circumstantial evidence that it's raining outside.

19             I will give you further instructions on these,

20   as well as other matters at the end of the case.  But keep

21   in mind that you may consider both direct and

22   circumstantial evidence in reaching your decision.  You are

23   to consider only the evidence in the case, however.  But in

24   consideration of the evidence, you're not limited to the

25   bare statements of the witnesses.  In other words, you're

1     not limited solely to what you see and hear as the

2     witnesses testify.  You are permitted to draw from the

3     facts which you find have been proved such reasonable

4     inferences as you feel are justified in light of your

5     experience.

6           In deciding the facts and considering the

7     evidence, you must decide which testimony to believe and

8     which testimony not to believe, and how much of any

9     witness's testimony to accept or to reject.  You may

10    disbelieve all or any part of any witness's testimony.  In

11    making that decision, you may take into account a number of

12    factors, including the following.  Was the witness able to

13    see or hear or know the things about which that witness

14    testified?  How well was the witness able to recall and

15    describe those things?  What it was witness's manner while

16    testifying?  Did the witness have an interest in the

17    outcome of this case or any bias or prejudice concerning

18    any party or any matter involved in the case?  How

19    reasonable was the witness's testimony considered in light

20    of all the other evidence in the case?  Was the witness's

21    testimony contradicted by what that witness has said or

22    done at another time, or by the testimony of other

23    witnesses or other evidence?  In deciding whether or not to

24    believe a witness, keep in mind that people sometimes

25    forget things.  You need to consider, therefore, whether a

1    contradiction is an innocent lapse of memory or an

2    intentional falsehood, and that may depend on whether it

3    has the do with an important fact, or only with a small

4    detail.  These are some of the factors you may consider in

5    deciding whether to believe testimony.

6            This is a civil case.  The plaintiff has the

7    burden of proving his case by what is called the

8    preponderance of the evidence.  That means the plaintiff

9    has to produce evidence which, considered in light of all

10   the facts, leads you to believe that what plaintiff claims

11   is more likely true than not true.  Now a few words about

12   your conduct as jurors, some basic ground rules.

13           First, during the time you are a juror in this

14   case, do not discuss the case or what you are doing with

15   anyone, or permit anyone to discuss it with you.  Until you

16   retire to the jury room at the end of the case to

17   deliberate on your verdict, you simply are not to talk

18   about this case even with each other.  If anyone tries to

19   talk to you about it, bring it to my attention promptly.

20   The important point to remember is that in our system of

21   justice, conclusions to be reached in a case must be based

22   only on evidence and argument in open court, and not by any

23   outside influence.

24           If a juror talks to or communicates with persons

25   they shouldn't, there may well be a presumption of juror

1    prejudice which could derail the whole trial process.

2            In addition to not discussing the case with

3    anyone in person or on the phone, do not use any electronic

4    devices to communicate about the case or what you are doing

5    with anyone until you've reached your final conclusion in

6    the case and you are told that you can discuss the case

7    under the conditions that I will describe to you at that

8    time.

9            It would violate your oath, for example, to text

10   a family member, friend, or the media about what is

11   happening during the trial or while you are in the jury

12   room.  Do not use your cell phone, BlackBerry, iPhone,

13   e-mail, social networking sites like Twitter, Facebook, to

14   post or even mention that you are on jury duty.  The risk

15   is that such communications, whether or not you intend to,

16   would involve people who are not jurors in possibly

17   influencing you in your decision at the conclusion of the

18   case.  These people have not taken your oath to make a

19   decision based solely on the evidence that you hear in

20   court.  Remember that both parties are entitled to a fair

21   trial by you, and you must follow the instructions as to

22   the law that I will give you at the end of the trial.

23           Second, do not read or listen to anything

24   touching on the case.  This includes any research or

25   investigation about the case on your own, including any

1          research on the Internet.  In this electronic age, vast

2          amounts of information and misinformation are almost

3          instantly available.  But the only information you may

4          consider in performing your duties as jurors is what you

5          see and hear in the courtroom.  Things like Wikipedia and

6          search engines like Google are out of bounds to look up

7          anything about the case.  All of these cautions are aimed

8          at ensuring that you do not form any opinion until all the

9          evidence is in, and that any opinion you do form is based

10         solely on the testimony and evidence you hear and see in

11         the courtroom.  Keep an open mind until you start your

12         deliberations at the end of the case.

13              If you become aware of any violation of these

14         ground rules, let me know immediately, even if it involves

15         another juror.

16              The case will proceed in the following order.

17         First, Mr. Dykes-Bey will make an opening statement.

18         Following his opening statement, Mr. Dean may make an

19         opening statement, or he may defer making his opening

20         statement until after Mr. Dykes-Bey has concluded

21         presenting his evidence.  Neither party is required to make

22         an opening statement.  Please remember that what is said by

23         Mr. Dykes-Bey and Mr. Dean in opening statement is not

24         itself evidence, but is simply designed to provide you with

25         an introduction as to what each side believes the evidence

1       will be.

2                   Second, Mr. Dykes-Bey will introduce testimony.

3       He will take the witness stand and testify in his own

4       behalf, and he may present other evidence in the form of

5       documents that have been admitted into evidence as exhibits

6       in the case.

7                   At the conclusion of Mr. Dykes-Bey's case,

8       Mr. Dean may introduce evidence.  I'm expecting Mr. Dean to

9       call Mrs. Kerr as a witness, and Mr. Dean may also use some

10      of the documents which have been admitted as exhibits.

11      After -- if Mr. Dean in fact introduces evidence,

12      Mr. Dykes-Bey then could, if he chose to, but he doesn't

13      have to, introduce what we call rebuttal evidence.

14                  Third, I will instruct you on the law which you

15      are to apply in reaching your verdict.  These instructions

16      will be in two forms.  I'll read them to you, and I'll ask

17      even now that you be sure to listen carefully when I read

18      them to you at the end of the evidence.  And I'll provide a

19      copy of the instructions to take back to the jury room with

20      you so you can refer to them if you want to during your

21      deliberations.

22                  Many jurors have told me that these hard copies

23      are very helpful.  The parties will present closing

24      arguments to you as to what they consider the evidence has

25      shown, and as to the inferences which they contend you

1       should draw from that evidence.

2               Like opening statement, what is said in closing

3       argument is not itself evidence.  The arguments are

4       designed by Mr. Dykes-Bey and Mr. Dean to present to you

5       the contentions of the parties based on the evidence

6       introduced.  Mr. Dykes-Bey will go first because he has the

7       burden of proof.  Mr. Dean will go second, and then

8       Mr. Dykes-Bey will be allowed to make what's called a

9       rebuttal argument.  So after Mr. Dean goes, Mr. Dykes-Bey

10      will be able to get back up and briefly address whatever

11      points he thinks he needs to, based upon what Mr. Dean has

12      argued.

13              After the evidence has been heard, the arguments

14      and instructions are concluded, you will as a group discuss

15      this matter among yourselves in the jury room and reach a

16      conclusion called a verdict.  You will determine the facts

17      from all the testimony that you hear and from the other

18      evidence that is submitted.  You are the sole and exclusive

19      judges of the facts, and in that field neither I, nor

20      anyone else may invade your province.  However, you are

21      bound to accept the rules of law that I give you, whether

22      you agree with them or not.

23              You will not be required to remain together

24      while court is in recess.  It's important that you obey the

25      following instructions with reference to the recesses of

1    the court.  Do not discuss the case either among yourselves

2    or with anyone else during the course of the trial.  In

3    fairness to the parties, you should keep an open mind

4    throughout the trial, reaching your conclusion only during

5    your final deliberations after all the evidence is in.

6            Though it's normal human tendency to talk to

7    people with whom one is thrown into contact, please do not,

8    during the time you serve on this jury, talk whether in or

9    out of the courtroom, with any of the parties or Mr. Dean,

10   the attorney, and there aren't any other witnesses.  So

11   don't talk to anybody, basically.  By this I mean not only

12   don't talk about the case, but don't talk at all, even to

13   pass the time of day.  So if, for example, you were to run

14   into Mr. Dykes-Bey or Mr. Dean in the elevator, you know,

15   please don't even say hi.  I know it seems funny or silly,

16   but really in no other way than that can both sides be

17   assured of the absolute impartiality which they are

18   entitled to from you as jurors.

19           Do not make up your mind about what the

20   conclusion of this matter should be until after you've gone

21   to the jury room to decide the case and you and your fellow

22   jurors have discussed the evidence.  Make every effort to

23   keep an open mind.  We will handle this case as quickly as

24   we can so as to respect your time.  However, we can't rush

25   things.  The trial must be fair.  We have to follow the law

1       and the rules.

2               We all have busy lives.  We know that you're

3       performing a great service by your presence here, and I'm

4       sure that both sides greatly appreciate that.

5               There will be times when breaks will be

6       necessary for legal matters to be considered.  This would

7       be in addition to the 15 minute schedule breaks that I

8       talked about earlier.  We'll try to keep those unscheduled

9       breaks as brief as possible, but they'll happen, and you

10      should be prepared for that.

11              Finally, I want you to know that if you have any

12      problems, if you can't hear, you can't see, you personally

13      need a break, just let me know by raising your hand or in

14      some other way, and I'll do whatever I can to deal with the

15      situation.  Just don't be shy in letting me know if you

16      have particular accommodations that are needed.

17              All of the exhibits in the case have been

18      preadmitted into evidence, so sometimes in a case, you

19      know, a lawyer will show a party, a witness, a document and

20      say, "Do you recognize this?"  "Yes."  "What is it?"  "It's

21      a contract," you know.  You know, "Who negotiated it," you

22      know, bla bla bla.  So we call that laying the foundation

23      for that exhibit, and if all the elements of the foundation

24      are met, then we allow the case to become part of the --

25      the document to become part of the evidence in the case.

1    In this case we've looked at the documents ahead of time.

2    The parties have made their arguments, I've ruled, so all

3    of the documents which are all contained in this exhibit

4    book have already been admitted into evidence.  So the

5    parties can use them for whatever purpose they want, and

6    you'll be able to -- you'll have a copy of this book to

7    take back to the jury room with you when you deliberate.

8            Certain of the exhibits, and we'll remind you of

9    this later, Exhibits 1, 2, 3, 4, 14, and 16, are grievances

10   filed by Mr. Dykes-Bey.  They are not admitted into

11   evidence in this case for the truth of what is said in

12   those grievances.  Rather, they are admitted for the

13   limited purpose of showing that Mr. Dykes-Bey filed these

14   grievances.  So as I said, we'll talk to you -- we'll

15   remind you of that fact later on.

16           Those conclude my initial instructions and

17   brings us now to opening statements.  Mr. Dykes-Bey will go

18   first.  I've put a limit on the parties of 20 minutes each

19   for their opening statements.  I don't know if they'll use

20   all that, but that's all they get.  So Mr. Dykes-Bey, you

21   want to come to the podium and --

22           MR. DYKES-BEY:  Yeah.

23           THE COURT:  -- deliver your opening statement?

24           MR. DYKES-BEY:  I really don't know -- have

25   much.  I just want you to know that it's a real simple case

1    in this, it deals with the facts.  The facts are very

2    easily to comprehend.  It's not complicated, and it really

3    shouldn't take that long.  Thank you.

4              THE COURT:  All right, Mr. Dean?

5              MR. DEAN:  That's going to be hard to follow in

6    its brevity, so I'll keep it short myself.  First of all,

7    I'd like to thank all of you for your time and service as a

8    jury member.  I know a lot of people kind of inwardly groan

9    when they're told they have to go to jury duty, but I've

10   found over the years of doing this -- these cases, these

11   prisoner cases, it kind of opens up a world that most

12   people don't get to see or hear about.  I know before I had

13   this job, my first -- my only knowledge of prison life was

14   Shawshank Redemption, so it's a vastly different world, and

15   I think it will be enlightening when you get to hear all

16   the testimony.

17             Judge Kent was correct, every lawyer would love

18   to be part of a jury.  I was juror number three in a murder

19   trial last year in Lansing, and survived four rounds of

20   voir dire before the prosecutor finally kicked me off the

21   jury, so I came that close to being in on a murder trial.

22   So I envy you.  It's a fun job, I think, and I think you'll

23   find that it's actually pretty interesting.

24             In terms of this case, Mr. Dykes-Bey is correct,

25   it's a very simple case, and it doesn't get any simpler

1        than having two witnesses, the plaintiff and the defendant,

2        testifying and presenting evidence before you.  I've been

3        involved with cases that take three weeks or longer with 15

4        to 20 witnesses, and sometimes the complications can be

5        tricky to follow.  But in this case we're here for one

6        reason only, and that's Mr. Dykes-Bey's claim that

7        Ms. Nancy Kerr violated his first amendment right to

8        redress the government for grievances, for filing

9        grievances.  It's a retaliation case, and it has certain

10       elements.

11               I'll speak to you for a couple of minutes on

12       those elements, only as a signpost where I think we're

13       going to go with the evidence and testimony here, but keep

14       in mind, as Judge Kent says, he will be the final arbiter

15       of what retaliation claim, the law that you're to follow.

16               It is my understanding that a first amendment

17       retaliation claim requires three elements for Mr. Dykes-Bey

18       to prove.  And the burden of proof is on him to prove his

19       case.  The first element is pretty simple, it's he has to

20       be engaged in protected conduct.  In this case he filed a

21       number of grievances against Ms. Kerr and other individuals

22       working in the food service of the Michigan Reformatory,

23       and as a result of that, he claims that he lost his job.

24       Neither side is disputing that prisoners have a First

25       Amendment right to file grievances, so right off the bat

—72—

1          he's proven element one.

2                    The second element is that the defendant has to

3          have taken an adverse act against the prisoner.  An adverse

4          act could be multiple things, but in this case,

5          Mr. Dykes-Bey is claiming that being terminated from his

6          food service job at Michigan Reformatory was the adverse

7          act.  You will hear testimony from both witnesses, I

8          believe.  Nancy Kerr, and she was Nancy Marshall at the

9          time, so a lot of the documents that you'll see in the

10          exhibit book refer to a Ms. Marshall.  That's Nancy.  She

11          was the classification director at Michigan Reformatory.

12          When prisoners came into the facility, she was in charge of

13          looking at their records, seeing if they had positions open

14          for prisoners, and placing those prisoners in the different

15          jobs.  There's quite a few throughout the prison system.

16          There's food service, there's unit porters, there's all

17          kinds of jobs that prisoners can qualify.  They can do busy

18          work, landscaping, all types of things.  Her job was to

19          place these prisoners in there, in those jobs.

20                    You'll hear testimony that Mr. Dykes-Bey was

21          working in food service.  There are exhibits that we expect

22          to show on both sides that show that at some point in 2014

23          a prisoner who was working in the cafeteria was intercepted

24          by an officer with a note on his person, and we believe

25          that the evidence will show that that note was from

1          Mr. Dykes-Bey.  The note indicated to the prisoner, hey, I

2     need you to pay me for that legal work that I did for you

3     in making arrangements for five bags of coffee to be

4     transferred to him for helping him out with legal work.

5     You'll hear testimony that that is a rules infraction in

6     the Michigan Department of Corrections.  Prisoners are not

7     allowed to enter into contracts with each other to provide

8     legal services for each other, and you'll hear the reasons

9     why that's not acceptable.

10          The other factor that's implicated in the

11    cafeteria job here is we believe the evidence will show

12    that the motivation for terminating him from his assignment

13    is that he was using his work assignment in the cafeteria

14    to conduct this business with this other prisoner,

15    providing legal work, and that that violated the rules of

16    the MDOC.  There was no other motivation on the part of

17    Ms. Kerr to terminate him from his assignment.

18          Now one of the big issues here is that if

19    Mr. Dykes-Bey conveys that there were issues with how he

20    was terminated, i.e., the process, what would tell you is

21    that we're not here for the method or the manner in which

22    he was terminated from his work assignment.  We're here for

23    one reason only, the retaliatory motive, or when it existed

24    or not.  One of the things that you will hear testimony

25    from Nancy is that grievances themselves are a normal part

—74—

1          of the prison process.  They're nonpunitive.  A prisoner

2          files a grievance against an officer, generally speaking,

3          many times the officer doesn't even know that the grievance

4          was filed against them because they don't automatically

5          receive the grievance.  It goes to a grievance coordinator

6          who assigns it a number, and that grievance then gets

7          responded to at different levels.  Sometimes it does

8          involve the person who is being grieved.  They call them in

9          and ask them some questions, whether it's true or not, but

10         many times grievances are resolved at that level and that

11         person never hears about it.  Secondly, there's a

12         three-step process to the grievances.  And one of the

13         things about federal litigation with prisoners is that

14         prisoners have to do what's known as exhausting their

15         administrative remedies.  In other words, they have to take

16         that grievance through the three-step process before they

17         can bring a lawsuit.

18              So it's common, grievances happen all the time,

19         and it really rarely, if ever, affects the person who is

20         being grieved.  It's possible if a prisoner was alleging

21         that an officer sexually assaulted them or physically

22         assaulted them that that grievance might lead to

23         discipline, but in this case I think the evidence will be

24         pretty clear that there were no consequences to the

25         grievance to Ms. Kerr.

1                    So when you evaluate this case and the evidence,

2          what you're going to be looking at is the motivations.  Now

3          one of the things that you'll be touched upon in the jury

4          instructions is this idea of credibility, you know, was --

5          what's the motivation for a person for testifying.  In this

6          case, as simple as it is, it's a little bit difficult

7          because both parties have a vested interest that you

8          believe them.  And Mr. Dykes-Bey wants you to believe that

9          he was retaliated against so that he can get a verdict and

10         potentially a money verdict in his -- on his behalf.

11                   But Ms. Kerr also has a vested interest in you

12         believing her story as well, because in her case, while

13         she's not seeking any money, she's seeking to protect her

14         name, her reputation, or her professional reputation is at

15         stake here because of these allegations.  And so when you

16         have this kind of direct conflict between motivations, the

17         question then becomes, well, how do you evaluate the

18         evidence in light of that.

19                   And I will tell you that commonsense will play a

20         big part in your decision.  You'll not only be evaluating

21         the demeanor of the two witnesses testifying, but you're

22         going to look outside in your own common experience as to

23         does it make sense that Nancy Kerr retaliated against

24         somebody for filing grievances against her and coworkers

25         when there were no direct consequences to her?  She didn't

1          suffer a termination because of these grievances.  I think

2          the evidence will show she wasn't even aware of most of the

3          grievances, certainly not the ones against her coworkers,

4          and so you have to evaluate, is it -- does it make sense

5          that a classification director who is in charge of hiring

6          and terminating a facility with well over a thousand

7          prisoners at all, does it make sense that that would be her

8          motivation.  We would argue it's not, and we'll --

9                    THE COURT:  Mr. Dean, I'm going to interrupt

10         you.  I hate to do that --

11                   MR. DEAN:  Sure.

12                   THE COURT:  -- during an opening statement.  Can

13         I see you and Mr. Dykes-Bey at --

14                   MR. DEAN:  Yeah.

15                   THE COURT:  -- sidebar please.

16                   (From 11:16 a.m. to 11:17 a.m., off the record

17         sidebar conference with white noise.)

18                   MR. DEAN:  And after all that I was going to

19         conclude anyway.  So I thank you for your time.  And we're

20         finished.  Thank you.

21                   THE COURT:  Ladies and gentlemen, a legal issue

22         has come up, so here we are already, an unscheduled

23         adjournment is necessary, so I'm going to send you back to

24         the jury room for a brief time, as soon as I find my

25         cautionary instruction.  Sometimes in trials I read this

—77—

1 every time I send the jury out, and I have come to conclude

2 that it probably isn't necessary, but I'm going to read it

3 to you this time and then remind you of it when we have

4 adjournments in the future.

5    We're going to break now for -- so that I can

6 deal with this legal issue.  In performing your role as a

7 jury, it's important to repeat the ground rules I mentioned

8 in the instructions a moment ago.  First, do not discuss

9 the case with anyone, including each other, or permit

10 anyone to discuss it with you.  Until you retire to the

11 jury room at the end of the case to deliberate, you're

12 simply not to talk about the case.  If anyone tries to talk

13 about it, bring it to my attention.

14    In addition to not discussing the case, don't

15 communicate using in person, telephone, electronic devices,

16 about the case with anyone until I tell you it's okay to do

17 so, and under what conditions.

18    Next, don't read or listen or do any research on

19 the Internet using Google or anything else to find out

20 anything about the case.  If you don't -- and here's the

21 bottom line.  If you don't follow the cautionary

22 instructions, it could pose such a problem in the case,

23 such a defect in the proceedings, that I may have to order

24 a new trial and start the case all over again.  Obviously,

25 that would be a huge waste of time and resources, a waste

1       of your time, my time, and everybody else's time, and we

2       don't want that.  So these cautions are aimed at ensuring

3       that you keep an open mind and don't reach any conclusions

4       until you've heard all of the evidence.

5                    So we're going to send you back to the jury

6       room, I'll have one of my staff come back and get you when

7       we're ready to go again.

8                    (At 11:20 a.m., court in recess.)

9                    (At 11:30 a.m., court back in session.)

10                   THE COURT:  All right, well, I'm happy to report

11      the parties worked it out among themselves, so we are

12      prepared to proceed.  Mr. Dykes-Bey, because he is

13      representing himself and does not have a lawyer, you know,

14      unlike some trials where the plaintiff's lawyer would call

15      the plaintiff to the witness stand and ask the plaintiff a

16      series of questions, obviously Mr. Dykes-Bey is not going

17      to come up and ask himself questions, because that would

18      just be goofy, but he's going to come up, we'll place him

19      under oath, and he will then deliver to you the facts that

20      he believes are important and necessary for you to reach

21      your decision on the issues in this case.  When he's

22      finished, Mr. Dean will be able to cross-examine him, in

23      other words Mr. Dean will be able to ask him a series of

24      questions, and then I will allow Mr. Dykes-Bey to give some

25      additional testimony, if he chooses to, in light of the

1     questions that Mr. Dean has asked him on cross-examination.

2         Now on the other side of the coin, just preview

3     of coming attractions, when Mrs. Kerr is called to the

4     witness stand, Mr. Dean will ask her questions, and then

5     Mr. Dikes bay will be able to cross-examine her or ask her

6     whatever questions he thinks are important.

7         So, with that brief introduction and

8     explanation, Mr. Dykes-Bey, you want to come forward and

9     take the witness stand?

10         MR. DYKES-BEY:  All right.

11         THE CLERK:  If you'll raise your right hand.

12         Do you swear or affirm that the testimony you

13     are about to give relevant to this cause now pending before

14     the court is the truth, the whole truth, and nothing but

15     the truth so help you God?

16         MR. DYKES-BEY:  I do.

17           ROBERT L. DYKES-BEY,

18         sworn by the clerk at 11:32 a.m., took the stand

19     and testified upon his oath as follows.

20         THE CLERK:  Please be seated.

21         THE COURT:  All right, Mr. Dykes-Bey, take it

22     away.

23           DIRECT TESTIMONY

24         THE WITNESS:  Oh, right.  Again, you know, I

25     won't be long and drawn out.  I was incarcerated at

1    Michigan Reformatory in Ionia, Michigan, from 2013 to 2014.

2    During that period, I was classified to food service.  At

3    the time this was my only source of income.

4         In 2014 the Michigan Department of Corrections

5    was making a transitional period.  It had delegated its

6    responsibility to feed its prisoners to Aramark, another

7    company.  So the employees that were working food service

8    at that time were going out and new people were coming in.

9    A couple of those particular individuals came from

10   Riverside when I was housed at Riverside as well, working

11   the food service at Riverside as well.  An officer named

12   Stephen Jones, he used to be a food service supervisor, and

13   when Riverside closed down, he also transferred over to

14   Michigan Reformatory, to continue to be a food service

15   supervisor.

16        He later became a correctional officer when the

17   Michigan Department of Corrections made its transition.  A

18   couple of officers who came in under Aramark was Meadows,

19   North, and Ms. Cordor (ph).  I'm only naming these

20   individuals because they obviously have some significance.

21        When Stephen Jones became a correctional

22   officer, they housed him or placed him in food service as

23   the officer.  And he used to make these inappropriate

24   pat-downs.  And so I wrote a grievance on him, you know,

25   because of his particular conduct.  Anyway, it violated

1    department policy and procedure, the way he was patting,

2    you know, patting me down.  And, you know, he had an issue

3    with it, but that's the way it go.

4            Meadows, he was a food service supervisor.  He

5    was new.  He used to try to, you know, talk to me, but I

6    didn't get personal with staff.  I don't, you know, I'm

7    confident.  I don't, you know, get personal with staff.  So

8    I tried to tell him that, but he didn't accept it.  And he,

9    you know, got a little bent out of shape about it, so he

10   started targeting me.  So I wrote him up as well for

11   discrimination and harassment.  I wrote both of these

12   grievances April 21st, 2014.

13           Six days later, on the 27th, April 27th, Stephen

14   Jones and Meadows both wrote me these counsel reprimands.

15   They was like counsel warnings.  I'll show them to you when

16   we get to the exhibits.  One was for being argumentative.

17   There is no such rule as being argumentative in the MDOC.

18   That was written by Stephen Jones.  The other was written

19   by Meadows.  His claim was that the officer, Stephen Jones,

20   sent me back to my housing unit, and he said because I

21   didn't inform him that he was writing me a counsel

22   reprimand.  I said, "Man, that's not even a rule," but I

23   understand what they was doing.  I'll get to that in a

24   minute, too.

25           The next day Meadows approached me and say,

1       listen, I need you to go back in your area of control and

2       wash the walls.  I did that.  He asked me about it later,

3       "Did you do that assignment I gave you?"  I said I did.  He

4       said, "No, I think you lying."  So he wrote me a ticket for

5       lying to employee, laid me in, tried to get me terminated

6       from my job.  That was the goal.  That's why they gave me

7       the two counsel reprimands, they trying to give me three,

8       get me terminated from my job because of the grievances I

9       wrote on them.

10           So I went back to my housing unit, I talked to

11      Lt. Cusack.  I asked him, "Listen, go back and review the

12      camera in my area of control."  They got cameras all

13      through the MDOC.  "Go back and review the camera, you will

14      find out that this man had lied on me."  So he went back

15      and reviewed the camera, found out that Meadows had lied.

16      So he ripped the ticket up and let me go back to work.

17      Meadows, you know, got bent out of shape.  He ended up

18      quitting a few days later.  He didn't want no pross-up

19      (ph).

20           So North and the other supervisors, they got

21      bent out of shape about it, you know, so North decided that

22      he was going, you know, unsanitary practices, he stuck his

23      hand in the pan of cookies, contaminated the whole pan, so

24      I told him, "I'm going to write you a grievance for that.

25      That's unsanitary practice.  Nobody want to eat behind you

1      like that."  So later on that day, when we was leaving the

2      chow hall, Stephen Jones was shaking down another prisoner

3      and he found a note on that prisoner.  The note allegedly

4      came from me.  It was going to another prisoner named

5      Johnson.  Well, Johnson approached me and asked me to write

6      a letter for him because he couldn't read and write.  He

7      asked me to write a letter for him to the prosecutor's

8      office so he could report a crime.  And because they

9      promote that in prison.  Everywhere you go, you know,

10     everywhere you walk they got Crime Stoppers everywhere.

11     They encourage prisoners, because you got a lot of unsolved

12     mysteries.  And so he wanted to report a crime about a

13     particular murder in his neighborhood, so he asked me to

14     write the letter for him.

15             And in exchange for the courtesy, he offered to

16     pay me five bags of coffee.  Well, I wrote the letter for

17     him or whatever.  He end up, you know, getting fired, so we

18     lost contact and I wrote the letter and asked him, said,

19     "Listen, if you're going to do that for me, just bring it

20     to the chow hall, drop it off to Slim in the dish tank, and

21     I'll get it."  Well, when Stephen Jones shook this guy down

22     and found the note, Ms. Cordor, that's the supervisor, she

23     was the head of all of them, she said, "Listen, because you

24     didn't actually get the, you know, the store items, you

25     didn't commit a rule violation.  So this will be a verbal

1          warning."  That's also logged in the disciplinary tracking

2          sheet because North is the one that put it in there.  It

3          state right in there, verbal warning.

4                    The next day the prisoners -- my job didn't

5          start until 11:30, so when the other guys in my unit got

6          over there, they told North, "Hey, man, Dykes-Bey wrote a

7          grievance on you about that unsanitary practice."

8                    MR. DEAN:  I'm going to object to hearsay, your

9          Honor.

10                   THE COURT:  Okay.

11                   THE WITNESS:  Okay.  All is well.

12                   THE COURT:  You may proceed.  Overruled.

13                   THE WITNESS:  Thank you.  So North in turn wrote

14         a notice of intent, and he put in the notice of intent that

15         I was somehow forcing and extorting prisoners.  So he laid

16         me in and, you know, requested I be terminated from my job.

17         And I wrote a letter to Ms. Kerr.  She was the manager

18         there, she was over all the supervisors.  And I explained

19         the situation to her, told her say, "Listen, this guy

20         lying, you know, extorting who?  Well, who was these

21         prisoners?"  So she kind of agreed we me, so she said,

22         "Listen," she wrote up the 363 and asked that the

23         classification department give me what is called a 30 day

24         conditional period, and that's when they monitor your

25         behavior for 30 days, and if you improve or whatever, you

1      know, you can keep your job.  Well, that didn't happen.

2              June the 2nd the defendant, Nancy Kerr, called

3      me out to the classification department, and when I got

4      there, I brought all the grievances that I had wrote on all

5      the officers, say, "Listen, this just an attack on me, they

6      retaliating against me because of these grievances that I

7      wrote."  She said, "I don't need to see those grievances.

8      I already know about those grievances, and the conflict

9      you're having with the staff in food service.  But that's

10     over with, because you're being terminated from your job."

11     I said, "How you -- how you going to terminate me from my

12     job?"  She say, "Hey listen, ain't nothing else to talk

13     about," and that was that.

14             So I left, I got the report that she made out

15     later on, and it said that her reasons for terminating me

16     was based up on 436 misconduct.  So I went to my ARUS and

17     told my ARUS, say, "Listen, she, you know, terminated me

18     for a 436 misconduct claim that I caught this on the job.

19     I didn't catch no ticket on the job."  So she tried to

20     contact her, sent her a memo, she refused to respond, so I

21     wrote a grievance for retaliation, falsifying documents,

22     and violation of my due process.

23             Make a long story short, everybody that came

24     into contact as far as her superiors was asking, "Where is

25     this ticket you say this man caught?"  She couldn't produce

-86-

1      the ticket.  So when it got to Lansing, her response was,

2      "That was from another facility."  Well why didn't you

3      assert it on there as the reason for termination, if that

4      information don't apply to this facility, you know?  So she

5      evaded that and started expounding on, "Well, he was

6      getting into it with the officers in food service."  Well,

7      that ain't what you asserted on the report which got me

8      terminated from my job.  That's not what you put on there.

9      And me getting into it with the officers is legitimate.  I

10     could write grievances, if the conduct is in violation of

11     policy and procedure.  I'm entitled to write grievances.

12     So why would you discipline me for that?  And that's why we

13     come to the point of where we at today of me filing the

14     lawsuit.

15          After, you know, I was transferred to another

16     facility, that's when I, you know, filed my lawsuit.  When

17     I filed my lawsuit, I received the defense from the

18     defendant, and the defense asserted that her reasons for

19     terminating me from my job was because of the allegations

20     for --

21          MR. DEAN:  Your Honor, objection, again.

22     Hearsay.  These were filings that we had already discussed

23     at the final pretrial conference.  It's not direct

24     testimony.  He's talking about filings that the defendants

25     did later on.

1              THE WITNESS:  No -- no, I --

2              THE COURT:  All right, gentlemen, come to the

3       sidebar.

4                   (From 11:44 a.m. to 11:46 a.m., off the record

5       bench conference with white noise.)

6              THE WITNESS:  Then, that was I believe ten.  Can

7       you pull up Exhibit 10?

8              THE COURT:  Ten?

9              THE WITNESS:  Yeah.  Nancy Marks was an

10      affidavit.  That's why I was there with that.

11             THE COURT:  And ladies and gentlemen, Mr. Dean,

12      because he has a nice iPad, is going to be putting up all

13      the exhibits, both when he wants to use them and when

14      Mr. Dykes-Bey wants to use them.  So he's going to -- going

15      to be our IT guy for the trial.  Thank you for that.

16             MR. DEAN:  Okay.  Which page?

17             THE WITNESS:  Oh, I just wanted you to pull it

18      up because you didn't know which one it was that I was

19      referring to.  So is that okay with you?

20             MR. DEAN:  Yes.

21             THE WITNESS:  Okay.  Okay.  Back to what I was

22      saying.  She had made a claim that she terminated me from

23      my food service job based on the allegations that North put

24      into that notice of the lady in the notice.  As a matter of

25      fact, I want to go to that.  Can you pull up Exhibit 7?

1          MR. DEAN:  Uh-huh.

2          THE WITNESS:  The lady in notice, right here.

3          MR. DEAN:  Okay.

4          THE WITNESS:  It says that, the prisoner was

5     counseled by Jones, he talking about that.  But down a

6     little further it says, "Prisoner admits in the letter

7     that" -- oh, right -- it says, "Upon review of this

8     particular policy, prisoner Dykes-Bey, by his own admission

9     in attached note, is in fact extorting prisoners for doing

10    legal work."  That's just falsehood, you see.  That's not

11    true.  She claimed that she terminated me from my job

12    assignment because of that.  But if you will, I would like

13    for you to pull up Exhibit 9, please.

14          THE COURT:  Uh-huh.

15          THE WITNESS:  But in actuality, you see right

16    there, "Terminated food service 436 misconduct on

17    assignment."  That's what she terminated me for.  But she

18    claimed in a sworn affidavit that she terminated me based

19    on the allegations, the fabrication by north, which is two

20    different things, you see.  But Exhibit 12, please.  I

21    would like to go to the text between her and the grievance

22    specialist.

23          MR. DEAN:  Which one?  Page one, two, or three?

24          THE WITNESS:  I believe it's page one, if I'm

25    not -- if I'm not mistaken.  It says, there's a lot of

1           material indicating.  But at the bottom.

2                     THE COURT:  Would it be helpful for you to go

3           look at the -- you can look at the paper copies.  Might be

4           easier to read --

5                     THE WITNESS:  Oh, right.

6                     THE COURT:  -- than the screen.  Ladies and

7           gentlemen, can you read that?

8                     THE JURORS:  (No verbal response.)

9                     THE COURT:  That make it any better?  Okay.

10                    THE WITNESS:  Oh, okay.  If you go down to page

11          one, the text by it, says from Nancy Marshall.  Yeah, right

12          there.

13                    MR. DEAN:  Okay.

14                    THE WITNESS:  See where it say, "Terminate food

15          service 436 misconduct on assignment?"  This was for a

16          previous facility.  So now you telling the truth that this

17          information is false, that it was from a previous facility,

18          but that's what you used to terminate me, you see.  You

19          didn't use the other information pertaining to this

20          extorting prisoners.  You didn't assert that.  You asserted

21          this about, this information about a 436 misconduct on

22          assignment was from a previous facility.  Now if you can

23          scroll up top, please.

24                    MR. DEAN:  Yeah.

25                    THE WITNESS:  Right -- right -- right there.  It

1     says no mention of any of the grievance responses or any of

2     the 336s.  A 336 is a work report, a 175 is the

3     classification program report that she made out as, you

4     know, the process for termination.  She says that his

5     assignment was a security, that's a security -- it's

6     dealing with security.  She said, "Hey, you claimed that

7     this job, food service, was a security job."  She say, "But

8     that don't say that on none of this stuff."  So she really

9     correcting Ms. Kerr incorrect information.  That does not

10    make -- that does make a big difference.  I don't doubt

11    that he was doing stuff for which he could be terminated,

12    but I still do not see any 363 or 175 requesting approving

13    termination from the assignment.  See nobody requested

14    that.  She just did that.  And her motive for doing that

15    was because of the grievances that I filed against her

16    long-time coworkers, you see, who she knew of from previous

17    facilities.

18          If we could go to Exhibit, I said I wasn't going

19    to make this long, but --

20          THE COURT:  That's all right.  Take all the time

21    you need.

22          THE WITNESS:  If we could go to Exhibit 11 and

23    this is the, excuse me.  I just want the jury to know what

24    this is.  This is the policy directive of the MDOC and how

25    the prisoner program classifications.  And if you can go to

1          section GG, please.

2                    THE COURT:  A little bit farther, I think.

3                    MR. DEAN:  I'm sorry, which --

4                    THE WITNESS:  Yeah, GG.

5                    MR. DEAN:  GG, right here.

6                    THE COURT:  One more.

7                    MS. KERR:  GG.

8                    MR. DEAN:  Oh, G -- sorry.  GG?

9                    THE WITNESS:  Yeah, right there.

10                   MR. DEAN:  Okay.

11                   THE WITNESS:  "When termination from a work or

12         school assignment is necessary, the recommendation shall be

13         submitted by the assignment supervisor using a prisoner

14         program and work assignment evaluation and forward it to

15         the classification director."  See, the classification

16         director can't just do it on her own, it have to come from

17         the supervisor, you see?  So the -- the step three

18         grievance specialist in Lansing asked her, like, "Hey,

19         where is this, you know, 363 at?  Nobody requested that

20         this man be terminated from his assignment."  You need

21         that, according to the policy right there.  You need that.

22         So now the relevant question is, at least I know I can't

23         ask myself no questions, but --

24                   THE COURT:  No, no, you can.  That's fine.

25                   THE WITNESS:  -- to the jury, you know, the

                              —92—

1       relevant question would be, why would a person in an office

2       such as that have to fabricate a claim to get a response, a

3       favorable response that they looking for?  Well, it's

4       because you don't have the authority to do so, so you have

5       to fabricate a claim.  You just, if what she placed in that

6       affidavit that I showed you that I extorting prisoners, I

7       never received no misconduct, I didn't get no -- no

8       investigation came out of it, no nothing, because it's a --

9       it's a vague statement, you know.  It didn't have no

10      substance to it.  And so they did -- and I'm going to tell

11      you now, in prison if they believe that you're extorting

12      and squeezing people, first off, you're going to

13      segregation, and then they're going to do an investigation,

14      all three of them.  So when Deputy Skipper, I have to send

15      a letter to Deputy Skipper about it, he called me in his

16      office and he contacted Mr. Johnson.  Mr. Johnson say,

17      "Hey, man, that man ain't did nothing like that," you know.

18      And so nothing came of that is what I'm saying.  Nothing

19      came of that.

20              But something did come of me being terminated

21      from my job.  I fell into poverty, and that ain't, you

22      know -- you know, a good thing in prison.  You know,

23      everything costs.  The store, the phones, everything costs.

24      So if you don't have a job to, you know -- you know,

25      provide for yourself, man, you just out, you see.  You have

1       to resort to other things, you know, in prison.  But

2       anyway, that was my only source of income and she took that

3       in response for the grievances that I filed against her

4       coworkers, who she had been known for quite some time.

5              Only the Classification Department could

6       terminate you, according to that policy that you see right

7       there.  Only -- but you -- it have to be recommended by the

8       supervisors.  In order for that process to get ignited it

9       have to be recommended by your supervisor, see.  And there

10      is no evidence that my supervisors have recommended that I

11      be terminated.  In fact, what they recommended was if you

12      can go to Exhibit 8, please.  That's it right there.  Yes,

13      scroll on down.

14             MR. DEAN:  Okay.

15             THE WITNESS:  Right there at the bottom.  You

16      see that?  It says be placed on 30 day conditional.  See

17      that?  Thirty day conditional.  They asked for

18      investigation and all of that about the, you know, the

19      false allegations.  Like I say, nothing came of it, didn't

20      receive no misconduct, no nothing, you see.  But they asked

21      for a 30 day conditional.  A 30 day conditional is

22      expressed in the policy that we just left which is

23      05-01-100.  It tells you that it's like a probational

24      period, you know.  But the defendant took it upon herself

25      to bypass all of that and just terminate, took my job, you

```
1          see.  And I'm telling you that the reason she did that was

2          in response for the grievances I have filed against her

3          coworkers.  And I hope that I have enlightened you a little

4          bit about my case.  And like I said, that's -- that's about

5          all I have to say about this.  Thank you.

6                    THE COURT:  All right, Mr. Dykes-Bey, you're

7          welcome.  Now Mr. Dean is going to be able to ask you some

8          questions.

9                    THE WITNESS:  Oh, yeah, yeah.

10                   THE COURT:  And then as I said, if you want to,

11         when he's finished I'll let you speak to the jury some

12         more.

13                   THE WITNESS:  Okay.

14                   THE COURT:  And before we start, Mr. Dean, I

15         just want to say, ladies and gentlemen, that we will be

16         taking or second scheduled break at 12:15.

17                   MR. DEAN:  12:15?

18                   THE COURT:  Yeah, 12:15.

19                   MR. DEAN:  Okay, thank you.

20                        CROSS-EXAMINATION

21    BY MR. DEAN:

22    Q    I want to just keep this exhibit --

23    A    Yeah.

24    Q    -- and work my way back.  This is Exhibit A.  You said down

25         here it says, this is from your food service supervisor --
```

1     A    Ms. Kerr.

2     Q    This is from Ms. Kerr that wrote this?

3     A    Yeah, that's what -- that's what -- see what this say?

4           This say, "Supervisor seemed to," not the evaluator, but

5           the supervisor.  That's Kerr.

6     Q    Right here?

7     A    That's right there.

8     Q    You're saying that's her signature?

9     A    Right.

10    Q    Okay.  Who typed in this, according to you?

11    A    That was the clerk.  The food service clerk.  A prisoner.

12    Q    Okay.  They did this on their own, or at the direction of

13         who?

14    A    Now that I -- I don't know.

15    Q    Okay.  Did this document originate out of the food service

16         area and went to Ms. Kerr, is that what you're saying?

17    A    This -- this what I'm telling you that in food service they

18         have a clerk, a prisoner, and he's instructed to do all the

19         typing.

20    Q    Okay.  And --

21    A    And so it's under my impression that he typed that up, she

22         signed it and sent it in.  But North signed it too, though.

23    Q    Okay.  So that's my question is the box here, says,

24         "Evaluator's printed name and title, Mr. North, food

25         service supervisor?"

1    A    Right.

2    Q    That means this is coming from him and his office, correct?

3    A    Okay.  Yeah, but see Ms. Kerr is over him, and if you see

4         where over there it says interim manager.

5    Q    And Mr. Dykes-Bey, didn't you just testify a few minutes

6         ago that food service supervisor, your supervisor

7         recommended only a 30 day conditional --

8    A    That's what she did.

9    Q    -- not that you be terminated?

10   A    And if you -- you get the letter from Ms. Kerr, if you want

11        to go to it, Ms. -- the letter that I sent Ms. Kerr, and in

12        her response she says that, listen, nobody requested

13        termination.  I requested 30 day conditional.  That's in

14        her response to the letter I seen.

15   Q    Just so we're clear --

16   A    Right.

17   Q    -- you're saying your supervisor only wanted you on a 30

18        day conditional?

19   A    That's what it say right there.

20   Q    Right?

21   A    It don't say termination.

22   Q    I want your interpretation.  That's why I'm asking the

23        question.

24   A    Right.

25   Q    And you're saying that they only recommended a 30 day, but

—97—

1             when Nancy got it --

2     A      Yeah.

3     Q      -- she decided, no, she wants to terminate you?

4     A      Yeah.

5     Q      And you also testified a few minutes ago that the only

6            person that can do the termination would be the

7            classification director, correct?

8     A      Yup.

9     Q      That's your understanding?

10    A      Yup, that is.

11    Q      You're saying to me and to the jury that the warden doesn't

12           have any say in whether somebody is terminated?

13    A      No, what I'm telling you is, according to that policy we

14           just got done looking at, it says that that reside with the

15           classification director.  It don't say nothing about the

16           warden.

17    Q      Okay.

18    A      And --

19    Q      I agree with you that the quote that you said doesn't do

20           that, but are you saying in your experience as a prisoner

21           that the warden has to take a backseat to the

22           classification director in all matters related to

23           employment?

24    A      Well, what I would suggest to you is if that's what you're

25           saying -- I don't see how it relates to my situation, but

```
 1            if you're saying that's true and the jury is listening,

 2            then I would like for you to present something to --

 3    Q    Well, okay --

 4    A    -- show us that, you know --

 5    Q    -- that's fine, and you can make that in closing argument.

 6            But in answer to my question, is it --

 7    A    I don't know.

 8    Q    You don't know?

 9    A    No, I don't -- I don't know.

10    Q    Then that's fair.

11    A    Yeah.

12    Q    So you're saying that for her to have terminated you,

13            though, that the recommendation had to come from below her

14            to the -- from the food service supervisor?

15    A    I never said that.  I quoted policy.  That's what the

16            policy say, Section GG, 05-01-100 Section GG.

17    Q    And what exhibit was that?

18    A    That was, I believe that was Exhibit 8.  Thank you, sir.

19            Oh, no, that ain't 8.  No, that's not 8.  Oh, see, it's 11.

20    Q    Okay.

21    A    It's 11.

22                    THE COURT:  He's got it.

23                    THE WITNESS:  Section GG.

24    BY MR. DEAN:

25    Q    Yeah, I want to go back to GG first.  You want me to read
```

1        it first?

2               THE COURT:  Wait, he'll ask you questions.

3               THE WITNESS:  Oh.

4   BY MR. DEAN:

5   Q   Okay.  I want you to take a look at paragraph DD for a

6      moment.  The last sentence of it says, "The prisoner shall

7      not be returned to the same assignment if the

8      classification director determined it to be a threat to the

9      safety or security of the facility."

10  A   Well, you asked me do it say that?

11  Q   Yes.

12  A   It does say that, but if you -- you don't -- you got it

13      blocked off so the jury can't see it, but that section is

14      dealing with misconducts.  That section is not dealing

15      with, yeah, that's dealing with misconducts.

16  Q   Okay.

17  A   In this case I received no misconducts.  That's why I don't

18      understand how this applies to me.

19  Q   You had Exhibit 5 in your exhibit book.  That's the

20      orientation manual for RMI Food Service.

21  A   Okay.

22  Q   I just want to make sure I'm on the right page.

23  A   Six.

24  Q   This is the section in that exhibit for suspension.

25  A   Yup.

1    Q      And it says --

2                    THE COURT:  What page is that, Mr. Dean?

3                    THE WITNESS:  That's page six.

4                    THE COURT:  Six?  Okay.

5                    THE WITNESS:  Yup.

6                    MR. DEAN:  Yeah, there's an ID number at the

7           top, your Honor.  It's page ID 801.

8    BY MR. DEAN:

9    Q      It says in the second sentence up there that you may -- or

10          "He," meaning a prisoner, "may be awaiting the outcome of

11          misconduct, a rule infraction, or a suspension request,"

12          correct?

13   A      That's right.

14   Q      Down below at the bottom it says in a note, "A ticket does

15          not have to be written to have you removed from the

16          assignment" --

17   A      That's right.

18   Q      -- correct?

19   A      That's right.

20   Q      You testified a few minutes ago that you never were written

21          a ticket?

22   A      That's right.

23   Q      But according to this orientation manual, you still -- they

24          have the right to take you off that assignment.

25   A      Okay.  The part that you skipped over was what's in

1          between.  They tell you how a person could be suspended.

2          Right there, one through -- one through nine is how a

3          person could be suspended.  And some of those do not

4          require misconduct.

5    Q     Okay.

6    A     But some of those do require that you have some form of

7          written --

8    Q     Sure.

9    A     -- documentation.

10   Q     And Mr. Dykes-Bey, let's be clear for a minute.  You are

11         testifying that because they didn't follow the procedure

12         that you think is the way it should be followed, that is

13         the retaliation?

14   A     No.  What I'm explaining to you is this, the process --

15         before a prisoner can have anything deprived of his

16         property, his job, there has to be a process.  Now in order

17         for a person to claim to have followed that procedure,

18         there would have to be documentation.

19   Q     And Mr. Dykes-Bey, you've done some legal work for other

20         prisoners, have you not?

21   A     Yes, I have.

22   Q     Okay.  You've taken some time to become well versed in

23         prisoner litigation issues; is that correct?

24   A     I wouldn't say that, but --

25   Q     Okay.

1    A    -- you know, if that's your assessment.

2    Q    Well, if you can answer this question, then I'd like you

3         to, based on your experience.  Prisoners do not have a

4         Constitutional right to employment in prison, right?

5    A    No, they do not.

6    Q    Okay.  So there's no process to violate, and I'm assuming

7         you meant the process that they have to follow would be due

8         process under the 14th Amendment.  You recognize that you

9         don't have a due process claim of the way you were fired,

10        correct?

11   A    I do -- what I -- I do not have a due process in that, but

12        I do have a state-created liberty interest.  See, that's

13        something totally different.  So if you want to go that

14        route, we can, you know --

15   Q    Well, we don't need to go that route because the only claim

16        you have surviving in your complaint is the --

17   A    Is the retaliation.

18   Q    -- First Amendment retaliation?

19   A    Yes, sir.

20   Q    So there is no 14th Amendment due process --

21   A    No.

22   Q    -- claim in this case?

23   A    No, it's not.

24   Q    You understand that?

25   A    Yeah.

```
 1    Q   So I'm trying to understand.  You got to the point where
 2        you think that they didn't follow the rules in terminating
 3        you, correct?
 4    A   Well, I've showed that they didn't follow it.
 5    Q   Well, how, then, does that show that she was motivated to
 6        retaliate?
 7    A   This -- this is how.  If you're not doing anything wrong,
 8        there's no need for you to take shortcuts or create
 9        fabrication, if you ain't doing nothing wrong.
10    Q   Okay.
11    A   If you believe what you're doing is right, then why don't
12        you assert what you believe that to be?  Why would you
13        create some other fabrication?
14    Q   And the documentation from your supervisor that said they
15        wanted you investigated for extorting money or goods from
16        another prisoner --
17    A   Yeah, like you said, that's North.  Absolutely.  That's
18        what North said.  And there was nothing that came out of.
19    Q   And let me ask you this.  All of the information that Nancy
20        has that you know of --
21    A   Yeah.
22    Q   -- was from information provided by North, correct?
23    A   Those two reports, yeah.
24    Q   And then one of those is Exhibit 7, I believe?
25    A   Yeah, 7 and 8.
```

1    Q    Let's go to that real quick.  Let's start here.  This is

2         information that was provided by your food service

3         supervisor, correct?

4    A    Yeah, North.

5    Q    Okay.  North was saying that you were counselled by Jones

6         in the month of April about doing legal work, that he wrote

7         a note for prisoner Robinson to pass to prisoner Johnson

8         while on assignment?

9    A    Yup.

10   Q    That it's your third write-up within 30 days.  That you

11        admit in the letter he was charging prisoner Johnson for

12        legal work he completed and sent to the prosecutor.  Do you

13        disagree with that?

14   A    Yeah, you know I disagree with it.  I never admitted that

15        that's what that was, and I never had a hearing that

16        established that that's what that was.

17   Q    But we have established that this wasn't something Nancy

18        Kerr wrote, correct?

19   A    Oh, yes.

20   Q    Okay.

21   A    Yeah.

22   Q    So the only information she has is coming from these

23        reports she's getting.  So if they're incorrect, how is she

24        to know that?

25   A    This is how she -- this is how she's to know that.  She got

1           a -- she's a well-experienced officer.  She's been around

2           for quite some time.  You know that you can't just accept

3           just a blank allegation about something don't have no

4           substance.  We know that allegations such as this warrants

5           a misconduct ticket, you know.  You often thrown in

6           segregation for that.  So because none of these things had

7           occurred, you got to know they got to be fabricated for a

8           particular reason.

9      Q    Okay, so if your assumption is correct, then, she should

10          have followed up to see if you had a misconduct before she

11          took you off assignment?

12     A    Well, she, no -- hey, she is the classification officer,

13          and according to you in your opening statements, they do

14          what?  They investigate a prisoner's file.  So they

15          investigate a prisoner's file, they, before she called me

16          up then she would already have known that I never received

17          a misconduct or no investigation had came out of that.

18     Q    Let's take a look at the next page in the exhibit book.

19          This is purportedly the note that was found on this

20          prisoner Robinson that was going to Johnson, correct?

21     A    Right.  Right.

22     Q    Do you dispute that this is your writing on the right?

23     A    No, I do not.

24     Q    Okay, and it says, "Black," and presumably Black is

25          prisoner Johnson?

1    A    Yes.

2    Q    Okay.  This is DB, which you signed at the bottom

3         Dykes-Bey?

4    A    That's right.

5    Q    That was you?

6    A    That's right.

7    Q    The one who is -- what, I'm not sure I understand what this

8         is?

9    A    Oh, I'll be frank, I've got it right here.

10   Q    Yeah, please do.

11   A    "This is DB, the one who hook that situation up for you to

12        go to the prosecutor's office.  I need them five bags of

13        coffee ASAP.  So look, bring a bag at lunch, and at dinner

14        just bring one bag at a time and give it to Slim in the

15        dish tank, white boy Slim.  You can do this all the way up

16        until Thursday.  Remember, one bag at lunch and one at

17        dinner every day until I get all the money.  I didn't cross

18        you.  I took care of you, now take care of me."

19   Q    Okay.  So let's establish a couple things.  You wrote this

20        note?

21   A    Absolutely.

22   Q    You intended it to go to Mr. Johnson?

23   A    Absolutely.

24   Q    You intended by that for him to bring coffee to the

25        cafeteria, your work assignment?

1    A    That's right.

2    Q    To give you the bags of coffee?

3    A    That's right.

4    Q    You understand that's against MDOC policy, correct?

5    A    Yes, I do.

6    Q    Okay.  So the fact that you didn't legalistically get

7         convicted of a misconduct is one thing, but you admit that

8         this is -- if you got caught and were written up a

9         misconduct for it, you could have been punished for that,

10        correct?

11   A    Right.  No, first off, you can't receive a misconduct for

12        receiving stole items on your job.  You can be reprimanded

13        for it, but no, you won't receive a misconduct.  But they

14        tell you that in the rule that you -- the food service

15        manual, they tell you that in there.  You could be written

16        up a counsel warning, but they won't give you a misconduct

17        for it.

18   Q    What about written up for having a legal agreement with a

19        prisoner?  Could you have been written up for that?

20   A    Well, I didn't have a legal agreement.  You haven't even

21        established that the letter I wrote to the prosecutor

22        office was legal.

23   Q    Okay.

24   A    He reported a crime.

25   Q    That's what I'm getting at.  This note, all the MDOC has to

1          go on as to what happened here --

2     A    That's right.

3     Q    -- is that you said to the prosecutor's office --

4     A    That's right.

5     Q    Would you agree with me that a layperson would read that or

6          you would take that as being something about a legal

7          matter?

8     A    Until you find out otherwise, you have to accept --

9     Q    Okay.  So the only other confirmation they could have

10         received was you telling them, "Oh, that wasn't legal work.

11         I was just helping him report a crime?"

12    A    Hey, I all right testified under oath that they talked to

13         both of -- Deputy Skipper talked to both folks.  Now you're

14         a well, you know, respected guy.  You did this.  You

15         investigated this.  You know that if there was something

16         there, you would have it.

17    Q    Well, let me ask you this, are prisoners allowed to trade

18         favors for coffee or other goods for anything?

19    A    Well, it says no loaning and borrowing, you see.  But it

20         don't say anything about you cannot give a person

21         something.  The man gave me that out of common courtesy.

22    Q    But what if that was given to you and the quid pro quo here

23         was for work you did for him?

24    A    He -- I just told you, he gave it to me out of common

25         courtesy.  You show somebody an act of gratitude, that's

1            what they'll say, man.

2      Q    But this letter doesn't read like that.  You have very

3            specific instructions to bring a bag at lunch --

4      A    On how --

5      Q    -- and a bag at dinner.

6      A    That's right.  Oh, how to get it to me.  If you going to

7            give that to me, hey, we at level four is restricted

8            movement.

9      Q    Uh-huh.

10     A    You can only do things, you know, a certain time, you know.

11     Q    So let me get this straight then.  He, out of the goodness

12           of his heart says, you know, I like the fact that you wrote

13           that letter to the prosecutor for me --

14     A    No.

15     Q    -- I'm going to give you five bags of coffee?  How did that

16           work?

17     A    If you read the letter that Mr. Johnson wrote to Deputy

18           Skipper that, you know, I don't know if I can speak on

19           because you asked the judge to disbar it, but it say in the

20           letter this man didn't approach me, I approached him.

21     Q    So he came up with the deal for you to do something for

22           him?

23     A    Wasn't a deal.  The man asked me to do something for him.

24           After I did it, he say, "Listen, this what I'm going to do

25           for you in exchange."

1    Q    Okay.

2    A    That's how that went.

3    Q    That sounds like a regular ole contract to me.

4    A    Hey, man, okay, well you can interpret it however you'd

5         like.

6    Q    Okay.  Okay.

7              THE COURT:  Mr. Dean, we're getting close to

8         12:15.

9              MR. DEAN:  Yeah, why don't we just take a break

10        now and --

11             THE COURT:  Sure, yeah.

12             MR. DEAN:  -- that would be great.

13             THE COURT:  All right, ladies and gentlemen,

14        we're going to take our second scheduled break.  We'll come

15        back at 12:30, we'll go until 2, and then we'll break for

16        the day.  Please remember the cautionary instruction I've

17        given you twice already, so I won't -- I don't want to give

18        it again.

19                  (At 12:15 p.m., court in recess.)

20                  (At 12:37 p.m., court reconvened, all parties

21        and jury present.)

22             THE COURT:  All right, ladies and gentlemen.  In

23        a moment we'll continue with Mr. Dean's cross-examine of

24        Mr. Dykes-Bey, but did want to tell you that while you were

25        out we arranged some entertainment for you.  So we have the

—111—

```
 1              Grand Valley State University marching band out in Calder

 2              Plaza and they're going to be playing for you here in the

 3              next couple hours.  So just, if you wonder what that is,

 4              you'll know, that's for us.  Actually it's -- they're

 5              kicking off the football season, having a big pep rally out

 6              in that plaza.  So if you hear some music, that's what's

 7              going on.

 8                        Mr. Dean.

 9                        MR. DEAN:  All right, thank you, your Honor.

10    BY MR. DEAN:

11    Q    I want to switch gears a little bit with you,

12         Mr. Dykes-Bey.  The first grievance you wrote on Nancy Kerr

13         was after you were terminated?

14    A    Yes.

15    Q    Okay, so --

16                        THE COURT:  Mr. Dean, I hate to interrupt you.

17         Are those Mr. Dykes-Bey's copy of the exhibits?

18                        THE WITNESS:  It is.

19                        THE COURT:  Would you --

20                        MR. DEAN:  This one?

21                        THE COURT:  Yeah, would you mind giving that to

22         him so I can get my copy back --

23                        MR. DEAN:  Oh, gotcha.

24                        THE COURT:  -- and I can follow along ?

25                        MR. DEAN:  Yeah, no problem.
```

```
 1                    THE COURT:  Thank you.  Thank you very much.

 2         Sorry to interrupt.

 3                    THE WITNESS:  Thank you.

 4                    MR. DEAN:  No problem.

 5    BY MR. DEAN:

 6    Q    So in terms of this retaliation lawsuit, you're saying the

 7         adverse act that she took against you was terminating you

 8         from your work assignment, correct?

 9    A    Absolutely.

10    Q    After that happened you filed the grievance against her?

11    A    For retaliation.

12    Q    Okay.  So in terms of the protected conduct, though, that

13         couldn't be the protected conduct, right?  Because it

14         happened after she took the action?

15    A    I said that she took the action on behalf of her coworkers.

16    Q    Exactly.  And that's where I'm getting to next.

17    A    Yeah.

18    Q    Which coworkers specifically do you think she was taking

19         the action against you --

20    A    All of them.

21    Q    Well, which ones were --

22    A    I filed grievances --

23    Q    Okay, that's what I want is a list of names of the people

24         you filed grievances --

25    A    Yeah, I filed grievances on Jones for inappropriate
```

1            pat-down.

2    Q      Okay.

3    A      I filed a grievance on Meadows for, food service Meadows,

4           for discriminatory practices and harassment.

5                        THE COURT:  Do you know how to spell Meadows?

6                        THE WITNESS:  Yeah, M-e-a-d-o-w-s.

7                        THE COURT:  Oh, Meadows, okay, gotcha.

8                        THE WITNESS:  Yeah.

9                        I also filed grievances on both of them for

10          retaliation, for giving me those bow counsel write-ups.

11                       MR. DEAN:  Okay.

12                       THE WITNESS:  Then Meadows, I filed another

13          grievance on him for retaliation, because he charged mine

14          and wrote that bow with Tiggy, that they found out that he

15          lied, then he end up quitting.

16   BY MR. DEAN:

17   Q      Okay.

18   A      Then I, you know, those are the grievances that I wrote,

19          along with the -- your grievance from North.

20   Q      Okay.

21   A      So these all food service employees who I have wrote

22          grievances on.

23   Q      Okay.  So these are the grievances that you are in the

24          process of dealing with writing pursuant --

25   A      I had already wrote them.

1    Q    Okay.  They're in the MDOC database at this point?

2    A    You got 'em.

3    Q    Right.  And so these are the grievances you're saying she

4         was motivated to retaliate against you, correct?

5    A    That's right.

6    Q    And I think you testified a few minutes ago that for her

7         long-term coworkers, correct?

8    A    Yeah.

9    Q    But didn't you testify that Jones came over from Riverside?

10   A    Along with her.

11   Q    Okay.  You're saying she came from Riverside?

12   A    Oh, you didn't know that?

13   Q    Okay.  Was there ever conversation or in any of these

14        grievances that you wrote against these other food service

15        workers, you didn't mention her name at all, correct?

16   A    You're trying to show the connection?

17   Q    Right.

18   A    The connection is I told you when she called me up there to

19        unjustly terminate me from my food service job, she told me

20        it was in relation to --

21   Q    Okay.

22   A    -- the conflict I was having with food service personnel.

23   Q    Well, where did this conversation take place?

24   A    In her office.

25   Q    Okay, and do you know the date of that?

1    A    Yeah, it was on June 2nd.

2    Q    Any other witnesses to that conversation, besides you two?

3    A    No.  No.

4    Q    At that point, that's when she fired you?

5    A    Yeah, on June 2nd.

6    Q    Okay.  When was your grievance against her?

7    A    You can look at it.  I filed it on June -- June 3rd.

8    Q    Which exhibit are you looking at?

9    A    Exhibit 12.

10   Q    Okay.  You understand when I ask you these questions, what

11        I'm looking for is you to refer to the documents that

12        you --

13   A    I gotcha.

14   Q    -- instead of saying I know -- I know they exist, but

15        we're --

16   A    I got it.

17   Q    -- creating a record for the court.

18   A    I gotcha.  I gotcha.

19   Q    So which exhibit were you referring to?

20   A    That's Exhibit 12.

21   Q    Thank you.

22   A    The first grievance I wrote on Nancy Marshall for

23        retaliation.

24   Q    Okay.  She didn't take any other actions against you after

25        that grievance?

```
1    A    No.

2    Q    Okay, well --

3    A    Well -- well, I mean at what point?  Because, you know,

4         after I wrote this grievance, she continued her retaliatory

5         campaign, you understand, by trying to keep me on the rule

6         restriction, which I wasn't supposed to be on in the first

7         place, you know, unemployable status.  Ms. Rogers, which

8         was my ARUS, she kept sending these reclassification forms

9         every 30 days.  I put them in here.  It's in Exhibit --

10        Exhibit 13.  She sent like three of them.  Well, as I

11        stated in my -- in my complaint under oath that another

12        prisoner who was terminated from food service way after me,

13        she reclassified him within 30 days, but kept me on there

14        for almost 90 days, for no reason though.  She never gave a

15        reason why she continued me on unemployable status.

16                  MR. DEAN:  Okay.  No further questions.

17                  THE COURT:  All right, Mr. Dykes-Bey, is there

18        additional testimony that you would like to give to the

19        jury?  It would have to be testimony that relates to, you

20        know, Mr. Dean's questioning of you.

21                  THE WITNESS:  Right.  I do have just two -- two

22        things, real quick.  One is I believe that the jury was led

23        off the primary point.

24                  THE COURT:  All right, well, we're not -- this

25        isn't the time --
```

```
 1                    THE WITNESS:  Well --
 2                    THE COURT:  -- for -- well, hold on.  This isn't
 3          a time for argument.
 4                    THE WITNESS:  No argument.
 5                    THE COURT:  Okay, so just stick to the facts.
 6                    THE WITNESS:  Which was this?
 7                    THE COURT:  Okay.  Hold on.
 8                    THE WITNESS:  Oh, sorry about that.
 9                    THE COURT:  That's all right.
10                    THE WITNESS:  The whole purpose of me being
11          terminated from my food service job was she asserted a
12          false accusation which was that I was terminated from food
13          service for misconduct.  That was not true.  She admitted
14          that that was not true in a text between her and the
15          grievance specialist in Lansing.  The defense counsel
16          focused on the, what he classified as legal work, which it
17          wasn't, but a letter.  You know, it's a lot of guys in
18          prison, man, who can't read and write.  And it's
19          embarrassing for them, so they often pick guys who, you
20          know, respectful people who not going, you know, expose
21          that to the public.  Well, anyway, as an act of gratitude,
22          they often, you know, like throw them a honey bun or bag of
23          coffee or something like that in exchange for that.  That's
24          not a violation of the rules.  What is a violation of the
25          rules is loaning and borrowing.  I can't loan anything to
```

1      you and I can't borrow anything from you.  But to give

2      somebody something, you can give -- you can give anything

3      you want to anybody.  That's not a violation of the rules.

4      So I just wanted to clarify that.  That way the jury isn't

5      confused as to believing that just because he brought that

6      up that that was the reason.  Because if it was, like I

7      said, if you were a respectful person in this respected

8      office, you don't have no reason to fabricate anything.

9      You can just tell the truth, hey, this what I'm saying.

10     Just tell the truth.  You don't have to create a

11     fabrication to justify why you're doing something.  I just

12     didn't want nobody to be confused as to what the primary

13     objective is.

14                THE COURT:  All right, thank you for your

15     testimony --

16                THE WITNESS:  Thank you.

17                THE COURT:  -- Mr. Dykes-Bey.  Is there any

18     other evidence that you wish to present?

19                THE WITNESS:  Oh, all the evidence?  All the

20     evidence has already been presented.

21                THE COURT:  Okay, fair enough.  You may return

22     to your seat.

23                (At 12:46 p.m., witness excused.)

24                THE COURT:  Do I take it then that you rest,

25     that you --

1          MR. DYKES-BEY:  I do.

2          THE COURT:  -- rest your case.

3          MR. DYKES-BEY:  I do rest.

4          THE COURT:  Okay.  Mr. Dean, do you intend to

5     present evidence?

6          MR. DEAN:  I do, your Honor.  And at this time

7     I'd like to call Nancy Kerr to the stand.

8          THE COURT:  All right.  Ms. Kerr, please come

9     forward.

10          THE CLERK:  If you would raise your right hand.

11          Do you swear or affirm that the testimony you

12     are about to give relevant to this cause now pending before

13     the Court is the truth, the whole truth, and nothing but

14     the truth so help you God?

15          MS. KERR:  I do.

16                         NANCY KERR,

17          sworn by the clerk at 12:47 p.m., took the stand

18     and testified upon her oath as follows.

19          THE CLERK:  You may be seated.

20          THE WITNESS:  Thank you.

21                    DIRECT EXAMINATION

22     BY MR. DEAN:

23     Q    After good afternoon, Ms. Kerr.  Why don't you start -- oh,

24          yes?

25          MR. DEAN:  (To Mr. Dykes-Bey)  This is for the

```
 1              witness stand.  Did you take the one off the witness stand?
 2                      MR. DYKES-BEY:  Yeah.
 3                      THE COURT:  That was off his table, Mr. Dean.
 4                      MR. DEAN:  Okay.
 5                      THE COURT:  Hold on, we've got one right here.
 6                      MR. DEAN:  Okay.
 7                      THE WITNESS:  Thank you.
 8      BY MR. DEAN:
 9      Q    Why don't you start off by telling the jury what your
10           employment status was at the Reformatory back in the time
11           in question?
12      A    In time in question, I was the classification director, and
13           my responsibility was to classify and interview all the
14           prisoners when they arrived at the facility and place them
15           in the proper programming that they needed to complete
16           according to the courts, and also sign them up for job
17           assignments.  Not only was I responsible for job
18           assignments, but I was responsible for the hiring and
19           firing of them.  I also processed indigent orders, when
20           prisoners didn't have money and needed hygiene products
21           they could apply for indigent loans.  I was in charge of
22           the prisoner payroll, and I was on several committees
23           amongst a lot of other duties that came along with being
24           classification director.
25      Q    And when did you start your position there in the
```

1        classification director position?

2   A   At the Reformatory, or just in general as classification --

3   Q   At the Reformatory.

4   A   At the Reformatory.  I transferred to the Reformatory in

5        the end of April, beginning of May of 2012.

6   Q   So you'd been there about two years before this --

7   A   Yes, sir.

8   Q   -- the incidents in this case?  Prior to 2012, where were

9        you at?

10   A   I worked at the Newberry Correctional Facility.

11   Q   And Newberry is up in the Upper Peninsula?

12   A   It is in the UP, yes.

13   Q   Okay.  How long did you work there?

14   A   I worked at Newberry from 1995, when it opened, until I

15        transferred to the Reformatory in 2012.

16   Q   Okay.  You heard testimony a few minutes ago that you were

17        protecting long-term coworkers at Riverside, and when I

18        asked him did -- "You're saying that Nancy worked at

19        Riverside," he said, "Yeah."  Is that true?

20   A   No, it is not true.  I never worked at Riverside

21        Correctional --

22   Q   Ever?

23   A   Never.

24   Q   Okay.  Let's talk about the different defendants.

25        Mr. Dykes-Bey has testified that the grievance he wrote

1        against you came after he was terminated from his position.

2        Were you aware of any grievances from Mr. Dykes-Bey against

3        you prior to you terminating him from his job?

4  A   Against me?  No.

5  Q   Okay.

6  A   I was not.

7  Q   Had you had any interactions with Mr. Dykes-Bey?

8  A   Just probably when he was classified.

9  Q   Okay, when he --

10  A   When he --

11  Q   How does that --

12  A   When he arrived at the facility.  When they arrive at the

13        facility, you have a designated time period to review their

14        file, call them up to your office, and have an interview

15        with them.  And give them the rules and orientate them to

16        the facility so they know what the rules of the facility

17        are, and get them signed up for job assignments.  And if

18        they have questions about different programming, at that

19        time they can ask it.

20  Q   You heard Mr. Dykes-Bey testify that he had a conversation

21        with you and you told him, "I'm aware of all your

22        grievances and we're getting rid of you.  We're going to

23        fix the problem," or words to that effect.  Did that ever

24        happen?

25  A   No.  It didn't happen because when prisoners file

1          grievances, I wouldn't know who they're filed on.

2                    MR. DYKES-BEY:  Object.

3                    THE WITNESS:  Not as classification director.

4                    MR. DYKES-BEY:  Excuse me, object.  He didn't

5          ask -- that's not the question he asked.  He asked when I

6          came to her office for the termination hearing, not about

7          the grievance.

8                    THE COURT:  All right, so nonresponsive.  I'll

9          sustain it.  Please answer the question as asked, and then

10         Mr. Dean will undoubtedly follow up --

11                   THE WITNESS:  Okay.  Okay.

12                   THE COURT:  -- with other points that he thinks

13         are --

14                   MR. DEAN:  Now I don't remember what my last yes

15         was.  I think it was --

16                   THE WITNESS:  Was I aware of the grievances.

17    BY MR. DEAN:

18    Q    Right.  Were you aware?

19    A    No, I was not aware of them.

20    Q    Were you aware of any grievances against Officer Jones?

21    A    No, I was not aware of them.

22    Q    And let's talk about Jones.  Do you know who Officer

23         Stephen Jones was?

24    A    I did not know him.

25    Q    If he walked by you on the street today, would you be able

                              -124-

1          to recognize who he was?

2     A    No.

3     Q    How about Meadows, do you know who that individual was?

4     A    No, I don't.

5     Q    Okay.

6     A    I mean I probably heard names, but to see them, I have no

7          idea who they are.

8     Q    Okay.  How about North.  You knew North?

9     A    Yes, I did know who North was, but to have a conversation

10         with him, no.

11    Q    Okay.  Let's talk geographically speaking, where is the

12         cafeteria or food service operations in relation to where

13         you work?

14    A    My office was upstairs across from the library.  It was

15         just the classification director's office and the library.

16         And you had to go down a back stairwell that brought you

17         out to, you could go one way to the housing units, or the

18         other way led you out to the cafeteria.

19    Q    And was the area you were in, was that a secure area?

20    A    Yeah, when -- when there was no -- we only had officers

21         manning it at certain times, and when it wasn't manned, my

22         office and the library were locked.

23    Q    Okay.  Did you spend a frequent amount of time in the food

24         service area?

25    A    No, I did not.

```
 1    Q    Okay.

 2    A    Very rarely.

 3    Q    So you didn't have daily interactions with these

 4         individuals I just mentioned?

 5    A    No.

 6    Q    Okay.  I think there was some testimony earlier about

 7         Aramark taking over, do you know when that took place?

 8    A    I believe it took place at the beginning of December of

 9         2013.

10    Q    Okay, so we're talking just within the first six months of

11         it.  What -- I'm using the word "Aramark," and I know what

12         it is, but can you explain to the jury what we're talk --

13    A    Aramark -- Aramark was a privatized food service company.

14         Before Aramark came, state employees ran our food service

15         and they figured that they could do it at a better rate if

16         they had a private company come in.  So Aramark was a

17         private company.  They hired their own staff.  They had to

18         pass the security clearances of the prison, of course, but

19         they were hired through Aramark, and Aramark was

20         responsible for them.

21    Q    And like any government operation anywhere over time, I'm

22         sure that was a smooth transition?

23    A    It was not a smooth transition, no.

24    Q    Okay.

25    A    It was not.  They had a lot -- they had a lot to learn
```

1          about how the policies of the DOC worked.

2     Q    And was it, I mean you're talking about private

3          contractors, civilians coming in to an area which was once

4          designated just for corrections trained employees, correct?

5     A    Yes.

6     Q    And there's an entirely different paperwork system, I

7          imagine, for the people coming in?

8     A    The paperwork system was supposed to stay the same, but

9          because they were not familiar with it, several meetings

10         were set up to try and teach them and train them, and it

11         took quite a while to finally get it to where they were

12         doing it the way they were supposed to be doing it.

13    Q    Okay.  You had frequent interactions with Aramark?

14    A    I had frequent interactions with the supervisor of Aramark,

15         because then he passed the information on to his staff.

16    Q    Okay.  So at the point that all of this is happening, you

17         weren't aware of any previous grievances or any

18         interactions with Mr. Dykes-Bey in which could be

19         categorized as negative interactions between you two?

20    A    No, I did not.

21    Q    Your first interactions were, or at least the memorable

22         ones, was when you terminated him, correct?

23    A    When I received the paperwork indicating, yes.

24    Q    What was the bottom line?  Why was he terminated?

25    A    He was terminated based upon the fact that he was doing

```
1              legal work for a prisoner and requesting the payment.  And

2              not only was he requesting the payment, but he was

3              requesting it to be delivered to his work assignment and he

4              was involving other prisoners.  He was involving one

5              prisoner to pass a kite to another prisoner, and he was

6              involving the prisoner to bring the coffee to another

7              prisoner within his work area.  And food service is a

8              really sensitive work area at the Reformatory, because it's

9              not -- it's not highly staffed.  I mean you have your staff

10             in there running the chow lines, but to -- and there's lots

11             of hidden -- hidden spots.  They call them blind spots,

12             where stuff can happen and staff don't necessarily see it.

13             So --

14    Q        Let me stop you there for a second.

15    A        Yes.

16    Q        When you say it's not highly staffed, you mean civilian

17             employees, there aren't a lot in the kitchen?

18    A        There's not a lot of correction staff.  I mean you have

19             correction staff in there watching chow lines, but when you

20             have that many prisoners and they're level fours in that

21             area at one time, it -- it can get to be pretty serious if

22             you're having, you know, little side businesses taking

23             place within your food service.

24    Q        What about weapons?  Are there anything that could be used

25             as a weapon in the kitchen service area?
```

1    A    Oh, my gosh, yes.  There is lots that can be used as a

2         weapon in the food service area.

3    Q    Like?

4    A    It could be anything from their serving utensils to

5         prisoners can make homemade shanks.  There are pieces of it

6         could be hard metal, or could be metal, hard plastics, and

7         they -- and they shape them to a point, and they, you know,

8         catch them on them all the time.

9    Q    What about being in a kitchen?  I worked as a restaurant

10        manager for many years.  We had chef's knives, paring

11        knives.  Was that similar in a prison cafeteria as well?

12   A    Yes.  They -- there were areas where, designated areas

13        where those kinds of items were used.

14                  THE COURT:  Mr. Dean, before you ask your next

15        question, could Mr. Dykes-Bey and Mr. Dean come forward for

16        a second?

17                  (From 12:57 p.m. to 12:59 p.m., off the record

18        bench conference with white noise.)

19   BY MR. DEAN:

20   Q    You heard Mr. Dykes-Bey testify that he didn't get a

21        misconduct ticket in this case, and because of that he

22        shouldn't have been terminated.  Is he correct in that

23        statement?

24   A    No, he's not.  When -- when a prisoner can be classified as

25        unemployable or terminated from an assignment, it doesn't

1        necessarily have to involve a misconduct.  If it is

2        jeopardizing the integrity of the job, the trust of the

3        position, or the safety and security of the institution, he

4        can be removed from that assignment.

5   Q    And along those lines, he testified that only the

6        classification director could terminate somebody from their

7        assignment?

8   A    Uh-huh.

9   Q    Is that statement correct?

10  A    No, I wouldn't say that that was correct, because the

11       warden of the facility is in charge of that entire

12       facility, and if she wants someone terminated, she can have

13       them terminated.

14  Q    All right.  So you don't need to have a misconduct to

15       remove somebody from a work assignment?

16  A    No, you do not.

17  Q    What about his statement that the only -- that because the

18       food service supervisor was asking for a 60 or 30 day

19       conditional that you were bound by that.  Is that your

20       understanding of the position?

21  A    No, it is not -- I'm not bound by that.  As classification

22       director, it's your responsibility to make sure that the

23       facility, when it comes to job positions running smoothly,

24       and if you feel that there's a threat to the safety and

25       security of the institution due to a prisoner in that work

1          assignment, he can be removed.

2    Q    Now, I'm pulling up Exhibit 9.  This is a program

3          classification report.  First of all, I want to establish

4          there's a 00 unemployable status.  Was that written by you?

5    A    Yes, it was.

6    Q    What does that mean?

7    A    It means that that reclassification form was indicating he

8          was being placed on unemployable status for at least the

9          next 30 days before he was eligible to be reclassed.

10    Q    Okay.  And then the big part of this testimony from

11          Mr. Dykes-Bey, this SASSI3 and then terminate food service

12          436 misconduct on assignment.  Let's break them apart.

13    A    Okay.

14    Q    Why is this stuff typewritten into this, and who does it?

15    A    Okay.  For when it comes to the printable comments on their

16          175s, because that's what that is called, it's their

17          program classification report, the printable comments are

18          to aid classification directors from facility to facility.

19          But classification directors are not the only ones who have

20          access to enter stuff in that area.  So when there's other

21          things on there like "terminated from food service, four,

22          three, six, misconduct on assignment," that is not

23          something that I practiced on putting on 175s, because

24          there's so much other information that's necessary to be on

25          them, like the SSSI-3, that's the substance abuse

1       assessment scores, that is important, because that's

2       required programming for prisoners.  And there's limited

3       space in that area to type, so to keep the unnecessary

4       information off of there is important.  But he came here

5       from another facil -- he came to the Reformatory from

6       another facility that had that information on there, and it

7       was also a practice of mine not to remove other people's

8       information, not knowing why it was put there in the first

9       place, because there may have been something important with

10      that information.

11  Q   So you're saying you did not type that information --

12  A   Did not type that information.

13  Q   He wasn't fired because of a misconduct?

14  A   He was not fired because of a misconduct.

15  Q   Okay.  This was part of Exhibit 12 that Mr. Dykes-Bey added

16      to the exhibit this morning.  These were e-mails between

17      you and Barbara Slovisky?

18  A   Yes.

19  Q   Hmm, okay.  This was a section that you were shown by

20      plaintiff, but I want to go up -- actually down.  This

21      first sentence, the first one let's establish, this was an

22      e-mail from you, correct?

23  A   Yes.

24  Q   And it was written to a couple of people, Slovisky and a

25      Kurt Miller?

```
 1    A    Kurt Miller was grievance coordinator.

 2    Q    At your facility?

 3    A    At the Reformatory.

 4    Q    Okay.  What was the purpose of these back and forth --

 5         well, let me ask it this way.  What is this designator

 6         right here?

 7    A    That -- that is the grievance designation number.

 8    Q    Okay.

 9    A    A grievance that Dykes-Bey had wrote, and that was the

10         identifying number of it.

11    Q    And so the purpose of these e-mails was somebody from

12         central office was trying to get clarification on what the

13         termination was for, correct?

14    A    Yes.

15    Q    This, quotations, "Terminated FS 436 misconduct on

16         assignment," is the exact same line that was on that 175

17         form we looked at a few moments ago, correct?

18    A    Yes.

19    Q    And what -- it says here this was from a previous facility.

20         Is that what you meant by that?

21    A    Yes.

22    Q    What you just testified to?

23    A    Yes.

24    Q    You were explaining to them that this was information from

25         another facility and not you?
```

1   A   Yes.

2   Q   Okay.  And then in the body of this you give the various

3       reasons why he was terminated.  And what were those

4       reasons?

5   A   Well, he was accepting payment for legal work, which is

6       against policy.

7   Q   And let me stop you right there.  Let's break that down.

8       Why is that important to the MDOC?  Why do they care?

9   A   Well, because it can cause a lot of security issues.  We

10      have a legal assistance program that if prisoners need

11      legal help, they can request it through our librarian and

12      we have legal writers that get paid to do that job.  So to

13      do it on his own is -- is not acceptable.

14  Q   Okay.  Anything else in here that you need to elaborate on?

15  A   Food service, like I said earlier, is considered one of

16      those assignments that's a special security assignment.

17      It's in a secluded area, and --

18  Q   And you utilized the language "jeopardizing the integrity

19      and trust of the job position."  What does that mean?

20  A   Well, they -- there's a great honor or trust placed into

21      them to work in that position due to the location, and that

22      trust was placed in him, and he violated that trust and the

23      integrity, and jeopardized his job position for doing such.

24  Q   You heard Mr. Dykes-Bey testify that, "Hey, I never got a

25      misconduct ticket for this."  Is that correct?

```
 1    A    That's correct.

 2    Q    Okay.  Is the MDOC or employee, such as yourself, required

 3         to ignore any facts that come to your attention just

 4         because the prisoner wasn't written a misconduct ticket?

 5    A    No.

 6    Q    In fact you have to use your eyes and ears for everything

 7         you do in your position, correct?

 8    A    Absolutely.

 9    Q    And if you're aware of circumstances which could impugn the

10         integrity or trust in the position, you have to act on

11         that, correct?

12    A    Absolutely.

13    Q    And as far as the misconduct ticket that he says he didn't

14         get, that would have been a custody issue, correct?

15    A    It would have been a custody issue, yes.

16    Q    That would have been a decision for the officers in the

17         control center or custody who would have written that

18         misconduct if they chose --

19    A    Well, food service could have wrote the misconduct as well.

20    Q    Okay.  Okay.

21    A    So they could have.  I mean any employee within the

22         department can write a misconduct on a prisoner.

23    Q    And what do they write the misconduct, based on what they

24         themselves have seen, or how do they --

25    A    It could be based on what they've seen or third party.
```

```
 1              There's also third party misconducts.

 2    Q    And this information as far as the note that we saw in

 3         Exhibit 7 --

 4    A    Yes.

 5    Q    -- that Mr. Dykes-Bey says he intended to get to another

 6         prisoner --

 7    A    Yes.

 8    Q    You didn't originally come across that note, correct?

 9    A    I didn't come across that note, no.

10    Q    You didn't find it on this other person?

11    A    I did not.

12    Q    Okay.  But you were made aware of it subsequently, which is

13         one of the reasons you let him go, correct?

14    A    Yes.

15              THE COURT:  Mr. Dean, could you attempt to

16         phrase your questions --

17              MR. DEAN:  Yeah, sorry.

18              THE COURT:  -- open-ended and not lead?

19              MR. DEAN:  Not a problem.

20    BY MR. DEAN:

21    Q    To your knowledge, was any other officer disciplined as a

22         result of Mr. Dykes-Bey's grievances?

23    A    No.

24    Q    Were you ever disciplined as a result of Mr. Dykes-Bey's

25         grievances?
```

1    A    No.

2    Q    Were you aware of any situation in which these officers

3         that we've mentioned previously were being investigated for

4         their actions towards Mr. Dykes-Bey?

5    A    No.

6    Q    Did you have any reason to retaliate against him for

7         writing grievances?

8    A    No.

9    Q    And as far as the grievance process, is that one that

10        normally causes or can it cause you problems in your job,

11        having to respond to them?

12   A    What do you mean by "cause me problems?"

13   Q    I mean do you spend hours, or did you spend hours of your

14        day responding to grievances?

15   A    No.  I never spent hours of my day responding to

16        grievances, no.

17                    MR. DEAN:  No further questions.  Thank you.

18                    THE COURT:  All right.  Mr. Dykes-Bey.  Before

19        you begin, can I see you and Mr. Dean at sidebar.

20                    MR. DYKES-BEY:  Sure.

21                    (From 1:09 p.m. to 1:09 p.m., off the record

22        sidebar with white noise.)

23                              CROSS-EXAMINATION

24   BY MR. DYKES-BEY:

25   Q    I would like to stay focused on the primary objective.  The

```
 1          primary objective is I was terminated from food service,

 2          and you explained that I was terminated from food service

 3          because of the allegations set forth in the Notice of

 4          Intent and the 363, CSJ 363.

 5                    MR. DYKES-BEY:  Pull up Exhibit 7.

 6     BY MR. DYKES-BEY:

 7     Q    You say that's why you terminated me?

 8     A    I terminated you based on the information from that lay-in

 9          notice and the note that you wrote indicating you needed

10          your coffee ASAP, and you explained to the prisoner exactly

11          how he had to get it to you --

12     Q    Uh-huh.

13     A    -- and who he had to get it to --

14     Q    Right.

15     A    -- because you needed it.  And you didn't cross him, so

16          take care of you now.

17     Q    Right.  Now, you said that's why you terminated me?

18     A    I terminated --

19                    MR. DYKES-BEY:  Can you go --

20                    THE WITNESS:  -- because you were doing legal

21          work, yes.

22                    MR. DYKES-BEY:  -- Exhibit 9?

23                    MR. DEAN:  Uh-huh.

24     BY MR. DYKES-BEY:

25     Q    So what prevented you from putting it on there?
```

1   A   Whenever I have terminated a prisoner, the only thing I

2       ever wrote on those, and it was a common practice, is

3       double O status, unemployable.

4   Q   Is that the policy procedure?

5   A   The policy procedure is I'm placing you on double O

6       status --

7   Q   No, I'm asking you is, when a prisoner is reclassified like

8       you did here, termination and reclassified, right?

9   A   Yes.

10  Q   Do the policy require that you assert on there your reasons

11      for termination?

12  A   Does policy require it, to write it on there?  No, it does

13      not.

14              MR. DYKES-BEY:  Can you pull up Exhibit 11, I

15      believe it is?  There you go.  Can you scroll down to the

16      bottom?

17              MR. DEAN:  Which one?

18              MR. DYKES-BEY:  Well, the first page.  Okay.

19      Okay, yeah, now scroll down to the bottom of the first

20      page.

21              MR. DEAN:  Okay.

22              MR. DYKES-BEY:  Right there.

23  BY MR. DYKES-BEY:

24  Q   The classification director shall create a case plan for

25      each prisoner that outlines initial classification

1        decision, program referrals, enrollments, and termination

2        on a program classification report and transit

3        accountability plan CSX 175.  Now if you go back to Exhibit

4        9, you will see -- oh, right there, at the top.  CSX 175,

5        that's the form they're talking about.  So any time a

6        prisoner is terminated, they have to assert on that form

7        why he is terminated.

8                    THE COURT:  Is this a -- you have to ask a

9        question.

10                   MR. DYKES-BEY:  Oh, okay, so --

11                   THE COURT:  You can say, "Isn't that right," or

12       something like that.

13   BY MR. DYKES-BEY:

14   Q    Yeah, okay.  The policy that you just seen, is that not

15       accurate, the policy --

16   A    The policy it does --

17   Q    -- not your personal --

18   A    The policy does say that.

19   Q    Okay.

20   A    But when I terminate a prisoner, I also include their

21       termination memo, the paperwork that came along with the

22       termination, which was your letter that you wrote, along

23       with the lay-in notice and the 175.  So all of them are

24       stapled together, and you receive a copy of it, your

25       counselor receives a copy of it, I kept a copy of it, the

1         records office gets a copy of it, so there is an entire

2         packet indicating why he was terminated.

3   Q   Okay.

4   A   So it doesn't have to be specifically wrote on one form.

5         It's all attached as one packet.

6               MR. DYKES-BEY:  Can you go back to --

7               MR. DEAN:  Which one?  Nine or --

8               MR. DYKES-BEY:  Eleven.

9               MR. DEAN:  -- eleven?

10             MR. DYKES-BEY:  Because I'm -- right there.

11  BY MR. DYKES-BEY:

12  Q   My question is, is this accurate, this policy that Lansing

13        created for the classification director to follow, is that

14        accurate?

15  A   It is accurate.

16  Q   Okay --

17  A   But I placed you on double O.

18  Q   I'm just asked -- I just asked, "Was that accurate?"

19        That's all I'm asking.  If this is accurate and the

20        classification director is supposed to follow this

21        particular model, all I'm asking is why wasn't your reason

22        that you're giving today asserted on that CSX 175 form as

23        it expresses right here in this policy?

24  A   I placed the -- you were put on double O status, that's

25        what I put on there.

```
 1    Q    That's not what -- see, I don't want to make it appear that

 2         I'm badgering, I'm just asking why didn't you follow this?

 3         This says that you have to assert it on the form.

 4    A    Because common practice was to make a complete packet.

 5    Q    So you -- so you diverted from this particular policy?

 6    A    I, if that's how you want to look at it.

 7    Q    But you say "common practice," right?

 8    A    Right, because the common practice was --

 9    Q    Common practice is something --

10    A    -- the complete packet.

11    Q    -- separate from policy itself, you agree with that?

12    A    Which was all attached.

13    Q    Common practice is something separate from the structure

14         established by the Michigan Department of Corrections.  You

15         agree with that?

16    A    What was the question?

17    Q    Common practice.

18    A    Okay.

19    Q    You say that you did what you did out of common practice,

20         something that you was accustomed to doing?

21    A    Correct.

22    Q    Was that authorized by policy right here?

23    A    I, when I do it, I just placed it on there as termination,

24         and you got the entire packet --

25    Q    It's really a "yes" or "no."
```

```
 1    A    -- so it's all included.

 2    Q    If this policy which created by Lansing, the Michigan

 3         Department of Corrections, it specifically says that when

 4         you terminate a person, referrals or anything, it has to go

 5         on the CSX 175 form.  That's what it says.  I'm asking you

 6         why didn't you put what you claim today as your reasons for

 7         termination on that form?

 8    A    Because it's -- I placed my decision on the 175, because

 9         that's what it shows right there.

10    Q    Your decision was not --

11    A    Decision --

12    Q    -- on the 175?

13    A    -- was to terminate you.

14    Q    Let's go back to --

15    A    That was the decision --

16    Q    -- Exhibit 9?

17    A    -- to terminate you.  The reasons why I terminated you were

18         laid out in the packet.

19    Q    There.  Right here.

20    A    That was the decision for the --

21    Q    It says -- it says --

22    A    -- classification right there.

23    Q    -- comments, classifications, review summary.  That's what

24         it says.  This is where you're supposed to put your reasons

25         for termination, right there.  There is no other existing
```

1    documents which you asserting why you terminated me on this

2    particular form right here.  There's nothing else on there.

3    What you did --

4              THE COURT:  You've got to ask questions.

5              MR. DYKES-BEY:  Well, okay.

6    BY MR. DYKES-BEY:

7    Q    My question is, why didn't you put it on there?  That's the

8    question.

9    A    Why didn't I put it on there?

10             MR. DEAN:  Your Honor, I'm going to object.

11   This has been asked and answered.  She said --

12             MR. DYKES-BEY:  She didn't answer.

13             MR. DEAN:  -- she put the reasons in a packet

14   stapled with the 175 form.

15             MR. DYKES-BEY:  That's not true.

16             THE COURT:  Well, I think her answer -- the

17   answer I heard was it was her practice --

18             MR. DYKES-BEY:  Common practice.

19             THE COURT:  -- to not put it on there.

20             MR. DEAN:  Because she put the other information

21   as to the reasons why --

22             THE COURT:  Well, the jury -- the jury can --

23   you remember.  You heard the testimony.  You talk about it.

24   You'll figure out what was said.

25             MR. DYKES-BEY:  Okay.  I'll move -- I'll move

—144—

1               on, your Honor.

2                         THE COURT:  All right.

3     BY MR. DYKES-BEY:

4     Q    The other thing was the, as it relates to whether or not

5          the warden can terminate a prisoner from his job

6          assignment.  In this particular case, what did the warden

7          have to do with this termination?

8     A    What did the warden have to do with this termination?

9     Q    Yeah.

10    A    The warden --

11    Q    Did the warden -- did the warden --

12                        THE COURT:  Let her answer.

13    BY MR. DYKES-BEY:

14    Q    Okay, go ahead.

15    A    The warden designates a classification director per

16         facility.

17    Q    Okay, did they play a role in this?

18    A    Actually, my supervisors were well aware of the decision I

19         made to terminate prior to me terminating, because in

20         situations like this, I would contact my supervisors and

21         give them all of the relevant information that I had, and I

22         would discuss it with them and let them know what my

23         decision would be, and they supported me on the -- on the

24         issue of terminating Dykes-Bey.

25    Q    So that's the role that they played?  They supported you?

1    A    Yes, they did.

2    Q    Do we have any evidence of that?

3    A    It was in a conversation I had with them.

4    Q    Oh.  So there's no other signatures on here, other than

5         yours?

6    A    Correct.

7    Q    Okay.  Can a prisoner be terminated from his job assignment

8         if -- no, I can't go back to that because, you know, you

9         won't answer that question.  So --

10             MR. DEAN:  I'm going to object to argumentative,

11        your Honor.

12             MR. DYKES-BEY:  Yeah, I'll --

13             THE COURT:  You'll get a chance to fully make

14        all your arguments at the end, Mr. Dykes-Bey.

15             MR. DYKES-BEY:  All right.  Wow.  Anyway, go

16        ahead, pull up Exhibit 12.  We're going to go to the text.

17        This is the actual grievance I wrote, but we're going to go

18        to the text.

19             MR. DEAN:  I'm sorry, the what?

20             MR. DYKES-BEY:  The text between her and the

21        grievance specialist.

22             MR. DEAN:  Oh.

23             MR. DYKES-BEY:  Yeah, page one.  Because we're

24        going to go up.  Yeah, right there.  Yeah, you got it.  You

25        got it.

```
 1   BY MR. DYKES-BEY:

 2   Q    It says this grievance specialist text to you that she

 3        didn't doubt whether or not I was, you know, doing these

 4        particular allegations that, you know, you asserted.  She

 5        said, but she still did not see any 363 or 175 requesting

 6        approval termination from the sign-in.  The documentation

 7        should have matched and justified the actions taken.  Do

 8        you have any paperwork regarding the termination that you

 9        have not sent?

10                   MR. DYKES-BEY:  And the text after that on page

11        two.  No, not -- the page two.  Because she wrote -- there

12        you go.  There you go.  I'm going to just stay right there.

13   BY MR. DYKES-BEY:

14   Q    The question I have for you is this.  Is there any existing

15        documents to establish that a food service supervisor

16        recommended that I be terminated from my job?

17   A    Was there any other paperwork, is that what you're asking

18        me?

19   Q    That's what she asked.

20                   MR. DYKES-BEY:  Well, go back to the first page

21        so she can see --

22                   THE WITNESS:  What I think she was asking --

23                   MR. DYKES-BEY:  There you go right there.

24                   THE WITNESS:  What I think she was asking in

25        this is she was requesting information for --
```

```
 1   BY MR. DYKES-BEY:

 2   Q    Where?  She says where -- where --

 3   A    -- a couple different things.

 4   Q    Where is the 363 and the 175?  Right there, requesting

 5        approval of termination from the signer.  She asking,

 6        "Where is that," and I'm asking you, do you have anything

 7        to present to establish or to answer her question?

 8   A    I don't have a three sixty -- I did not have a 363

 9        requesting a termination.  I had the lay --

10   Q    So, what is your reasons for termination?

11   A    The lay-in notice.

12   Q    So you used --

13   A    And your letter that you wrote.

14   Q    So you used North's lay-in note.  Now my question is this,

15        what led you to believe the allegations that North set

16        forth in the lay-in notes?  What led you to believe that?

17   A    What led me to believe that you received coffee for

18        those -- that --

19   Q    No.  The man said that I was extorting people over there in

20        food service.  What led you to believe that?

21   A    The letter you --

22   Q    Or did you -- or did you --

23   A    The letter you wrote.

24   Q    -- terminate me from something else?

25   A    No.  The letter you wrote.
```

1    Q    Okay.  We're going to go back to that -- that letter, which

2         is I think Exhibit 7.

3              MR. DYKES-BEY:  Exhibit 7.  That's it right

4         there, but go to the letter.  I think it's on the -- right

5         there.  There you go.  Right there.  Right here.

6    BY MR. DYKES-BEY:

7    Q    Now, if you will, explain to me, I would like you to

8         explain to me, where is a demand in this letter right here?

9         You said demand, right?  You took that as I was forcing

10        somebody to do something, right?

11   A    "I need them.  Five bags of coffee ASAP."

12   Q    That's, okay.  And you took that as a demand?

13   A    Yes.

14   Q    Okay, all is well.  For the sake of any misconception, the

15        letter reads, "This is DB, the one who hooked that

16        situation up for you to go to the prosecutor's office."  So

17        you took that as what, legal work?

18   A    Absolutely.

19   Q    Okay, now most often when a prisoner is accused of doing

20        legal work for another prisoner, he has an administrative

21        hearing to determine whether or not the document classifies

22        as legal work.  Do you agree with that?

23   A    Um.

24   Q    Or do you want to get the --

25              THE COURT:  Let her answer.

```
1                    MR. DYKES-BEY:  Okay.

2                    THE COURT:  Let her answer.

3                    THE WITNESS:  Do I agree with -- I don't know

4          all the technical terms on the administrative hearing

5          for --

6     BY MR. DYKES-BEY:

7     Q    How long you work for the DOC?

8     A    I've worked there 21 years.

9     Q    Okay.  So was you ever --

10    A    But I didn't have to do the legal --

11    Q    Was you ever a --

12    A    -- paperwork.

13    Q    -- correction officer?

14    A    Yes, I was.

15    Q    Okay, and you wrote tickets before, right?

16    A    Yes, I have.

17    Q    Okay.  So in your 21 years of experience, you don't know

18         whether or not a person who been accused of doing legal

19         services for payment for another prisoner, you don't know

20         whether or not that somebody could write him a ticket for

21         that?

22    A    Well, yes, I do know that they can be written a --

23    Q    Okay, so --

24    A    -- ticket for that.

25    Q    -- you -- okay.  Now, if he -- if the policy required that
```

1          this particular person receives a misconduct for that, I

2          would like to ask you in your 21 years of experience why

3          wouldn't a person receive a misconduct for that?

4     A    Well, here --

5     Q    Why wouldn't he?

6     A    Why wouldn't he?

7                    MR. DEAN:  Object to foundation.

8                    MR. DYKES-BEY:  The foundation is --

9                    THE COURT:  Well -- easy.

10                   MR. DYKES-BEY:  Oh.

11                   THE COURT:  I'll allow it.

12                   MR. DYKES-BEY:  Thank you.

13                   THE COURT:  You may answer.

14                   THE WITNESS:  Okay.  Like mentioned earlier, in

15         the end of December of 2013 Aramark took over the food

16         service privatization company, and they were not fully

17         aware of all of the rules of the MDOC, and neither were

18         their staff.  So when it comes to writing misconducts, the

19         staff member was probably unaware that that was something

20         he could write a ticket on.  He knew it wasn't right, but

21         he probably wasn't aware that he could write a ticket on

22         it.

23    Q    Who -- who found the note?

24    A    Who found the note?

25    Q    Yeah.

1    A    Didn't you say Jones found the note?

2    Q    And Jones was what?

3    A    Jones was -- I don't know, was Jones an officer at the

4         time?  I don't know who Jones is.  Was Jones an officer at

5         the time?

6    Q    Stephen Jones was the kitchen officer at that time.

7    A    Oh.

8    Q    Before that he was the food service supervisor.  Now I

9         don't know how you don't know that, but all is well.  I'm

10        saying this, the officer, he was not new.  And so I asked

11        you, "Normally would that constitute a misconduct?"  You

12        said, "Yes."

13   A    Normally it would, yes.

14   Q    But you did defer to, well, these people, because they new

15        and don't know the policy, they don't know how to write a

16        ticket.  Well, you refer to the food service supervisors

17        who work for Aramark, right?

18   A    I was, because I was reading this --

19   Q    Okay, well, that --

20   A    -- and it said North on the --

21   Q    Yeah, that -- that --

22   A    -- note right there.

23   Q    That's not who --

24   A    Okay.

25   Q    -- discovered the note though.

1      A      Okay.

2      Q      Now the person that discovered the note was a correctional

3             officer, Stephen Jones.  So if from your 21 years of

4             experience, if an officer discovered that another prisoner

5             was doing legal work for another person in exchange for

6             money, you said that he would receive a misconduct.  In

7             this regard, I'm asking you why Stephen Jones, a correction

8             officer, did not write a misconduct?

9                    MR. DEAN:  Objection, foundation.

10                   THE WITNESS:  I can't answer that, because I

11            don't know.

12                   MR. DEAN:  How could she possibly know what's --

13                   MR. DYKES-BEY:  Well, how --

14                   MR. DEAN:  -- Officer Jones --

15                   THE COURT:  Well, he may have told her.

16                   MR. DEAN:  Well, then he should ask that.

17                   THE COURT:  I'll allow -- I'll allow her to

18            answer.  Allow the question.  You can answer.

19                   THE WITNESS:  What?  Was the question, "Why

20            didn't Jones" --

21                   MR. DYKES-BEY:  I'll say --

22                   THE WITNESS:  -- "write the ticket?"

23                   THE COURT:  "Why didn't Jones -- why didn't

24            Jones write him the ticket?"

25     BY MR. DYKES-BEY:

1    Q    Yeah.  Well, why do you think --

2              THE COURT:  Hold on.  Mr. Dykes-Bey, hold on.

3              MR. DYKES-BEY:  Okay.

4              THE COURT:  The question was, "Do you know why

5         Jones didn't write him a ticket?"

6              THE WITNESS:  I have no idea --

7              THE COURT:  Answer the question if you can --

8              THE WITNESS:  -- why officer --

9              MR. DYKES-BEY:  Okay.

10             THE WITNESS:  -- Jones wouldn't have wrote the

11        ticket.

12   BY MR. DYKES-BEY:

13   Q    Do you know why an officer wouldn't write one?  A seasoned

14        officer wouldn't write one?

15   A    I have no idea.  I can't -- I can't answer the question

16        for --

17   Q    Your -- I said your 21 years --

18   A    -- other people.

19   Q    -- of experience?

20             THE COURT:  Mr. Dykes-Bey --

21             MR. DYKES-BEY:  Okay.

22             THE COURT:  I know -- I know it's -- you get

23        caught up and the adrenaline's pumping.

24             MR. DYKES-BEY:  Okay, yeah.

25             THE COURT:  I've been there myself.

-154-

1          MR. DYKES-BEY:  Okay, answer this question --

2          THE COURT:  But I will -- but let her -- you've

3     got to let her fully answer.

4          MR. DYKES-BEY:  All right.

5          THE COURT:  And then you can ask the next

6     question.

7     BY MR. DYKES-BEY:

8     Q    Go ahead.

9     A    I can't answer why an officer wouldn't write a ticket on

10         the violation.

11    Q    All right.

12    A    Every officer is their own being.

13    Q    Big difference, right.  Okay, now my question is, since

14         you've got 21 years of experience and that you was a

15         correction officer yourself once, why wouldn't you write

16         one if you discovered it?

17    A    Why wouldn't I write the ticket?

18    Q    Yeah.  What would be a reason for you not to write it, if

19         you had discovered it?

20    A    If I had discovered it, I would have wrote the ticket.

21    Q    There, you're telling me there is no instance where you

22         wouldn't have wrote it?

23    A    Not in a situation like that, no.

24    Q    Okay.  Have you ever heard of an instance where an officer

25         had discovered something but didn't know how to write the

| | | |
|---|---|---|
| 1 | | misconduct, and a superior officer who investigated with |
| 2 | | him wrote it instead?  Have you ever seen that? |
| 3 | A | Where the officer didn't write it instead, they may have |
| 4 | | asked for help on writing it, but the other officer didn't |
| 5 | | write it.  The officer who found it wrote it themselves. |
| 6 | Q | Okay.  But normally a person would receive a misconduct if |
| 7 | | they're found to be at fault for a misconduct violation? |
| 8 | A | Yes. |
| 9 | Q | You agree with that? |
| 10 | A | Yes. |
| 11 | Q | Okay.  But we know that no misconduct was written in this |
| 12 | | particular case.  We do know that, right? |
| 13 | A | Yes. |
| 14 | Q | Okay.  So I asked what made you believe the allegations set |
| 15 | | forth by North, and you said this note right here? |
| 16 | A | Correct. |
| 17 | Q | But there is no hearing report to establish that the letter |
| 18 | | sent to the prosecutor office reporting a crime constituted |
| 19 | | as legal work? |
| 20 | A | You were -- you were doing services for another prisoner |
| 21 | | and receiving payment for them. |
| 22 | Q | No, I said there is no hearing officer report to establish |
| 23 | | that, meaning a fact finder.  You see there was no -- there |
| 24 | | was no fact finder to establish that.  If you believed |
| 25 | | that, why didn't you assert that on the CSX 175 form?  If |

-156-

```
 1            you actually believed that?

 2    A     Why didn't I write --

 3    Q     That -- or -- or why did -- the question is this, why

 4          did -- I'll make it more simpler.  Why did you write on

 5          that CSX 175 form, "see attached," if you actually believed

 6          that you claimed you attached this to that?

 7    A     I attached it to it.  I attached the whole --

 8    Q     What -- what --

 9    A     -- packet together.

10    Q     Okay, but if you did that, why didn't you write on the

11          front of that, "see attached?"

12    A     Because I just wrote unemployable.

13    Q     Is all, is it common for MDOC employees to just deviate

14          from the structure or policy?

15    A     No.

16    Q     That's not a common practice?

17    A     No.

18    Q     But it was for you?

19    A     I included it all as a packet.  You got all the information

20          in a packet.

21    Q     Well, you said it was a common practice for you not to

22          assert anything --

23    A     I didn't -- I didn't write it on the 175 because you got

24          the entire packet together.  That was all stapled together.

25    Q     Okay.  There was --
```

1    A    Indicating you were on double O, and all the double O

2         information was within that packet.

3    Q    Right.  Now how'd we, because all I received was the actual

4         form.  I never received everything that came with it.

5         That's why I'm asking you why didn't you write "see

6         attached" on there?  Because the only thing that was on

7         there was the reclassification.  As a matter of fact --

8              MR. DYKES-BEY:  Can you pull number nine up

9         again?

10   BY MR. DYKES-BEY:

11   Q    I'm going to show you what was attached to it.  This right

12        here, your report, and this right here.

13             MR. DYKES-BEY:  Stop right there, sir.  Can you

14        pull it back up to the top?  That right there.

15   BY MR. DYKES-BEY:

16   Q    This memorandum where you telling me that I was terminated

17        from my job and that I had been placed on unemployable

18        status, that's what was attached to it.  Nothing else was

19        attached to that.  So I'm asking you if you had attached

20        that, would it not have made sense to just assert on there,

21        "See attached?"  If that's what you was going to do.  If

22        you wasn't going just write in the box like the policy say

23        write it in there, would it not have been appropriate to

24        just put in the box, "See attached?"

25   A    I probably could have put it in the box, "See attached,"

1          but because I stapled it all together, the lay-in notice

2          should have been with that as well.

3    Q    Now you claim that you know North.  Where you know North

4          from, if you never went to the chow hall.  You testified

5          you didn't go to the chow hall.  And your job was not in

6          the same location as food service.  So where did you -- you

7          didn't -- you said you didn't know Jones, you don't know

8          Meadows --

9    A    Didn't know him.

10   Q    -- but you know North?

11   A    I knew who North was because we had a food service meeting

12         and he was in it one time.  So to have a personal

13         conversation with North, no.  I just knew who he was.

14   Q    Wait, wait, wait -- okay, when did you become familiar with

15         who North was?

16   A    I couldn't -- honestly couldn't --

17   Q    Because Aramark --

18   A    -- couldn't answer that.

19   Q    -- I remembered like it was yesterday they came in in

20         February.  Jones knew -- went out, they came in, I believe

21         it was February 2013, because the allegations that came up

22         around May.  So I'm -- I was asking around what time did

23         this March meeting occur, and why is that North -- North,

24         he didn't even have no status.  He wasn't a manager, he

25         wasn't -- he wasn't anything.  As a matter of fact, North

1          had got escorted off the property for inappropriate

2          behavior, although he came back.  But I don't see where

3          you -- how y'all, you know, folks that had some meeting and

4          y'all met because you had Ms. Kerr, she was the manager,

5          and then you had the director, food service director, who

6          was over her.  North, well he was just a guy working in the

7          commissary and on kettle row.  He didn't have no status, so

8          I don't see how he was a part of any kind of meeting.  And

9          if he did, where did the meeting occur?

10                   MR. DEAN:  Your Honor, are we going to get a

11          question in here?

12                   MR. DYKES-BEY:  Yeah, where did the meeting

13          occur?

14                   MR. DEAN:  She just told him how she met with

15          him.

16                   MR. DYKES-BEY:  Okay, so what's --

17                   MR. DEAN:  So and then we're getting a long

18          soliloquy.

19                   THE COURT:  Mr. Dykes-Bey --

20     BY MR. DYKES-BEY:

21     Q    Okay, where did the meeting occur?

22     A    It happened in food service.

23     Q    In food service?

24     A    Yes.

25     Q    Okay, and you don't know what time?

1    A    I don't know what --

2    Q    The reason I'm asking --

3    A    -- time.  I don't know the day.

4    Q    -- about the time, can you give me an estimation?

5    A    That was four years ago.  I don't know the exact time and

6         day of when --

7    Q    How many meetings do y'all have with food service?

8    A    We did not have very many.  Not very many at all.  It was

9         when they first started coming to the facility, when

10        Aramark first started taking over.

11   Q    Uh-huh.  What was your natural course of termination?  Why

12        was that the natural course versus the 30 day condition?

13   A    What do you mean my natural course of termination?

14   Q    Yeah, why was that your -- your first instance?

15   A    Why was that one?  Because it was --

16   Q    Instead of what the food service had recommended?

17   A    Because that it was a safety and security issue of the

18        institution.  You jeopardized the trust of the position.

19   Q    Okay.  So you're saying that -- okay, go to this, the

20        policy which is Exhibit 13, I believe.

21             THE COURT:  That's a program classification.

22             MR. DYKES-BEY:  Yeah, that's -- okay, yeah.  Go

23        ahead.  Scroll down.  Not that.  It's another one.  Go to

24        the next one.  Okay, this what -- that what I'm going to

25        get to that in a minute.  This says, this was written by

```
 1              Ms. Rogers, my case manager.  She put on there that I

 2         haven't received a misconduct since 2013.  She wanted --

 3         she asked you about this.  You wrote her back and said

 4         there is reasons for food service.

 5                   THE COURT:  Is that a question?

 6    BY MR. DYKES-BEY:

 7    Q    The question is, which one is it?  Is it because of the

 8         legal work situation, or is it because of various reasons

 9         for food service?

10    A    It says, "No employment," and it's circled with a question

11         mark, right?

12    Q    She ask --

13    A    I'm answering your question.

14    Q    She asked, I'm just going to repeat it one more time.  My

15         ARUS asked on what date this alleged misconduct, what did

16         she want to identify it.  Because I haven't had a

17         misconduct since 2013.  You wrote her back and said,

18         "6/3/14, various reasons from food service."  I'm asking

19         you which one is it?

20    A    I'm --

21    Q    Is it because of the note between me and Mr. Johnson, or is

22         it because there is reasons from food service?

23    A    It has to do with neither of them on why I wrote "6/3/14

24         various reasons from food service."  I wrote that because

25         it says, "No employment, question mark.  Why?"  And I put
```

1        in parentheses, "6/3/14, various reasons from food

2        service."  That's why you have no employment.

3  Q    So why is that arrow from here to --

4  A    I have no idea why that arrow is there.  I did not do that

5        arrow.

6  Q    Oh.  Okay.  There was only two explanations that you gave.

7        One is in the grievance that you -- that's another thing.

8        You said that when the prisoner writes a -- files a

9        grievance that the person who you filed a grievance with is

10       never interviewed?

11  A    I didn't say that.

12              MR. DEAN:  That's not what she said, your Honor.

13              THE WITNESS:  I did not say that.

14  BY MR. DYKES-BEY:

15  Q    Okay, I'm just asking the question for clarification.

16  A    Okay.

17  Q    So that person is interviewed according to the policy, if

18        you pull it up, what grievance is.  I think it's -- oh,

19        it's right there, at 00, the first one.  This the grievance

20        policy.  Now the grievance, according to the grievance

21        policy, if I am mistaken --

22              MR. DYKES-BEY:  Can you go to the grievance

23        process on step one?

24  BY MR. DYKES-BEY:

25  Q    I believe the grievance policy calls for -- for step one.

1              MR. DYKES-BEY:  For step one you got to keep

2        going down.  Right there.  Right there.

3    BY MR. DYKES-BEY:

4    Q    See?  It says, "If the grievance is accepted, the grievance

5         coordinator should assign appropriate respondent to

6         identify the date by which their response is due.  The

7         respondent shall generally be the supervisor or the person

8         being grieved, except for grievances involving the parole

9         board."  Okay, we going to go on it says, "If the issue of

10        an" -- okay.  Right here.  "The respondent shall interview

11        the grievant unless he or she refuse to participate in the

12        interview.  The respondent is not assigned to the location

13        at which the grievant is confined or if the grievant is

14        under parole -- parole in the community.  The respondent

15        does" -- where -- where you go -- where you go that fast?

16        But anyway, anyway, my question is, do the MDOC interview

17        both parties?

18   A    Yes.

19   Q    Okay.  If they interview both parties, can you recall what

20        your response was to the grievance that I filed against

21        you?

22   A    I --

23   Q    Because you said you didn't have no knowledge that I wrote

24        a grievance?

25   A    I didn't is a that I didn't have knowledge that -- you

-164-

1          didn't write a grievance on me.  On the other people I

2          didn't have knowledge of it, but when I get grievances

3          wrote on me, my supervisor will call me and ask me about

4          them.

5     Q    Okay.

6                    MR. DEAN:  Your Honor, I'm going to object here

7          on foundation.  This passage he had the witness read is

8          talking about the grievant.  The prisoner writing the

9          grievance --

10                   MR. DYKES-BEY:  Yeah.

11                   MR. DEAN:  -- not the grievee.  So --

12                   MR. DYKES-BEY:  Well, she asked a question --

13                   THE COURT:  Hold on --

14                   MR. DEAN:  So your line of questioning is

15         misleading.

16                   THE COURT:  -- Mr. Dykes-Bey.

17                   MR. DEAN:  It's misleading because it's implying

18         that the interview has to be with the grievant implying

19         that it was her, when actually the policy is talking about

20         the grievant.

21                   THE COURT:  Okay.  Well, you --

22                   MR. DYKES-BEY:  It's --

23                   THE COURT:  Mr. Dykes-Bey, hold on.  It seems to

24         me that's grounds for argument.  The jury will have this

25         exhibit in the jury room.  They can read it for themselves

1    and draw whatever conclusions they think are appropriate.

2              MR. DYKES-BEY:  Well, I was going to say I could

3    have continued to read, but didn't want to take all day

4    reading the whole policy, but it's in there that both

5    parties are interviewed.  They appoint a designated person

6    who has no stake in it to do an investigation.

7              THE COURT:  Ask her a question.

8    BY MR. DYKES-BEY:

9    Q    Okay.  So you do agree that both parties are interviewed --

10   A    Yes.

11   Q    -- by a neutral person?

12   A    Yes.

13   Q    And you said that you don't recall what your response

14        was --

15   A    No, I don't recall it.

16   Q    -- in that particular grievance.

17             MR. DYKES-BEY:  Okay.  Well, with that, I'm

18   going to make sure I've got -- with that, I'm going to

19   close off.  Thank you.

20             THE COURT:  All right, thank you, Mr. Dykes-Bey.

21             Ladies and gentlemen, we have 20 minutes left

22   until our break.  I regret to inform you that the judge has

23   to use the little judge's room, so we're going to take like

24   a five minute break, and then we'll come back and we'll go

25   to two, and we'll adjourn at two as promised.  So we'll be

```
1              adjourned for about five minutes.

2                        MR. DEAN:  Well, if it will help --

3                        THE COURT:  Yeah.

4                        MR. DEAN:  -- I don't think I have any redirect,

5              so.

6                        THE COURT:  Oh, you don't?  Okay.

7                        MR. DEAN:  Yeah, we might be done for the day

8              or --

9                        THE COURT:  All right, well, I'll tell you what,

10             we'll still adjourn, I'll talk to Mr. Dean and

11             Mr. Dykes-Bey.  It's possible that we'll be done for the

12             day now.  You may step down, Ms. Kerr.  Thank you for your

13             testimony.

14                       (At 1:42 p.m., witness excused.)

15                       THE COURT:  All right, Stef.

16                       (At 1:42 p.m., court in recess.)

17                       (At 1:47 p.m., court reconvened, all parties

18             present.)

19                       THE COURT:  All right, so Mr. -- you may be

20             seated.  Mr. Dean, you -- are you going to offer any

21             additional evidence?

22                       MR. DEAN:  No.

23                       THE COURT:  So you're going to rest?

24                       MR. DEAN:  We'll rest, yup.

25                       THE COURT:  Okay.  Mr. Dykes-Bey, do you intend
```

1              to offer any rebuttal evidence?

2                        MR. DYKES-BEY:  No.

3                        THE COURT:  All right.  So the evidence is done.

4         What I'm proposing is we'll adjourn, I'll bring the jury

5         back in, tell them that, we'll adjourn for the day.  I've

6         got the jury instructions, which I'll give you each a set

7         of.  You can look those over tonight.  I assume there's no

8         problem with him taking these jury instructions back with

9         him, gentlemen?

10                       Okay, you can both work on your closing

11        arguments, we'll come back 9 o'clock tomorrow morning.

12        You'll deliver closing arguments.  I'll then read the

13        instructions to the jury and send them back to deliberate.

14        So, all right.  Anything else we should talk about before I

15        bring them back?  Mr. Dykes-Bey, anything?

16                       MR. DYKES-BEY:  No, sir.

17                       THE COURT:  All right, Mr. Dean?

18                       MR. DEAN:  No, your Honor.

19                       THE COURT:  Okay.  Well, let's get the jury in.

20                       I have a verdict form, too, which I'll include

21        with the --

22                       MR. DYKES-BEY:  Okay.

23                       THE COURT:  -- instructions.  Gentlemen, I'd

24        like -- you had him here early today, thank you for that.

25        You know, by 8:30 tomorrow, just in case there's any legal

1          issues we need to talk about.

2                    (At 1:49 p.m., jury enters courtroom.)

3                    THE CLERK:  Please be seated.

4                    THE COURT:  All right, ladies and gentlemen,

5     Mr. Dean has rested the defense case, so they have

6     presented all the evidence they're going to present.

7     Mr. Dykes-Bey has decided not to present any rebuttal

8     evidence, so you've now heard all the evidence you're going

9     to hear in the case.

10                   We're going to adjourn for the day.  I'm going

11    to -- I prepared jury instructions.  Mr. Dykes-Bey and

12    Mr. Dean need to review those, so they'll do that tonight.

13    They'll work on their closing arguments tonight.  We'll

14    come back 9 o'clock tomorrow morning and you'll hear the

15    closing argument from each side.  As I said, Mr. Dykes-Bey

16    will go first, Mr. Dean will then follow him, and then

17    Mr. Dykes-Bey will be able to give a brief rebuttal to

18    whatever Mr. Dean says, if he chooses to.  And then I will

19    read you the jury instructions and we'll send you back to

20    the jury room to decide.  So that's the plan.

21                   Please remember my cautionary instruction.

22    Don't discuss the case with anyone, including yourself.  I

23    know it's a pain to not be able to go home and talk to your

24    spouse or, you know, kids or whoever and tell them, you

25    know, what's going on down here, but you just can't do it.

1    So when the case is over you'll be able to talk to them

2    about it, but for now, you can't.

3                So go on and have a wonderful evening.  Enjoy

4    what's left of this gorgeous day.  You'll notice the

5    entertainment.  They knew we were finishing I guess, so

6    they ended the entertainment.  So you'll have to go make

7    your own.  All right, we'll be adjourned.

8                THE CLERK:  All rise, please.

9                (At 1:50 p.m., proceedings concluded.)

10                          -oo0oo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3

4                        I, Bonnie L. Rozema, CER, do hereby certify

5       that the foregoing transcript consisting of 171 pages, is a

6       complete, true, and accurate transcript of the proceedings and

7       testimony, to the best of my ability from the audio recording,

8       held in this case on August 22, 2018.

9                                I do further certify that I prepared the

10      foregoing transcript.

11

12

13

14      /s/  Bonnie L. Rozema

15      Bonnie L. Rozema, CER-5571
        2700 92nd Street, S.W.
16      Byron Center, MI  49315
        (616) 878-9091
17

18      Notary Public in and for
        Kent County, Michigan
19      My commission expires:
        March 26, 2019
20      Acting in the County of Kent

21

22

23

24

25

—171—